UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,

|                          |                         |
|--------------------------|-------------------------|
| Plaintiff,               | **MEMORANDUM & ORDER**  |
| -against-                | 09 CV 5195 (DRH) (ETB)  |

THE INCORPORATED VILLAGE OF OLD
WESTBURY, THE BOARD OF TRUSTEES OF
THE INCORPORATED VILLAGE OF OLD
WESTBURY, MAYOR FRED CARILLO, in his
official capacity and individually, TRUSTEE
HARVEY BLAU, in his official capacity and
individually, TRUSTEE STEVEN GREENBERG,
in his official capacity and individually, TRUSTEE
HARVEY SIMPSON, in his official capacity and
individually, TRUSTEE MICHAEL WOLF, in his
official capacity and individually, FREDERICK P.
CLARK ASSOCIATES, INC., in its corporate
capacity and as planning and land use consultant to
the Village of Old Westbury, DAVID J. PORTMAN,
in his official capacity as Village Planner of the
Village of Old Westbury and individually, TARA M.
NESI, in her official capacity as planning and land
use consultant to the Village of Old Westbury and
individually, MICHAEL MALTINO, in his official
capacity as Superintendent of Buildings and Public
Works of the Village of Old Westbury and individually,
LEGGETTE BRASHEARS & GRAHAM, INC., in its
corporate capacity and as groundwater and environmental
engineering consultants to the Village of Old Westbury,
and THOMAS P. CUSAK

Defendants.
--------------------------------------------------------------X

**APPEARANCES:**

**WINSTON & STRAWN LLP**
Attorneys for Plaintiff
200 Park Avenue
New York, New York 10166
By:     Eric M. Robinson, Esq.
        Vincent A. Sama, Esq.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Attorneys for Defendants The Incorporated Village of
Old Westbury, The Board of Trustees of the Incorporated
Village of Old Westbury, Mayor Fred Carillo, Trustee
Harvey Blau, Trustee Steven Greenberg, Trustee Harvey
Simpson, Trustee Michael Wolf, and Michael Maltino
77 Water Street, Suite 2100
New York, New York 10005
By:     Jason Ederer, Esq.
        Peter J. Biging, Esq.

**MCCULLOUGH, GOLDBERGER & STAUDT LLP**
Attorneys for Defendants Frederick P. Clark Associates, Inc.,
David J. Portman and Tara M. Nesi
1311 Mamaroneck Avenue, Suite 340
White Plains, New York 10605
By:     Evan M. Eisland

**WILSON, ELSER. MOSKOWITZ, EDELMAN & DICKER LLP**
Attorneys for Defendants Leggette Brashears & Graham, Inc. and
Thomas P. Cusack
177 Broad Street, Sixth Floor
Stamford, Connecticut 06901
By:     Anthony B. Corleto

**HURLEY, Senior District Judge:**

Plaintiff The Roman Catholic Diocese of Rockville Centre, New York ("the

Diocese") seeks recovery for alleged violations of the Religious Land Use & Institutionalized

Persons Act, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA") as well as 42 U.S.C. §§ 1983, 1985, and

1986.  Presently before the Court are: (1) a motion to dismiss filed by defendants The

Incorporated Village of Old Westbury (the "Village"), The Board of Trustees of the Incorporated

Village of Old Westbury (the "Board"), Mayor Fred Carillo ("Carrillo"),[1] Trustee Harvey Blau,

---

[1]     The Village Defendants state that Mayor Fred Carrillo's name is incorrectly spelled in the case caption as "Carillo."  (Vill. Defs.' Mem. at 1 n.1.)

Trustee Steven Greenberg, Trustee Harvey Simpson, Trustee Michael Wolf (collectively, the "Trustees"), and Michael Maltino ("Maltino") (collectively, the "Village Defendants") pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), or, alternatively, a motion to strike redundant, immaterial, impertinent, or scandalous matter from the Complaint pursuant to Federal Rule of Civil Procedure 12(f) (Docket No. 29); (2) a motion to dismiss filed by defendants Frederick P. Clark Associates, Inc. ("FPCA"), David J. Portman ("Portman"), and Tara M. Nesi ("Nesi") (collectively, the "FPCA Defendants") pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), and a motion for costs and disbursements of that motion, including reasonable attorneys' fees (Docket No. 34); and (3) a motion to dismiss filed by defendants Leggette Brashears & Graham, Inc. ("LBG") and Thomas P. Cusack ("Cusack") (collectively, the "LBG Defendants") pursuant to Federal Rule of Civil Procedure 12(b)(6) (Docket No. 26).[2]  For the reasons stated below, the motions are GRANTED in part and DENIED in part.

## BACKGROUND

The following facts are taken from the Complaint, including the voluminous exhibits attached thereto,[3] and are presumed true for purposes of these motions.

The Diocese is a nonprofit religious corporation formed pursuant to an act of the New

---

[2]     The FPCA Defendants and the LBG Defendants will be referred to collectively as the "Consultant Defendants."

[3]     The Court may properly rely on material attached to the Complaint when deciding the instant motions.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "Pleadings," for purposes of a motion to dismiss under Rule 12(b)(6) "include not just the four corners of the complaint, but also any written instrument attached to it as an exhibit or any statements or documents incorporated by reference."  *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 59 (S.D.N.Y. 2010) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)) (internal quotation marks omitted).

York State Legislature. The Village encompasses approximately twelve square miles of land in Nassau County, New York. The Board is the legislative governing body of the Village and is comprised of the Mayor and four Trustees. Maltino has been employed by the Village since at least April 2009 as the Superintendent of Buildings and Public Works. FPCA provides community planning, developmental, environmental and transportation consulting services and rendered such services to the Village during the relevant time period. Between approximately 1995 and 2008, Portman "provided his services to the Village through FPCA" and "[t]he Village from time-to-time held him out, and more than one of its Trustees referred to him as the Village Planner." (Compl. ¶ 19.) Nesi, a Senior Associate with FPCA, assumed Portman's role in 2008. LBG provides groundwater and environmental engineering consulting and related services to its clients, including the Village. Cusack is the Senior Vice President of LBG.

## I.     *The Property*

In 1993, the Diocese entered into a contract with Old Westbury Farms, Inc. (which is not a party to this action) to purchase approximately ninety-seven acres of land located within the Village (the "Property"). The transaction never closed and the federal government ultimately took title to the Property from Old Westbury Farms, Inc. through a forfeiture proceeding. On March 21, 1995, the Diocese acquired the Property from the federal government and is currently the sole fee owner.

As early as 1993, the Diocese learned of a Village land use ordinance that did not permit the use of land within the Village for the burial of human remains. At the Village's instruction, sometime in 1993 the Diocese submitted an application to the Board for a zoning change with respect to its planned development of the Property as the Queen of Peace Cemetery ("Queen of

Peace").  In early April 1995, after the Diocese acquired title to the Property, it asked the Village

to proceed with its consideration of the Diocese's request for the required zone change and a

special use permit.  In May 1995, the Village informed the Diocese that it would be required to

present its proposed development plan at a public hearing "to prove" that the development of

Queen of Peace "is in accord with the comprehensive plan of the Village."  (Compl. ¶ 55.)  The

Diocese alleges that "as of May 1995 [there was] no such thing as a discernible and objective

comprehensive plan adopted to or adhered to by the Village," and that "the uncertainties and

subjectivity of any comprehensive plan were used by the Village as a pretext."  (*Id.* ¶¶ 56, 57.)

In October 1995, the FPCA and Portman provided the Village with a lengthy report

opining that the Diocese's proposed development of Queen of Peace constituted a commercial

enterprise or business use of property that was inconsistent with the Village's comprehensive

plan.  After a public hearing held on November 30, 1995, the Board took a formal vote on March

18, 1996 and denied the Diocese's application, concluding that the proposed Queen of Peace was

not a religious use of real property but would be a "huge commercial operation outside the

Village's framework."  (*Id.* ¶ 63A.)

## II.     *The State Court Action as Described in the Complaint*

In 1996, the Diocese commenced what would ultimately become a long and protracted

litigation that went back and forth between the New York State Supreme Court, Nassau County

(the "State Supreme Court") and the Appellate Division, Second Department (the "Appellate

Division") to challenge the Village's zoning ordinance and the Board's denial of the Diocese's

application to develop Queen of Peace (the "State Court Action").

Following the Diocese's unsuccessful First Amendment-based constitutional attack on

the portion of the Village's zoning ordinance that prohibited the development of cemeteries within its borders (Compl., Ex. 2 at 17), a non-jury declaratory judgment action was tried before the State Supreme Court to "determine whether plaintiffs' proposed [Queen of Peace project] . . . would constitute a religious use of property entitling plaintiffs to additional considerations and accommodations under defendants' Zoning Code." (*Id.* at 1.) In an Order dated November 9, 2000, the State Supreme Court determined that the Diocese's proposed use of the Property to develop a cemetery did constitute conduct for a religious purpose. (*Id.* at 22.) Therefore, the court annulled the Board's denial of the Diocese's application for a special use permit and remitted the matter to the Board for the issuance of such a permit consistent with its opinion. (*Id.* at 26-27.) That ruling was made part of a Judgment entered on January 16, 2001. (Compl., Ex. 3.)

In March 2001, the Village enacted amendments to the Village Code (the "2001 Act") that Plaintiff contends "specifically and impermissibly targets religious institutions and restricts religious practice and in effect prohibits land use within the Village as a cemetery, without regard to the determination" in the State Court Action."[4] (*Id.* ¶ 74A.) Meanwhile, the Village appealed the State Supreme Court's November 9, 2000 Order and January 16, 2001 Judgment.[5] On April 15, 2002, the Appellate Division upheld the trial court's determination that the Diocese's proposed use of the Property was a "religious use," but found that the "trial court erred in directing the defendant Board . . . to issue a special permit to the Diocese upon remittitur."

---

[4]    The 2001 Act was enacted as a Local Law 4-2001.

[5]    It appears that the January 16, 2001 judgment was amended on November 7, 2001, but a copy of the amended judgment was not provided to the Court.

(Compl., Ex. 3 at 1-2.)  The Appellate Division found that the Diocese's proposed development of Queen of Peace qualified as a type I action under the State Environmental Quality Review Act ("SEQRA") and, therefore, carried a presumption that such development would likely result in a significant adverse environmental impact.  (*Id.* at 2.)  The court found that an Environmental Impact Statement ("EIS") might be necessary.  (*Id.*)  Therefore, the Appellate Division remanded the matter to the Board to determine the environmental impact of the Diocese's proposed development of Queen of Peace "including examination under SEQRA of the effect of any possible mitigating measures."  (*Id.*)  The court further directed that "[a] determination on the plaintiffs' application shall be consistent with the preferential treatment afforded the religious use of this property."  (*Id.*)  On September 10, 2002, the New York Court of Appeals dismissed an appeal from the Appellate Division's April 15, 2002 Order.  (Compl., Ex. 3.)

### III.    *Subsequent Interaction Between The Diocese and Defendants*

The Diocese alleges that "[f]rom 2002 through [2009], the Village, Carillo, Blau, Greenberg, Simpson, Wolf, Maltino, the Consultant Defendants, and other involved Village officials have abused virtually every device and mechanism available to prevent the development of Queen of Peace."  (Compl. ¶ 72.)  In particular, the Diocese asserts that each of the Defendants "repeatedly and continually used . . . and appl[ied] in a disparate and discriminatory manner the New York State Environmental Quality Review Act ("SEQRA") to delay . . . approval of the Diocese's application to develop Queen of Peace, and . . . to add as much as possible to the Diocese's expenditures in connection with that process . . . ."  (*Id.* ¶ 74D.)  For example, the Diocese contends that the Property was subjected to repeated soil and groundwater testing "with the hope of achieving results adverse to the Diocese."  (*Id.* ¶ 74D.iii.)

The Diocese further alleges that in 2002 the Village authorized the construction of a private golf course on the "Schonfeld Property," located within the Village, and that "[t]he initial testing standards applied" by the Village and Consultant Defendants with respect to irrigation, fertilizer, herbicide, and pesticide use on the Schonfeld Property "were materially less stringent" than the standards applied to the Property. (*Id.* ¶ 74D.iv.)[6] Further, the Diocese asserts that the FPCA, Portman, and Nesi have advocated for the "imposition of land use standards and restrictions with respect to the Diocese and its application to develop Queen of Peace in a manner more restrictive than those adopted by New York State." (*Id.* ¶ 74J.)

In April 2009, Maltino "who holds himself out as having police power within the Village," conducted several warrantless searches of the Property. (*Id.* ¶ 74H.) The Diocese contends that these searches were conducted "to harass the Diocese in retaliation for continuing to insist that the long-abandoned structures on its Property had no historic value, and in an attempt to compel the Diocese to maintain them so that a pretextual historic significance concern would continue to require attention and the expenditure of resources to address same by the Diocese." (*Id.*)

## IV.    The Final Environmental Impact Statement

On July 1, 2009, a Final Environmental Impact Statement ("FEIS") regarding the proposed development of the cemetery was submitted to the Village, Board, and Trustees. According to the Diocese, "[t]his is the last material step for issuance [of a] permit to develop

---

[6]    The Diocese also alleges that the Consultant Defendants advised the Village that it would be acceptable for the Schonfeld Property to use computer modeling to determine projected nitrate concentrations in groundwater, but that the Diocese was required to complete repeated and expensive drilling and extraction of groundwater samples to check nitrate concentrations.

Queen of Peace." (Compl. ¶ 76.) Although the Board was required to act on the FEIS within seventy-five days, the Board failed to take any such action at its October 19, 2009 or November 16, 2009 meetings. The Diocese contends that there are only two parish cemeteries in Nassau County, and both are filled to capacity. Accordingly, while the Diocese waits for the Board to act on the FEIS, many parishioners have been "forced . . . to choose burial in a non-Catholic cemetery." (*Id.* ¶ 82.)

## V.     *The Complaint*

The Complaint contains eight causes of action and seeks damages and declaratory relief. The first and fourth causes of action assert claims under RLUIPA. The second, third, fifth, and sixth causes of action allege violations of the Diocese's First and Fourteenth Amendment Rights. The seventh cause of action asserts a claim under 42 U.S.C. § 1985(3), and the eighth cause of action asserts a claim under 42 U.S.C. § 1986.

## VI.    *Developments Subsequent to the Filing of the Complaint*[7]

The Complaint was filed on November 30, 2009. In April 2010, the Board issued a "Statement of Findings" pursuant to SEQRA[8] and, in June 2010, the Board adopted a "Resolution Granting a Special Exception Permit and Related Variances to the Roman Catholic Diocese of Rockville Centre Authorizing the Use of Certain Property Within the Village of Old

---

[7]     The following factual information is taken from letters submitted to the Court by the Diocese on July 16, 2010 (Docket No. 38) and August 27, 2010 (Docket No. 46), by the LBG Defendants on July 16, 2010 (Docket No. 39), and by the Village Defendants on July 21, 2010 (Docket No. 40) and September 3, 2010 (Docket No. 49).

[8]     The Village Defendants claim that "[t]o the extent the Diocese purports to take issue with the Findings Statement recommendations, it should be noted that the time within which the Diocese could lawfully challenge it has now passed." (Vill. Defs.' Sept. 3, 2010 Letter at 2.)

Westbury as a Place of Worship/Cemetery" (the "Resolution"). (Pl.'s July 16, 2010 Letter, Ex.

1.) According to the Village Defendants, "[t]here is no question that the Diocese has been

authorized to proceed with its development," although the Village Defendants acknowledge that

"the Diocese apparently takes issue with certain conditions imposed upon the issuance of the

permit." (Vill. Defs.' Sept. 3, 2010 Letter at 2.) Indeed, the Diocese does appear to strenuously

object to certain of the conditions contained in the Resolution, and contends that "it actually

authorizes the Diocese to do nothing, and substantially restricts religious use." (Pl.'s Aug. 27,

2010 Letter, at 2.)[9]

## DISCUSSION

### I.      *Legal Standards*

Each of the motions presently before the Court seek the dismissal of the Complaint

pursuant to Rule 12(b)(6), and two of the motions alternatively seek dismissal pursuant to Rule

12(b)(1).

### A.      *Rule 12(b)(1)*

A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule

12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it."

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In contrast to the standard for a

motion to dismiss for failure to state a claim under Rule 12(b)(6), a 'plaintiff asserting subject

matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'"

*MacPherson v. State St. Bank & Trust Co.*, 452 F. Supp. 2d 133, 136 (E.D.N.Y. 2006) (quoting

---

[9]      The Diocese takes the position that "the content of the Resolution" does not
necessitate "the filing of an amended Complaint." (Docket No. 38.)

*Makarova*, 201 F.3d at 113); *see also Tomaino v. United States*, 2010 WL 1005896, at *1

(E.D.N.Y. Mar. 16, 2010). "On a Rule 12(b)(1) motion, the court may consider matters outside

the pleadings, including affidavits, documents, and testimony if necessary." *Tsanganea v. City*

*Univ. of N.Y.*, 2008 WL 4054426, at *3 (S.D.N.Y. Aug. 28, 2008) (citing *Kamen v. Am. Tel. &*

*Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)).

**B.** ***Rule 12(b)(6)***

Rule 8(a) provides that a pleading shall contain "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has

recently clarified the pleading standard applicable in evaluating a motion to dismiss under Rule

12(b)(6).

First, in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), the Court disavowed

the well-known statement in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint

should not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See*

*Twombly*, 550 U.S. at 561 (quoting *Conley*, 355 U.S. at 45-46). Instead, to survive a motion to

dismiss under *Twombly*, a plaintiff must allege "only enough facts to state a claim to relief that is

plausible on its face." *Id*. at 570.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does
> not need detailed factual allegations, a plaintiff's obligation to
> provide the grounds of his entitlement to relief requires more than
> labels and conclusions, and a formulaic recitation of the elements of
> a cause of action will not do. Factual allegations must be enough to
> raise a right to relief above the speculative level, on the assumption
> that all the allegations in the complaint are true (even if doubtful in
> fact).

*Id.* at 555 (citations and internal quotation marks omitted).

More recently, in *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937 (2009), the Supreme Court provided further guidance, setting forth a two-pronged approach for courts deciding a motion to dismiss. First, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual assumptions." *Id.* Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 555).

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. The Court defined plausibility as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 1949 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must look to the allegations on the face of the complaint, but may also consider "[d]ocuments that are attached to the complaint or incorporated in it by reference." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *see also Gillingham v. GEICO Direct*, 2008 WL 189671, at *2 (E.D.N.Y. Jan. 18, 2008) (noting that a court considering a motion to dismiss "must limit itself to the facts stated in the

complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint") (citation and internal quotation marks omitted).

## II.    *Plaintiff's Section 1983 Claims Against The Consultant Defendants Are Dismissed*

The Consultant Defendants argue[10] that Plaintiff's Section 1983 claims must be dismissed because the Complaint fails to allege that the Consultant Defendants acted under "color of law." (FPCA Mem. at 9-11.)  In particular, the Consultant Defendants assert that a "consultant's professional opinions and the advice he offers to municipalities are not state action and thus cannot support claims against such consultants for liability under section 1983."  (*Id.* at 12 (quoting *R-Goshen LLC v. Vill. of Goshen*, 289 F. Supp. 2d 442, 445 (S.D.N.Y. 2003)). Similarly, the Consultant Defendants contend that Plaintiff's RLUIPA claims must be dismissed because Plaintiff has failed to allege that they, as "private actors," were acting "under color of State Law." (*Id.* at 14.)

### A.    *Legal Standard*

A cause of action under Section 1983 may lie against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983; *see also Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) ("Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States.").  "Section

---

[10]    The Court has considered each of the arguments made by the FPCA Defendants and the LBG Defendants and, because of the overlapping assertions and legal positions therein, presents them together as arguments made by the Consultant Defendants.

1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes*, 13 F.3d at 519.

In order to maintain a Section 1983 claim, "a plaintiff must establish a deprivation of constitutional rights 'under color of law.'" *Faraldo v. Kessler*, 2008 WL 216608, at *3 (E.D.N.Y. Jan. 23, 2008) (quoting *Briscoe v. LaHue*, 460 U.S. 325, 329-30, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983)).[11]  Thus, "Section 1983 liability may only be imposed upon wrongdoers 'who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.'" *Id.* (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988)); *see also R-Goshen LLC*, 289 F. Supp. 2d at 445 ("Perhaps most importantly, excluded from the reach of Section 1983 is private conduct 'however discriminatory or wrongful.'") (quoting *Elmasri v. England*, 111 F. Supp. 2d 212, 217 (E.D.N.Y. 2000)).

Accordingly, "private actors are not liable under section 1983 unless 'the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State.'" *Omnipoint Commc'ns Inc. v. Comi*, 233 F. Supp. 2d 388, 393 (N.D.N.Y. 2002) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).  The plaintiff "bears the burden of proof to establish whether a private actor has acted under color of state law." *Id.*

B.    ***The Consultant Defendants Did Not Act Under "Color of Law"***

As the Consultant Defendants point out (*see* FPCA Mem. at 11-12), numerous courts within the Second Circuit have held that consultants merely providing advice to aid in

---

[11]    "[I]t is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."  *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929 (1982).

municipalities' decisions are not engaging in state action for purposes of Section 1983 liability. *See Stepien v. Schaubert*, 2010 WL 1875763, at *5 (W.D.N.Y. Feb. 23, 2010) ("Generally, a consultant's professional opinions and the advice he offers to municipalities are not state action and thus cannot support claims against such consultant[ ] for liability under section 1983."); *Westhampton Beach Assocs., LLC v. Strebel*, N.Y.L.J., Mar. 2, 2009, at 23 (E.D.N.Y. Feb. 19, 2009) (finding no Section 1983 liability against private attorneys and planning consultants providing advice to defendant Village); *R-Goshen LLC*, 289 F. Supp. 2d at 445 ("A consultant's professional opinions and the advice he offers to municipalities are not state action and thus cannot support claims against such consultants for liability under section 1983."); *Omnipoint Commc'ns Inc.*, 233 F. Supp. 2d at 395 ("Where a private actor merely provides professional advice, such advice cannot be considered state action for purposes of section 1983.").

The Court has thoroughly examined each of the Complaint's allegations as well as the numerous exhibits attached thereto, many of which constitute reports and correspondence prepared for the Village and/or Board by the Consultant Defendants. Upon review of this material, the Court finds that the Diocese has not sufficiently alleged that the Consultant Defendants did anything more than provide professional opinions and advice to the Village and Board. None of the factual allegations in the Complaint have "facial plausibility" sufficient to "allow[ ] the court to draw the reasonable inference" at this juncture that the Consultant Defendants played any role in the ultimate decision-making process regarding the Diocese's application to develop Queen of Peace. *See Ashcroft*, 129 S. Ct. at 1949. The only allegation that might even suggest otherwise is the Diocese's contention that "[t]he Village from time-to-time held [David Portman] out, and more than one of its Trustees referred to him as[,] the Village

15

Planner." (Compl. ¶ 19.) The Diocese does not specify when, to whom, or in what context the Village and/or Trustees "held [Portman] out" or "referred to him as the Village Planner,"[12] and does not allege (or explain) why such a reference would, in any event, transform Portman's consulting services into state action taken under color of law. *See Omnipoint Commc'ns Inc.*, 233 F. Supp. 2d at 390 (finding consultant not acting under color of law even when it negotiated lease with plaintiff on behalf of defendant Town).

The Diocese also alleges that the Consultant Defendants were "active participants in the conspiracy to deny to the Diocese . . . their rights to establish and use Queen of Peace for religious purposes." (Pl.'s FPCA Opp'n at 12.) An otherwise private entity can act "under color of law" by "engag[ing] in a conspiracy with state officials to deprive a person of his federal rights." *Brewster v. Nassau Cnty.*, 349 F. Supp. 2d 540, 546-47 (E.D.N.Y. 2004) (citing *Tower v. Glover*, 467 U.S. 914, 920 (1984)). "Claims alleging conspiracies to violate civil rights are held to a heightened pleading standard." *Id.* at 547 (citing *Julian v. N.Y. City Transit Auth.*, 857 F. Supp. 242, 252 (E.D.N.Y. 1994)). To survive a motion to dismiss, the Complaint must contain allegations of: (1) an agreement by a state actor and private entity (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal, which caused harm. *See id.* (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-35 (2d Cir. 2002)).

The Diocese's allegations regarding the Consultant Defendants are insufficient to support

---

[12]    In their motion papers, the Village Defendants state that "for the purposes of 'Defense and Indemnification,' the Village Code specifically defines consultants 'duly appointed to render services to the Village' as 'employees.'" (Vill. Defs.' Mem. at 19 n.8 (quoting Vill. Code § 30-1).) The Village Defendants further state that the "FPCA has been for many years the Village's duly appointed planner." (*Id.*)

a conspiracy claim under Section 1983. Although the Complaint alleges the existence of contractual relationships between the Village Defendants and the FPCA Defendants as well as the LBG Defendants, respectively, the Diocese does not allege any facts "indicating an agreement to act in concert to harm" it. *See id.* Each example of the Consultant Defendants' "independently actionable and conspiratorial involvement" involves their requests for testing and information in connection with the Diocese's application, analyses of test results, and opinions rendered to the Village and/or Board. (*See* Pl.'s FPCA Opp'n at 5-7.) As noted above, this conduct constituted the rendering of professional advice and consulting services – not state action taken under color of law. "An otherwise invalid 1983 claim cannot survive a motion to dismiss merely by mentioning the word 'conspiracy.'" *Brewster*, 349 F. Supp. 2d at 547.

### C.    *Plaintiff Has Not Shown That The Consultant Defendants Engaged in State Action Under the Close Nexus or Joint Activity Tests*

A private entity may act under color of law if it is "a willful participant in joint activity with the State or its agents." *United States v. Price*, 383 U.S. 787, 794 (1966). The Supreme Court has articulated three tests to determine whether private conduct represents state action for the purposes of Section 1983: "(1) when there is a 'close nexus' between the private and state actors,[13] (2) when the private activity is a product of 'state compulsion,' or (3) when the private activity is a public function." *Turturro v. Cont'l Airlines*, 334 F. Supp. 2d 383, 394 (S.D.N.Y. 2004).

The Diocese argues that "the Complaint alleges a sufficiently 'close nexus' between the

---

[13]    The close nexus test has also been referred to as the "joint action" test, *see Faraldo*, 2008 WL 216608 at *4, and the "symbiotic relationships" test, *see Omnipoint Commc'ns Inc.*, 233 F. Supp. 2d at 395.

[Consultant Defendants] and the Village and that the [Consultant] Defendants were joint participants with the Village in the actions taken against the Diocese." (*See* Pl.'s FPCA Opp'n at 9-11.) Under the close nexus test, the Court must determine whether there is a "sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). "The intention of the close nexus requirement is to 'assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.'" *Turturro*, 334 F. Supp. 2d at 395 (quoting *Okunieff v. Rosenberg*, 996 F. Supp. 343, 349 (S.D.N.Y. 1998)). "The close nexus test can also be met if it involves a situation in which the State has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" *Id.* at 396 (quoting *Okunieff*, 996 F. Supp. at 352).

The Diocese argues that "[t]he FPCA Defendants did not just advise the Village Defendants . . . [t]hey participated, and continue to participate willfully, in a conspiracy to deny to the Diocese . . . constitutionally and statutorily protected rights . . . ." (Pl.'s FPCA Opp'n at 10.) Specifically, the Diocese claims that: (1) in May 1995 the Village and Board, "with the wrongful assistance and participation of FPCA and Portman" concluded that the Village's comprehensive plan prohibited the development of Queen of Peace, (2) FPCA and Portman "actively participated in the Village's wrongful conclusion that . . . Queen of Peace [ ] constituted a business use, not a recreational use or open space," (3) FPCA and Portman "'abused virtually every device and mechanism available to prevent the development of Queen of Peace,'" and (4) FPCA and Nesi, "along with the other Defendants," promised to act on the FEIS at the October

18

19, 2009 Board meeting but failed to do so and told the Diocese that "'they will act on the FEIS if at all in a manner and within [a] time chosen by them.'" (Pl.'s FPCA Opp'n at 10-11 (quoting Compl. ¶¶ 57-61, 63(A)-(B), 72, 76).)

As the Consultant Defendants assert (*see* FPCA Reply at 4-6), the close nexus test "usually examines the conduct of the state, not the conduct of the private entity." *Omnipoint Commc'ns Inc.*, 233 F. Supp. 2d at 395 (quoting *Blum*, 457 U.S. at 1004). For example, in *Turturro v. Continental Airlines*, the plaintiff was removed from an airplane by Port Authority officers and brought to a hospital for psychiatric evaluation. 334 F. Supp. 2d at 390. The plaintiff was examined by two hospital-employed doctors who initially decided to hold her overnight for observation and then discharged her. *Id.* The plaintiff subsequently brought a Section 1983 claim against, *inter alia*, the hospital and doctors who treated her, arguing that these private entities acted under color of state law "because they acted in concert with state agents, *i.e.,* employees of the Port Authority." *Id.* at 394. The court applied the close nexus test to determine whether this was "a situation in which the State has so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the enterprise." *Id.* at 396 (internal quotation marks and alteration omitted). Ultimately, the court concluded that the actions of the hospital and doctors did not meet the close nexus test because there was no evidence that Port Authority officers played any role in the doctors' decisions to hold, treat, or discharge the plaintiff – the officers' act of simply dropping the plaintiff off at the hospital "is not enough to show concerted or joint action." *Id.*

Here, the close nexus test has not been met. The "challenged action" of the Consultant Defendants, *see Blum*, 457 U.S. at 1004, is their provision of consulting services to the Village

pursuant to their contractual obligations.[14]  At least one court within this Circuit has held that a consultant does not meet the close nexus test merely by providing professional advice and opinions to a municipality.  *Omnipoint Commc'ns Inc.*, 233 F. Supp. 2d at 394.  The Diocese has not given this Court any reason to decide otherwise.

Accordingly, the Court finds that the Complaint does not sufficiently allege that the Consultant Defendants acted under color of state law and are not, therefore, subject to liability under Section 1983.[15]  The Diocese's Section 1983 claims are therefore dismissed as against the Consultant Defendants.

### III.    *Plaintiff's RLUIPA Claims Against the Consultant Defendants Are Dismissed*

#### A.    *Legal Standard*

RLUIPA provides, in relevant part:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution –
>
> (A)    is in furtherance of a compelling government interest; and
>
> (B)    is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  The term "government" is defined by the statute as follows:

---

[14]    A private entity's contract with the government does not automatically convert the former's conduct into state action.  *See Cooper v. United States Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982)) (noting that the "[a]cts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts").

[15]    The Court need not consider the Consultant Defendants' alternative arguments in favor of dismissing Plaintiff's Section 1983 claims.

The term "government" –

(A)    means –

    (i)      a State, county, municipality, or other governmental entity created under the authority of a State;

    (ii)     any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and

    (iii)    any other person acting *under color of State law* . . . .

42 U.S.C. § 2000cc-5(4) (emphasis added).

## B.    *The Consultant Defendants Did Not Act "Under Color of State Law"*

The Diocese and Consultant Defendants agree that "the test to determine whether a private actor is the equivalent of a state actor for § 1983 purposes would be equally applicable to the Diocese's RLUIPA claims." (FPCA Mem. at 15; *see also* Pl.'s FPCA Opp'n at 9 n.8 ("[I]t is clear that the §1983 jurisprudence is applicable [to RLUIPA claims].").)

The Second Circuit has not specifically addressed the contours of RLUIPA's "under color of State law" requirement for the imposition of liability.[16]  From the scant legislative history available, it appears that RLUIPA's definition of "government" was intended to track the language found in an earlier statute, the Religious Freedom Restoration Act ("RFRA").[17]  *See*

---

[16]    It appears that the Ninth Circuit and at least one court in the Eleventh Circuit have interpreted RLUIPA's "color of law" requirement in the same way as that phrase is interpreted in Section 1983 cases. *See Florer v. Congregation Pidyon Shevuyim, N.A.*, 603 F.3d 1118 (9th Cir. 2010) (analyzing "color of law" elements of RLUIPA and Section 1983 claims in tandem), *withdrawn*, 611 F.3d 1097 (9th Cir. 2010); *see also Williams Island Synagogue, Inc. v. City of Aventura*, 222 F.R.D. 554, 556 (S.D.Fla. 2004) ("First, RLUIPA, by its terms, imposes obligations on, and creates a cause of action against, governmental entities exclusively; private actors . . . are incapable of violating the statute."), *aff'd*, 138 Fed. Appx. 299 (11th Cir. 2005).

[17]    RLUIPA was enacted after the Supreme Court invalidated RFRA "on the grounds that it exceeded Congress's authority under the Fourteenth Amendment." *Pugh v. Goord*, 571 F.

146 Cong. Rec. E1563-01 (daily ed. Sept. 21, 2000) (statement of Rep. Charles T. Canady) ("The definition of 'government' . . . includes the state and local entities previously covered by RFRA."). The RFRA defined "government" as "a branch, department, agency, instrumentality, and official (or other person *acting under color of law*) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2(1) (emphasis added).

In turn, RFRA's "acting under color of law" phrase has been interpreted in the same way as that phrase is used under Section 1983. *See Sutton v. Providence St. Joseph Med'l Ctr.*, 192 F.3d 826, 834-35 (9th Cir. 1999) ("[T]he judicial interpretation of the phrase 'acting under color of law,' as used in 42 U.S.C. § 1983, applies equally in this RFRA action."); *Brownson v. Bogenschutz*, 966 F. Supp. 795, 797 (E.D.Wis. 1997) ("Because the statutory definition of 'government' under RFRA includes any person 'acting under color of law,' . . . the required degree of [government] action under RFRA is analyzed under the same standard as § 1983."); *see also Mayers v. N.Y. Cmty. Bancorp., Inc.*, 2005 WL 2105810, at *10 (E.D.N.Y. Aug. 31, 2005) (analyzing "color of law" phrase under Section 1983 by referring to *Sutton*'s analysis of "color of law" phrase under RFRA).

Accordingly, the Court finds that RLUIPA's definition of government as including any "person acting under color of State law," 42 U.S.C. § 2000cc-5(4), should be interpreted in the same manner as the phrase "color of law" is used in RFRA and Section 1983. *See Leonard v. Isr. Disc. Bank*, 199 F.3d 99, 104 (2d Cir. 1999) (When 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute

---

Supp. 2d 477, 504 n.11 (S.D.N.Y. 2008) (citing *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997)).

indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.")
(quoting *Bragdon v. Abbott*, 524 U.S. 624 (1998)).

Therefore, for the reasons set forth above, the Court finds that the Consultant Defendants did not act "under color of State law," and are not subject to liability under RLUIPA.

**IV.** **_The Village Defendants' Motion to Dismiss Plaintiff's Section 1983 and RLUIPA Claims_**

   **A.** **_Claims Barred by the Statutes of Limitations_**

      **1.** **The Parties' Contentions**

The Village Defendants assert that certain of the Diocese's claims pursuant to Sections 1983, 1985, 1986, and RLUIPA are time-barred. Specifically, the Village Defendants assert: (1) Claims brought under RLUIPA are governed by a four year statute of limitations and must be based on allegations of conduct occurring on or after November 30, 2005; (2) claims brought under Sections 1983 and 1985 are governed by a three year statute of limitations and must be based on allegations of conduct occurring on or after November 30, 2006; and (3) claims brought under Section 1986 are governed by a one year statute of limitations and must be based on allegations of conduct occurring on or after November 30, 2008. (Vill. Defs.' Mem. at 6-7.)

According to the Village Defendants, the Diocese's claims arising from the following factual allegations are time-barred: (1) all of the Diocese's issues regarding the Village's comprehensive plan and its use as a pretext to prevent development of Queen of Peace; (2) the 2001 Act; and (3) the parties' dispute over whether the proposal to develop Queen of Peace constituted a "religious use" of property, which issue was raised during (and resolved at the conclusion of) the State Court Action. (*Id.* at 7-8.) The Village Defendants assert that by

September 2002 (when the Court of Appeals dismissed an appeal from the Appellate Division's April 15, 2002 Order) the State Court Action was concluded and the Diocese "was aware of the alleged wrongful conduct in question, and the actionable harm alleged." (*Id.* at 7.) The Village Defendants contend, therefore, that the Court should dismiss each claim and allegation of any "conduct that is alleged to have occurred prior to November 30, 2005." (*Id.* at 8.)

In opposition, the Diocese contends that the Complaint "alleges a continuous violation of the Diocese's constitutional and statutory rights by the same group of Defendants." (Pl.'s Vill. Opp'n at 16.) The Diocese asserts that the continuous violation doctrine has been applied to claims arising under Sections 1983 and 1985 as well as RLUIPA.[18] (*Id.* at 17.) According to the Diocese, because it has alleged "an uninterrupted course of discriminatory conduct by Defendants since 1995 . . . [t]his tolls the limitations period otherwise applicable to the claims alleged in the Complaint." (*Id.* at 18.) In response, the Village Defendants argue that every issue connected with the commencement and litigation of the State Court Action, which was completed in 2002, "is discrete in time and distinct in substance from the alleged conduct commencing 3 years later in connection with the review of the substantial environmental issues arising from the Diocese's special use permit application." (Vill. Defs.' Reply at 5.)[19] Moreover, the Village Defendants assert, without citation to legal authority, that any allegations or claims

---

[18]    The Diocese does not address whether the continuing violation doctrine applies to claims asserted under Section 1986. In any event, the Diocese's Section 1986 claims are dismissed as against the Village Defendants for the reasons set forth *infra*.

[19]    The Village Defendants contend that the Diocese did not initiate the SEQRA process until 2005 and that the Diocese caused numerous delays with respect to that process. (*See* Vill. Defs.' Mem. at 2, 3.) On a motion to dismiss, however, the Court must confine its review to the factual allegations pled in the Complaint, and cannot consider extraneous information contained in the parties' legal memoranda.

based upon the 2001 Act are also time-barred. (*Id.* at 6 n.3.)

## 2. Legal Standard

In an action arising in New York pursuant to Section 1983, the applicable statute of limitations is "borrowed from New York's general statute of limitations for personal injury actions," which is three years. *Blankman v. Cnty. of Nassau*, 819 F. Supp. 198, 206 (E.D.N.Y. 1993) (citing *Gleason v. McBride*, 869 F.2d 688, 695 (2d Cir. 1989)). Section 1985 actions are also subject to a three year statute of limitations. *Id.* (citing *Hernandez-Avila v. Averill*, 725 F.2d 25, 27 n.3 (2d Cir. 1984)). A claim brought pursuant to RLUIPA is governed by the "four-year catch-all federal statute of limitations." *Congregation Adas Yereim v. City of N.Y.*, 673 F. Supp. 2d 94, 107 (E.D.N.Y. 2009) (citing 28 U.S.C. § 1658(a)). Claims brought under these statutes generally accrue "'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Fabbricante v. City of N.Y.*, 2002 WL 34438898, at *6 (E.D.N.Y. Nov. 18, 2002) (quoting *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997)). The Second Circuit has made clear:

> The crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action. To permit [the plaintiff] to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable [the plaintiff] to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims.

*Singleton*, 632 F.2d at 192.

The Diocese commenced this action on November 30, 2009. Accordingly, only incidents that occurred after November 30, 2006 are actionable pursuant to Sections 1983 and 1985, and only incidents that occurred after November 30, 2005 are actionable pursuant to RLUIPA, unless

the Diocese can establish a "continuing violation."[20]  "Where a plaintiff can demonstrate an

ongoing or continuing violation of his federally protected rights, 'the plaintiff is entitled to bring

suit challenging all conduct that was a part of the violation, even conduct that occurred outside

the limitations period.'" *Yip v. Bd. of Trs. of the State Univ. of N.Y.*, 2004 WL 2202594, at *4

(W.D.N.Y. Sept. 29, 2004) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)).

"'[C]ourts of this circuit consistently have looked unfavorably on continuing violation arguments

. . . and have applied the theory only under compelling circumstances.'" *Blankman*, 819 F. Supp.

at 207 (quoting *Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408, 1415 (S.D.N.Y. 1989)) (alteration

added).  Compelling circumstances could include: "[W]here the unlawful conduct takes place

over a period of time, making it difficult to pinpoint the exact day the violation occurred; where

there is an express, openly espoused policy [that is] alleged to be discriminatory; or where there

is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness."

*Yip*, 2004 WL 2202594 at *4 (second alteration added, internal quotation marks omitted).

    "[T]he mere fact that wrongful acts may have a continuing impact is not sufficient to find

a continuing violation."  *Blankman*, 819 F. Supp. at 207 (citing *Del. State Coll. v. Ricks*, 449 U.S.

250, 257, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980)); *see also Yip*, 2004 WL 2202594 at *5 (same).

And, importantly, the Second Circuit has made clear that "[c]haracterizing defendants' separate

wrongful acts as having been committed in furtherance of a conspiracy or as a 'series of

---

[20]    It appears from the relatively scant federal case law on the issue (in the Second
Circuit and beyond) – and the parties do not dispute – that a continuing violation theory could
apply to claims brought pursuant to RLUIPA.  *See Orafan v. Goord*, 2003 WL 21972735, at *9
(N.D.N.Y. Aug. 11, 2003); *accord Price v. Owens*, 634 F. Supp. 2d 1349, 1354-55 (N.D.Ga.
2009) (applying continuing violation analysis to determine timeliness of Section 1983 and
RLUIPA claims).

interlocking events' does not postpone accrual of claims based on individual wrongful acts."

*Singleton v. City of N.Y.*, 632 F.2d 185, 192 (2d Cir. 1980).

### 3. The Application of the Continuing Violation Doctrine

Barring any applicable tolling of the statute of limitations, claims arising from the following factual allegations would be time-barred: (1) the Diocese's attempts to apply for a special use permit in 1993 and 1995; (2) the Board's denial of the Diocese's application in 1996; (3) the litigation of the State Court Action, which began in 1996 and culminated with the Court of Appeal's September 2002 dismissal of an appeal from the Appellate Division's April 2002 decision and judgment; and (4) the promulgation and enactment of the 2001 Act.

### a. Pre-2002 Alleged Conduct

The Court does not agree with the Diocese's position that the Complaint contains allegations of an "uninterrupted course of discriminatory conduct" on the part of the Village Defendants. (*See* Pl.'s Vill. Opp'n at 18.) With respect to the Diocese's claims based on the conduct of the Village Defendants prior to the commencement of the State Court Action – namely, the Diocese's application for a special use permit in 1993 and 1995 and the Board's denial of that application in 1996 – the Diocese knew (or had reason to know) of such claims as of 1996. Thus, any such claims accrued at that time.[21] *See Fabbricante*, 2002 WL 34438898 at *6. The Court finds, therefore, that the continuing violation theory does not apply to the Diocese's claims based on alleged conduct that occurred prior to the commencement of the State

---

[21]  Indeed, the Diocese commenced the State Court Action to challenge the denial of that application.

Court Action, and any such claims are time-barred.[22]

With respect to the Diocese's claims regarding the State Court Action, the Complaint alleges that the Diocese commenced that action but does not allege that the Village acted wrongfully or in a discriminatory fashion by litigating the State Court Action. Indeed, had the Diocese believed that the Village Defendants were improperly protracting the State Court Action or acting inappropriately in some other manner, they surely would have raised the issue during that litigation. But even if the Diocese believed that the Village Defendants had engaged in conduct that would give rise to a claim for relief, they knew (or should have known) of such claims by, at the latest, September 2002 when the State Court Action concluded. Thus, any claims arising from the litigation of the State Court Action are not subject to the continuing violation doctrine and are time-barred. *See Blankman*, 819 F. Supp. at 208.

### b. The 2001 Act

Any claims based upon the 2001 Act would also be time-barred absent the application of a continuing violation theory. The Diocese alleges that "the Village purported to enact a Local Law in March 2001 (LL-4 2001), which purports to regulate the Diocese's proposed development of Queen of Peace for religious use." (Compl. ¶ 99.) The Diocese further alleges that the 2001 Act "is an unconstitutional attempt to prohibit the Diocese's" rights under the First Amendment. (*Id.*) In particular, the Diocese alleges that the 2001 Act "specifically and impermissibly targets religious institutions and restricts religious practice and in effect prohibits

---

[22]     The Court notes that RLUIPA was enacted in 2000 and may not be applied retroactively. *See Zargary v. City of N.Y.*, 607 F. Supp. 2d 609, 612 (S.D.N.Y. 2009) ("[B]ecause the events at issue in this case preceded the enactment of RLUIPA, application of that statute's standard would be incorrect as a matter of law.").

land use within the Village as a cemetery . . . without regard to the determination from the [State Court Action] . . . and the rights of the Diocese and its parishioners under the United States Constitution."  (*Id.* ¶ 74A.)  The Diocese asserts in their opposition papers that the 2001 Act, which was apparently enacted in the midst of the State Court Action, contains "arbitrary" requirements that have been applied to the Queen of Peace proposed project and that are "markedly greater than the restrictions on religious land use imposed by nearby communities and the Village itself."  (Pl.'s Vill. Opp'n at 9.)

The parties have not addressed the merits of the Diocese's allegations regarding the 2001 Act, other than to dispute whether they are time-barred.  If the 2001 Act is "constitutionally invalid, it would constitute the equivalent of a continuing invasion of plaintiffs' property rights akin to a continuing trespass – a situation in which a new cause of action arises in plaintiff's favor against the [municipality] every day."[23]  *Greene v. Town of Blooming Grove*, 1988 WL 126877, at *4 (S.D.N.Y. Nov. 21, 1988), *aff'd in part, rev'd in part on other grounds*, 879 F.2d 1061 (2d Cir. 1989); *see also S. Lyme Prop. Owners Assoc., Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 547, 556-57 (D.Conn. 2008) (applying continuing violation doctrine when the plaintiff "present[ed] a facial challenge to a zoning ordinance which interferes with their use of their property for five and on-half months of each year"); *Town of Southold v. Town of E. Hampton*, 406 F. Supp. 2d 227, 238 (E.D.N.Y. 2005) (applying continuing violation doctrine when the

---

[23]      At least one court in this Circuit has recognized that other courts, including the Ninth Circuit, have held that a constitutional "challenge to a regulation accrues on the date on which the challenged regulation was enacted."  *See S. Lyme Prop. Owners Assoc., Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 547, 557 (D.Conn. 2008) (citing *Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 505 F.3d 860, 869 (9th Cir. 2007).  "However, as indicated by the decisions [ ] cited, courts in this circuit have not adopted this reasoning."  *Id.*

plaintiff "challenge[d ] a law that continues to prevent it from establishing ferry service to and from East Hampton"), *aff'd in part, vacated in part on other grounds*, 477 F.3d 38 (2d Cir. 2007); *Deepwells Estates Inc. v. Inc. Vill. of Head of the Harbor*, 973 F. Supp. 338, 347 (E.D.N.Y. 1997) (noting the application of the continuing violation doctrine when the plaintiffs "attack[ed] the constitutional validity of an ordinance).

To the extent that the Diocese has sufficiently alleged a challenge to the constitutionality of the 2001 Act, which "purports to regulate the Diocese's proposed development of Queen of Peace for religious use" (Compl. ¶ 99), the Diocese has alleged a continuing violation solely for limitations purposes, and the Diocese's claims regarding the 2001 Act would be timely. *See Town of Southold*, 406 F. Supp. 2d at 238. Given that the parties have not addressed the merits of the Diocese's claims regarding the 2001 Act, the Court declines to *sua sponte* determine the sufficiency of these allegations. Accordingly, that portion of the Village Defendants motion that seeks dismissal of the Diocese's claims regarding the 2001 Act is DENIED.

### B. *Claims Not Yet Ripe For Review*

#### 1. <u>The Parties' Contentions</u>

The Village Defendants assert that the Diocese's claims based upon the "[SEQRA] environmental review of the special use permit" are not yet ripe for review because "[a] final decision on the special use permit application at issue has not yet been issued by the Board of Trustees." (Vill. Defs.' Mem. at 8.) The Village Defendants contend that the "final decision requirement is applicable to violations of Equal Protection rights, substantive and procedural Due Process claims, and to First Amendment claims," as well as RLUIPA claims. (*Id.* at 9, 10.) According to the Village Defendants, "the Village has yet to issue a final decision on the special

use permit application at issue and, in fact, just recently approved the [Final Environmental Impact Statement] for same," and therefore any claims based on the Village Defendants' alleged conduct in connection with the special permit application process are not ripe for review. (*Id.* at 11.)

In opposition, the Diocese asserts that its claims regarding the SEQRA process are ripe because it has established a sufficient hardship and because "[t]here has [ ] been a constructive or operative denial of the Diocese's application, and the facts presented establish futility." (Pl.'s Vill. Opp'n at 12-14.) The Diocese contends that courts within this Circuit "have recognized futility in cases such as this one, where more than a decade of obstruction and delay demonstrates that further efforts to work with a government would be futile." (*Id.* at 14.) According to the Diocese, the Village Defendants have "continue[d] to demand [environmental] testing, . . . [and] improperly disregarded SEQRA time limitations." (*Id.* at 15.) Because "Defendants control ripeness, and have deliberately and in bad faith delayed making a decision in an attempt to preclude ripeness," the Diocese argues that the Court should find "the application process is futile." (*Id.*)

## 2. **Legal Standard**

Article III of the Constitution requires that all cases or controversies be ripe for judicial review. *Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 770 (E.D.N.Y. 1999) ("In the area of land use, the doctrine of ripeness is intended to avoid premature adjudication of administrative action.") (internal quotation marks and citation omitted). Because "[r]ipeness is jurisdictional inquiry," the Court must initially consider the ripeness of this matter. *Murphy v. New Milford Zoning Comm'n*, 402 F. 3d 342, 347 (2d Cir. 2005) (citing *Vandor, Inc. v. Militello*,

301 F.3d 37, 38 (2d Cir. 2002)). The Court must "presume" that it "cannot entertain [the Diocese's claims] 'unless the contrary appears affirmatively from the record.'" *Id.* (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)).

a. The *Williamson* Test

To determine whether a case is ripe for review, a Court is "generally require[d]" to "'evaluate both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). "Building on the foregoing, the Supreme Court has developed specific ripeness requirements applicable to land use disputes." *Id.* at 347-48. In *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), the Supreme Court considered whether the application of certain zoning laws amounted to a "taking" in violation of the Fifth Amendment. The Court established the following two-pronged test that the plaintiff was required to satisfy in order to maintain its lawsuit. First, the plaintiff had to show that prior to commencing its suit, it had "obtain[ed] a final, definitive position as to how it could use the property from the entity charged with implementing the zoning regulations." *Murphy*, 402 F.3d at 348 (citing *Williamson*, 473 U.S. at 186). Second, the plaintiff must demonstrate that it sought "compensation for an alleged taking before proceeding to federal court." *Id.* at 349 (citing *Williamson*, 473 U.S. at 194).

The Second Circuit has recognized that the two-pronged ripeness test set forth in *Williamson*, although developed in the context of a Fifth Amendment takings claim, "has not been so strictly confined." *Id.* The first prong of the *Williamson* ripeness test has been applied to

procedural and substantive due process claims as well as equal protection claims.[24] *See id.* at 350 (collecting cases); *Dougherty v. Town of N. Hemsptead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (collecting cases); *Adrian v. Town of Yorktown*, 2007 WL 1467417, at **6-8 (S.D.N.Y. May 16, 2007) (finding *Williamson* test applied to equal protection and due process claims); *Gottlieb v. Vill. of Irvington*, 69 F. Supp. 2d 553, 557-58 (S.D.N.Y. 1999) ("[T]here had been no substantive due process violation because there has been no final decision by the Village in this case.").

The Second Circuit has also found that, under certain circumstances, the first prong of the *Williamson* test can be applied to "a First Amendment claim emanating from a land use dispute." *Murphy*, 402 F.3d at 350 & n.5 (applying *Williamson* test to claim of violation of First Amendment rights to freely exercise religion); *Daugherty*, 282 F.3d at 90 (analyzing *Williamson* test in context of First Amendment retaliation claim). Thus, a plaintiff's claimed violation of his First Amendment rights in the land use context will be ripe for review only if he can show that he has suffered an "immediate injury" and that his "pursuit of a further administrative decision would do nothing to further define his injury." *Daugherty*, 282 F.3d at 90. The Second Circuit has explicitly stated that it is not "necessary to distinguish [a] RLUIPA claim from [a] First Amendment Free Exercise claim when it comes to our ripeness inquiry." *Murphy*, 402 F.3d at 350 (collecting cases).

---

[24] The second prong of the *Williamson* test, which requires the plaintiff to seek compensation for any alleged taking before proceeding to federal court, "is germane to takings challenges" only and does not apply to due process, equal protection, or First Amendment claims. *Murphy*, 402 F.3d at 349.

Courts within the Second Circuit have recognized a so-called "futility exception" to the

"final decision requirement" as follows:

> While the ripeness doctrine does not require litigants to engage in
> futile gestures such as "to jump through a series of hoops, the last of
> which is certain to find obstructed by a brick wall, . . ." the presence
> of that brick wall must be all but certain for the futility exception to
> apply.  There must be evidence that the relevant government body has
> no discretion to grant an exemption, or that it "has dug in its heels and
> made clear that all such applications will be denied."

*Country View Estates @ Ridge LLC v. Town of Brookhaven*, 452 F. Supp. 2d 142, 150 (E.D.N.Y.

2006) (quoting *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 161 (W.D.N.Y. 2006)).  It is

clear, however, that "mere allegations of open hostility [are] not sufficient to invoke the futility

exception."  *Homefront Org., Inc. v. Motz*, 570 F. Supp. 2d 398, 408 (E.D.N.Y. 2008) (quoting

*Goldfine v. Kelly*, 80 F. Supp. 2d 153, 160-61 (S.D.N.Y. 2000)) (alteration in the original); *see

also Country View Estates @ Ridge LLC*, 452 F. Supp. 2d at 154 ("Thus, plaintiff's conclusory

assertions that defendants[ ] acted with malicious intent and bad faith in processing plaintiff's

application in order to delay and obstruct the construction of plaintiff's . . . project without more

is insufficient to establish that the 'prospect of refusal [of the approval of the application] is

certain and invoke the narrow futility exception.'") (quoting *Dix v. City of N.Y.*, 2002 WL

31175251, at *8 (S.D.N.Y. Sept. 30, 2002)).

### 3.      The Diocese's Equal Protection Claims Are Not Ripe

"A 'final decision' is a 'definitive position on the issue that inflicts an actual, concrete

injury.'" *County View Estates @ Ridge LLC*, 452 F. Supp. 2d at 149 (quoting *Williamson*, 473

U.S. at 193).  "The rationale behind the finality requirement is that a court cannot demonstrate

whether a Plaintiff has been deprived of property arbitrarily or otherwise, until it has a final definitive position before it on how the administrative agency will apply the regulation at issue to the particular land in question." *R-Goshen LLC*, 289 F. Supp. 2d at 448.

The factual allegations contained in the Complaint make clear that, at the time the Complaint was filed, the Board had not yet made a decision to approve or deny the Diocese's application for a special use permit to develop Queen of Peace. (Compl. ¶ 76.) According to the Complaint, the FEIS was submitted to the Village and Board on July 1, 2009 and their approval of the FEIS would have been "the last material step for issuance to the Diocese by the Village and its Trustee Defendants of a permit to develop Queen of Peace." (*Id.*) It appears undisputed, however, that as of the filing of the Complaint the Board had "failed" to take "determinative action with respect to the completed FEIS." (*Id.*) Thus, the Court finds that the Complaint does not sufficiently allege that the Diocese "obtained a final definitive position as to how it could use the [Property]" with respect to its proposed plan for the development of Queen of Peace. *See Murphy*, 402 F.3d at 348; *see also Lost Trail LLC v. Town of Weston*, 289 Fed. Appx. 443 (2d Cir. 2008) (finding claims based on town officials' allegedly improper denial of building permits were not ripe for review when the plaintiff failed to seek permits from appropriate entity and did not appeal town officials' rejection of application); *Grossi v. City of N.Y.*, 2009 WL 4456307, at *4 (E.D.N.Y. Nov. 30, 2009) (finding claims not ripe for review when the plaintiff did not allege that it applied for a special permit); *Homefront Org., Inc.*, 570 F. Supp. 2d at 406-11 (finding claims not ripe for review when "plaintiffs cannot even argue that they made, and were denied, a meaningful application" and "Planning Board simply adopted a positive SEQRA declaration").

The Diocese asserts that "[t]here has also been a constructive or operative denial of the

Diocese's application, and the facts presented establish futility." (Pl.'s Vill. Opp'n at 14.)
According to the Diocese, "more than a decade of obstruction and delay demonstrates that further efforts to work with a government would be futile." (*Id.*) The cases cited by the Diocese in support of this contention, however, are readily distinguishable. For example, in *Westchester Day School v. Village of Mamaroneck*, 236 F. Supp. 2d 349, 351 (S.D.N.Y. 2002), the plaintiff applied to the municipality for a modification of its special use permit to permit construction of a new classroom structure for its Orthodox Jewish day school. The Zoning Board of Appeals ("ZBA") which acted as the lead agency for purposes of the SEQRA review, initially voted unanimously to issue a "negative declaration," which meant that no significant adverse environmental impacts would result from the proposed project and that no EIS process was required. *Id.* After public outcry, however, the ZBA held further public hearings and (although no new information was uncovered) reversed its "negative declaration" and issued a "positive declaration," which would require the plaintiff to "prepare a full EIS prior to the issuance of the special permit." *Id.* In considering ripeness, the court noted that a "positive declaration" is "an interim determination not typically ripe for judicial review." *Id.* at 355. The court found the matter justiciable, however, under the futility exception. *Id.* Importantly, the court found that the ZBA had rescinded its original "negative declaration" "based on issues that have already been thoroughly studied and found appropriate by professionals reviewing the project." *Id.* (internal quotation marks omitted).

In this case, by contrast, the Village Defendants did not initially issue a "negative declaration," and then rescind it in response to community pressure despite a lack of new evidence of an environmental impact. The ZBA in *Westchester Day School* issued a "negative

declaration" after the plaintiff submitted "comprehensive analysis and extensive studies" of

potential environmental impacts, and then reversed that determination even though no new

information regarding environmental impacts was uncovered. *Id.* By contrast, the Village

Defendants found that, pursuant to the provisions of SEQRA, an EIS was required before the

Diocese's application for a special permit would be approved.[25] The Diocese has not submitted

any case law in support of the notion that a municipality's requirement of an EIS (and the often

lengthy process that follows) constitutes sufficiently delay as to invoke the futility exception.

 *Honess 52 Corp. v. Town of Fishkill*, 1 F. Supp. 2d 294 (S.D.N.Y. 1998), another case

cited by the Diocese in support of its futility argument, is also factually distinguishable. In that

case, the plaintiff property owner's predecessors in interest had entered into a stipulation with the

defendant municipality that "entitle[d] [the plaintiff] to approval of an Application [to develop]

337 [residential units]." *Id.* at 301. The plaintiff filed an application with the municipality's

Planning Board to develop the residential units, but the Planning Board did not take any action

with respect to that application. *Id.* The plaintiff asserted that "Defendants' delays and

intransigence demonstrate that they have in effect reached a 'final decision' not to recognize

Plaintiff's asserted right to develop the Property," and that the defendants intended to delay a

formal decision on its application until "Plaintiff's rights under the 1977 Stipulation expire at the

end of 2000." *Id.* After the plaintiff brought suit, the defendant argued that the matter was not

ripe for review because the Planning Board had not yet approved or denied the Plaintiff's

---

[25] Indeed, in the Appellate Division's April 2002 decision, the court found that the Diocese's proposed plan qualified as a "type I listed action" under SEQRA that carried a "presumption that it is likely to have a significant adverse impact on the environment and may require an [EIS]." (Compl., Ex. 3.) The matter was remanded to the Board to "determine the environmental impact of the [Diocese's] proposed use. (*Id.*)

application because the plaintiff had not submitted an EIS pursuant to SEQRA.  The plaintiff

successfully invoked the futility exception by alleging that "Defendants' actions demonstrate that

no such approval will be forthcoming before the expiration of Plaintiff's rights under the 1977

Stipulation."  *Id.* ("In addition, withholding review arguably would work a 'hardship' on

Plaintiff, whose rights under the 1977 Stipulation expire at the end of the year 2000.")  Similar

facts are not present in this case.[26]

The allegations in the Complaint set forth that the parties had worked through the

SEQRA process to the point of submitting the FEIS, which, according to the Diocese was "the

last material step for issuance to the Diocese by the Village and its Trustee Defendants of a

permit to develop Queen of Peace."  (Compl. ¶ 76.)  That the Board did not act on the FEIS

between the time it was submitted in July 2009 and the time the Complaint was filed in

---

[26]        By letter dated August 27, 2010, the Diocese asserted that the decision in *Fortress
Bible Church v. Feiner*, 2010 WL 3199876 (S.D.N.Y. Aug. 12, 2010) lent support to its
argument regarding the applicability of the futility exception.  (Pl.'s Aug. 27, 2010 Letter, Ex. 1.)
The decision, however, is not on a motion to dismiss pursuant to Rule 12(b)(1) or 12(b)(6) – it
was rendered after the parties "engaged in a lengthy period of discovery that included
approximately eighteen depositions and significant document production" and a "twenty-six day
bench trial" was conducted.  (*Id.* at **1-2.)  Earlier in the *Fortress Bible Church* proceedings, the
court denied the defendant's motion to dismiss on ripeness grounds.  *Fortress Bible Church v.
Feiner*, 2004 WL 1179307, at *2 (S.D.N.Y. Mar. 29, 2004).  That decision, however, does not
provide a discussion of the specific factual allegations pled in the Complaint, and is difficult to
apply to this matter.
        Other cases cited by the Diocese in their opposition papers are factually distinguishable
from the case at bar.  *Cf. West 95 Hous. Corp. v. N.Y. City Dep't of Hous. Pres. & Dev.*, 2001
WL 664628, at *5 (S.D.N.Y. June 12, 2001) (finding plaintiff's claims against defendant ripe for
review when defendant stated in writing that it had no intention of issuing "Letter of No
Objection" sought by the plaintiff, and defendants did not identify any available administrate
procedures to appeal that decision); *Sunrise Dev., Inc.*, 62 F. Supp. 2d at 770-71 (finding Town
Board "effectively denied Sunrise's application for special use permit" by enacting Local Law
that "significantly changed the standards and procedures governing" Sunrise's pending
application and Town "made it clear that it will not willingly 'grandfather' Sunrise's application
under the old law").

November 2009 does not indicate that the Board had "dug in its heels and made clear that [the Diocese's] application[ ] [would] be denied." *See Country View Estates @ Ridge LLC*, 452 F. Supp. 2d at 150 (internal quotation marks omitted); *see also Homefront Org., Inc.*, 570 F. Supp. 2d at 409-10 (rejecting claim that one-year delay was sufficient to invoke futility exception and collecting cases in which futility was not found despite delays of up to eight years).[27] Given this, the Court finds that the futility exception does not apply here and that the Diocese's 14th Amendment equal protection claims against the Village Defendants based on the SEQRA process are not ripe for review and are dismissed.

### 4. The Diocese's First Amendment and RLUIPA Claims Are Not Ripe

As described above, the Diocese First Amendment and RLUIPA claims are subject to a slightly different test for ripeness. The Court must "follow the guideposts outlined in *Dougherty*" and determine whether to apply the *Williamson* test by asking the following questions: (1) did the Diocese experience an "immediate injury" as a result of the Village Defendants' conduct, and (2) would requiring Plaintiff to "pursue additional administrative remedies [ ] further define [its] alleged injuries." *See Murphy*, 402 F.3d at 351 (citing *Dougherty*, 282 F.3d at 90).

First, the Court finds that the Complaint does not contain sufficient allegations that the Diocese suffered an "immediate injury" as that term is defined by applicable case law. As an initial matter, at the time the Complaint was filed no decision had been rendered either approving

---

[27] The Diocese also asserts in its opposition papers that the Village Attorney and one or more Board members made hostile comments about the Diocese's proposed project. (Pl.'s Vill. Opp'n at 5, 15.) These allegations are not present in the Complaint. In any event, it is well-settled that "mere allegations of open hostility [are] not sufficient to invoke the futility exception." *Homefront Org., Inc.*, 570 F. Supp. 2d at 408.

or denying the Diocese's special permit application.  *See id.* ("Claims of immediate injury are further suspect given that an appeal of the cease and desist order to the New Milford Zoning Board of Appeals automatically would have stayed its enforcement."); *Cf. Dougherty*, 282 F.3d at 90 (holding that the revocation of a permit, as opposed to the refusal to grant a permit, constituted an "immediate injury" at the time of revocation).

Second, it is abundantly clear to the Court that Plaintiff's pursuit of additional administrative remedies (including, perhaps, waiting for a decision by the Board on its permit application, *see infra*, filing an appeal to the appropriate Zoning Board of Appeals, *see* Vill. Law § 7-712-a, or filing a *mandamus* action) would have further defined Plaintiff's alleged injuries. *See Murphy*, 402 F.3d at 351 (finding injury not clearly defined when "the constitutional and statutory claims . . . hinge on factual circumstances not yet fully developed").

Thus, the *Williamson* ripeness test also applies to the Diocese's First Amendment and RLUIPA claims against the Village Defendants based on the SEQRA process.  For the reasons described more fully above, the Diocese has not sufficiently pled that it received a "final decision" regarding its application for a special permit, and these claims are accordingly dismissed as not ripe for review.

> **5. Information Regarding Events Occurring Subsequent to the Filing of the Complaint**

Approximately eight months after the Complaint was filed, the Diocese contacted the Court to inform it of recent developments in the case.  Specifically, on June 24, 2010, the Diocese learned that the Board had "voted to adopt a resolution . . . [that] purports to grant to the Diocese certain permits and variances relating to Queen of Peace Cemetery."  (Pl.'s July 16,

2010 Letter, at 1.)  The Diocese asserts that the Resolution "actually authorizes the Diocese to do nothing, and substantially restricts religious use to which the Diocese, its parishioners, and clergy are entitled."  (Pl.'s Aug. 27, 2010 letter, at 2.)[28]  The Diocese further contends that the Resolution does not "alter[] materially the *status quo* between and among the parties as it existed at the time of the filing of the Complaint."  (Pl.'s July 16, 2010 Letter, at 2.)  According to the Diocese, the Resolution "further substantiates, *inter alia*, that the defendants' continued acts and failures to act operate as a denial of the protected rights of the Diocese, . . . that the Diocese's claims are ripe, and that further engagement with the Village Defendants is futile."  (*Id.*)  Finally, the Diocese asserts that it does not believe that the "content of the Resolution make necessary the filing of an amended Complaint."  (*Id.*)  The Village Defendants contend that the adoption of the Resolution has "clearly made untenable any continuing claim to 'constructive denial' of the special use permit application."  (Vill. Defs.' July 21, 2010 Letter, at 2.)

The Court is acutely aware that when considering a Rule 12(b)(6) motion to dismiss, the Court it "must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *Gillingham v. GEICO Direct*, 2008 WL 189671, at *2 (E.D.N.Y. Jan. 18, 2008) (citation and internal quotation marks omitted).  Moreover, this Court is disinclined to convert the motion to one for summary judgment.  *See Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991).  While the Court may consider matters outside the pleadings on a motion to dismiss made pursuant to Rule 12(b)(1),

---

[28]     It appears from the correspondence between the parties that the Diocese's objections center around the Resolution's inclusion of numerous modifications and conditions to the proposed site plan that must be satisfied, including setback requirements, landscape maintenance requirements, and meeting certain groundwater impact standards.  (*See* Pl.'s July 16, 2010 Letter, Ex. 4.)

the matters extraneous to the Complaint that were submitted to the Court are insufficient to permit the Court to make a determination as to whether the adoption of the Resolution renders the Diocese's claims ripe for review.[29]

Overall, the Court does not agree with the Diocese's assertion that the adoption of the Resolution does not "alter" the "status quo" between the parties, or that it does not "make necessary the filing of an amended Complaint." (Pl.'s July 16, 2010 Letter, at 2.) To the extent that the Diocese now claims that the Resolution (and the conditions imposed on the Diocese therein) constitute a violation of the Diocese's constitutional rights, such a claim does not fall within the ambit of the Complaint as currently framed.

Given all of these factors, the Diocese is directed to notify the Court via letter filed on ECF by no later than March 7, 2011 whether not it intends to move for leave to amend the Complaint.[30]

### C. *Claims Regarding Defendant Maltino*

At this point, the only remaining claim against any of the Individual Defendants is the Diocese's assertion that Maltino conducted one or more warrantless searches of the Property in

---

[29]     Although the Village Defendants appear to urge the Court to dismiss certain of the Diocese's claims "regardless of how the Court rules on the statute of limitations and ripeness issues" (Vill. Defs.' Reply at 13), ripeness is a "jurisdictional inquiry" and the Court must "presume" that it "cannot entertain [the Diocese's claims] unless the contrary appears affirmatively from the record." *Murphy*, 402 F.3d at 347 (internal quotation marks omitted).

[30]     Such motion must address, with citations to applicable case law, whether any amendment would be futile given the ripeness discussion contained herein. In particular, the Diocese should address: (1) whether the adoption of the Resolution constitutes a "final decision" within the meaning of applicable case law, and (2) how the adoption of the Resolution impacts the Diocese's argument that the futility exception applies here, *see Country View Estates @ Ridge LLC*, 452 F. Supp. 2d at 150.

2009.  The Village Defendants assert that the Diocese's claims against Maltino in his individual

capacity[31] "should be dismissed pursuant to the doctrine of qualified immunity."  (Vill. Defs.'

Mem. at 20.)  The Diocese alleges that beginning in approximately April 2009, the Village

Defendants, through Maltino, "conducted one or more warrantless searches of the Diocese's

Property" with the intent to: (1) "harass the Diocese in retaliation for continuing to insist that the

long-abandoned structures on its Property had no historic value," and (2) "attempt to compel the

Diocese to maintain them" so that the Diocese would have to unnecessarily expend attention and

resources.  (Compl. ¶ 74H.)

        "The doctrine of qualified immunity shields government officials from liability for

damages where 'their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known,' or where it was objectively reasonable

for them to believe that their acts did not violate those right."  *Abrahams v. Inc. Vill. of

Hempstead*, 2009 WL 1560164, at *6 (E.D.N.Y. June 2, 2009) (quoting *Harlow v. Fitzgerald*,

457 U.S. 800, 818, 103 S. Ct. 2727, 72 L. Ed. 2d 396 (1982)) (internal citation omitted).  "A

right is 'clearly established' if it is: (1) 'defined with reasonable specificity;' (2) if 'the decisional

law of the Supreme Court or the appropriate circuit court has clearly established the right,' or (3)

'whether in light of preexisting law the unlawfulness of the defendant official's actions is

apparent.'"  *Id.* (quoting *Charles W. v. Maul*, 214 F.3d 350, 356-57 (2d Cir. 2000)).  "Because

this defense necessarily involves a fact-specific inquiry, it is generally premature to address the

---

[31]        "A suit against an officer is his official capacity is essentially a suit against the
government entity itself."  *Obilo v. City Univ. of City of N.Y.*, 2003 WL 1809471, at *12
(E.D.N.Y. Apr. 7, 2003) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691, n.55 (1978)).
Accordingly, Plaintiff's claims against Maltino in his official capacity are dismissed.  *See
Vassallo v. Lando*, 591 F. Supp. 2d 172, 202 n.24 (E.D.N.Y. 2008).

defense of qualified immunity in a motion to dismiss." *Toth ex rel. Toth v. Bd. of Educ.*, 2008 WL 4527833, at *7 (E.D.N.Y. Sept. 30, 2008) (internal quotation marks and alteration omitted).

The Village Defendants do not assert how the qualified immunity defense should apply to shield Maltino from the claims asserted against him in the Complaint. Moreover, the Village Defendants have not addressed the sufficiency of the Diocese's allegations against Maltino. Accordingly, that portion of the Village Defendants' motion seeking the dismissal of the Diocese's claim against Maltino in his individual capacity is DENIED without prejudice and with the right to renew upon the development of the factual record.

## V. *The Diocese's Section 1985 Claims Are Dismissed*

### A. *Legal Standard*

Plaintiff alleges that the Defendants "have conspired to act and fail to act with respect to the Diocese," for the purposes of depriving it of its First and Fourteenth Amendment rights in violation of 42 U.S.C. § 1985(3) ("Section 1985"). (Compl. ¶¶ 123, 124.)

To state a cause of action under Section 1985(3), a plaintiff must allege: "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *Id.* (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995)) (internal quotation marks omitted). "Furthermore, the conspiracy must also be motivated by some racial or perhaps

otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.*

(quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993))

(internal quotation marks omitted).

**B.      *The Diocese's Section 1985 Claims Are Dismissed***

The Court notes as a threshold matter that "[a]bsent a valid predicate violation of § 1983,

Plaintiff cannot pursue a § 1985(3) claim based upon the same underlying constitutional

violation." *Zherka v. City of N.Y.*, 2010 WL 4537072, at * 4 n.4 (S.D.N.Y. Nov. 9, 2010); *see*

*also O'Bradovich v. Vill. of Tuckahoe*, 325 F. Supp. 2d 413, 426 (S.D.N.Y. 2004) ("In the

absence of any claim establishing a violation of civil rights, the court must also dismiss claims of

conspiracy brought under § 1985.")  Here, the only Section 1983 claims remaining in this action

involve the Diocese's challenges to the constitutionality of the 2001 Act and the alleged conduct

of Maltino.  Thus, any alleged conspiracy would be actionable under Section 1985 only to the

extent it involved a conspiracy related to these remaining claims.

In any event, the Court finds that the Diocese's Section 1985 claim against the

Defendants, even if based upon all of the alleged constitutional violations in the Complaint, fails

to state a claim upon which relief may be granted.  An essential element of a Section 1985

conspiracy claim is that the plaintiff plead "an overt act in furtherance of the conspiracy."

*Thomas*, 165 F.3d at 146.  The plaintiff "must provide some factual basis supporting a meeting of

the minds, such that defendants entered into an agreement, express or tacit, to achieve an

unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). "[A] plaintiff alleging a

conspiracy under § 1985(3) must allege, with at least some degree of particularity, overt acts

which defendants engaged in which were reasonably related to the promotion of the claimed

45

conspiracy." *Thomas*, 165 F.3d at 147 (finding assertions that were "conclusory and vague" failed to "establish the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights"); *see also Powell v. Workmen's Comp. Bd. of the State of N.Y.*, 327 F.2d 131, 137 (2d Cir. 1964) (noting that a plaintiff is "bound to do more than merely state vague and conclusionary allegations respecting the existence of a conspiracy . . . [and must] allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy"); *Simpson v. Uniondale Union Free Sch. Dist.*, 702 F. Supp. 2d 122, 133 (E.D.N.Y. 2010) (dismissing conspiracy claim that "provide[d] absolutely no detail to plausibly state a cognizable claim under Section 1985").

Here, the Complaint contains only "general allegations, framed in broad language closely paralleling that used in Sections 1983 and 1985(3), that [Defendants] successfully conspired to deprive plaintiff of his rights." *Powell*, 327 F.2d at 137. The Complaint outlines the actions (and inactions) of multiple defendants that were taken (or not taken) in response to the Diocese's application for a special use permit, and couples them with general allegations of a conspiracy. (Compl. ¶¶ 66, 74.D.xii, 123-27.) But while the Complaint may allege that Defendants worked together in response to the Diocese's application, it does not contain sufficient allegations to sustain a claim for conspiracy in violation of Section 1985. *Compare Powell*, 327 F.2d at 137 (finding allegations of "action of several interested parties to a workmen's compensation proceeding . . .coupled with the normal administrative processes of adjudication and appeal" insufficient to sustain conspiracy claim); *Farbstein v. Hicksville Public Library*, 2006 WL 288251, at *3 (E.D.N.Y. Feb. 6, 2006) (finding allegations that Library Director, staff and Library Counsel "engaged in a conspiracy to deprive the plaintiff" of equal protection rights and

46

subsequently "covered up acts of anti-Semitism . . . in a conspiracy to obstruct justice" could not

support claim of Section 1985 conspiracy); *with Townes v. New York City*, 1996 WL 164961, at

*9 (E.D.N.Y. Mar. 28, 1996) (declining to dismiss conspiracy claim based on allegations that

defendants acted "in support of each other, after the street arrest, did conspire to commit

perjury," and altered legal documents, and when proposed amended pleading identified particular

officers involved as well as the "times, facts, circumstances of the alleged conspiracy").

Accordingly, the Diocese's Section 1985 Claims are dismissed.

**VI.**     *The Diocese's Section 1986 Claims Are Dismissed*

It is well-established that a violation of Section 1986 is predicated on a violation of

Section 1985, since the former provides a remedy for the latter.  *See Talley v. Brentwood Union*

*Free Sch. Dist.*, 2009 WL 1797627, at *9 (E.D.N.Y. June 24, 2009) (citing *Brown v. City of*

*Oneonta, N.Y.*, 221 F.3d 329, 341 (2d Cir. 2000) ("[A] § 1986 claim must be predicated on a

valid § 1985 claim . . . .")).  Because the Court has dismissed the Diocese's Section 1985 claims

against the Defendants, its Section 1986 claim against them must fail as well.[32]  *See Posr*, 180

F.3d at 419; *Sylla*, 2005 WL 3336460, at *7 ("Where plaintiff fails to state a viable § 1985 claim,

he cannot state a claim under § 1986.").

---

[32]     The FPCA Defendants provide no legal authority to support their claim for costs
and attorneys' fees in connection with their motion to dismiss.  Accordingly, the Court declines
to entertain this application.

## *CONCLUSION*

For the reasons set forth above, the pending motions to dismiss the Complaint brought by the Village Defendants, the FPCA Defendants, and the LBG Defendants are GRANTED in part and DENIED in part as follows: (1) All of the Diocese's claims against the Consultant Defendants (i.e., the FPCA and LBG Defendants) are dismissed in their entirety; (2) All of the Diocese's claims against the Village Defendants based upon conduct occurring prior to and during the State Court Action are dismissed in their entirety; (3) All of the Diocese's claims against the Village Defendants based on the SEQRA process are dismissed in their entirety; and (4) Any remaining claims against Maltino in his official capacity based on the alleged warrantless searches are dismissed.

The Diocese's claims set forth above are dismissed without prejudice. The Diocese is directed to notify the Court on or before March 7, 2011 whether it intends to move for leave to amend the Complaint. Any such motion shall address, with citations to applicable case law, why any amendment or amendments of the dismissed claims would not be futile. Should the Diocese indicate that it intends to move for leave to amend, the Village Defendants are directed to file a written response within 10 days thereafter.

**SO ORDERED.**

Dated: Central Islip, New York
      February 14, 2011                                     _____/s/_____
                                                  Denis R. Hurley
                                                  Unites States District Judge