UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,


                                  Plaintiff,               **MEMORANDUM & ORDER**
      -against-                                 09 CV 5195 (DRH) (ETB)


THE INCORPORATED VILLAGE OF OLD
WESTBURY, THE BOARD OF TRUSTEES OF
THE INCORPORATED VILLAGE OF OLD
WESTBURY, MAYOR FRED CARRILLO, in his
official capacity and individually, TRUSTEE
HARVEY BLAU, in his official capacity and
individually, TRUSTEE STEVEN GREENBERG,
in his official capacity and individually, TRUSTEE
HARVEY SIMPSON, in his official capacity and
individually, TRUSTEE MICHAEL WOLF, in his
official capacity and individually, and MICHAEL
MALTINO, in his official capacity as Superintendent
of Buildings and Public Works of the Village of Old
Westbury and individually,

                                  Defendants.
----------------------------------------------------------------X

**APPEARANCES:**

**Attorneys for Plaintiff**
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
By:    Eric M. Robinson, Esq.

KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
By:    Vincent A. Sama, Esq.

**Attorneys for Defendants**
LEWIS BRISBOIS BISGAARD & SMITH LLP
77 Water Street, Suite 2100
New York, New York 10005
By:    Peter J. Biging, Esq.

**HURLEY, Senior District Judge:**

Plaintiff The Roman Catholic Diocese of Rockville Centre, New York ("plaintiff" or "the Diocese") asserts claims pursuant to the Religious Land Use & Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.* ("RLUIPA") as well as 42 U.S.C. § 1983 for violations of its First and Fourteenth Amendment rights. By Memorandum & Order dated February 14, 2011, the Court dismissed a large portion of the original Complaint but granted the Diocese leave to move to amend (the "February 2011 Decision"). Presently before the Court is the Diocese's motion to amend its Complaint as against defendants The Incorporated Village of Old Westbury (the "Village"), The Board of Trustees of the Incorporated Village of Old Westbury (the "Board"), Mayor Fred Carrillo, Trustee Harvey Blau, Trustee Steven Greenberg, Trustee Harvey Simpson, Trustee Michael Wolf (collectively, the "Trustees"), and Michael Maltino ("Maltino") (collectively, "defendants") pursuant to Federal Rule of Civil Procedure 15(a) and (d). For the reasons set forth, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from the proposed Amended and Supplemental Complaint ("Am. Compl."), including the voluminous exhibits attached thereto,[1] and are presumed true for purposes of this motion.

The Diocese is a nonprofit religious corporation organized under the laws of the State of

---

[1]     Defendants argue that plaintiff's motion to amend should be denied as futile. "[D]eterminations of futility on a motion for leave to amend are subject to the same standards as motions under Rule 12(b)(6)." *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 2011 WL 1142916, at *4 (S.D.N.Y. Mar. 22, 2011). Thus, the Court may properly rely on material attached to the proposed Amended and Supplemental Complaint when deciding the present motion to amend. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

New York.  The Village encompasses approximately twelve square miles of land in Nassau County, New York.  The Board is the legislative and governing body of the Village and is comprised of the Mayor and four Trustees.  Maltino has been employed by the Village since at least April 2009 as the Superintendent of Buildings and Public Works.

## I.  The Property

In 1993, the Diocese entered into a contract with Old Westbury Farm, Inc. (which is not a party to this action) to purchase approximately ninety-seven acres of land located within the Village (the "Property").  The transaction never closed and the federal government ultimately took title to the Property from Old Westbury Farm, Inc. through a forfeiture proceeding.  In March 1995, the Diocese acquired the Property from the federal government and is currently the sole fee owner.

As early as 1993, the Diocese learned of a Village land use ordinance that did not permit the use of land within the Village for the burial of human remains.  At the Village's instruction, sometime in 1993 the Diocese submitted an application to the Board for a zoning change with respect to its planned development of the Property as the Queen of Peace Cemetery ("Queen of Peace").  In early April 1995, after the Diocese acquired title to the Property, it asked the Village to proceed with its consideration of the Diocese's request for the required zone change and a special use permit.  In May 1995, the Village informed the Diocese that it would be required to present its proposed development plan at a public hearing "to prove" that the development of Queen of Peace "is in accord with the comprehensive plan of the Village."  (Am. Compl. ¶ 55.) The Diocese alleges that "[a]s of May 1995, there was no such thing as a discernible and objective comprehensive plan adopted or adhered to by the Village," and that "the uncertainties

3

and subjectivity of any comprehensive plan were used by the Village as a pretext." (*Id.* ¶¶ 56, 57.) After a public hearing held on November 30, 1995, the Board took a formal vote on March 18, 1996 and denied the Diocese's application, concluding that the proposed Queen of Peace was not a religious use of real property, but would be a "huge commercial operation outside the Village's framework." (*Id.* ¶ 62A.)

## II.    *The State Court Action and the Enactment of the POW Law*

In 1996, the Diocese commenced what would ultimately become a long and protracted litigation that went back and forth between the New York State Supreme Court, Nassau County (the "State Supreme Court") and the Appellate Division, Second Department (the "Appellate Division") to challenge the Village's zoning ordinance and the Board's denial of the Diocese's application to develop Queen of Peace (the "State Court Action").

A non-jury declaratory judgment action was tried before the State Supreme Court to "determine whether plaintiffs' proposed [Queen of Peace project] . . . would constitute a religious use of property entitling plaintiffs to additional considerations and accommodations under defendants' Zoning Code." (Am. Compl., Ex. 3 at 1.) In an Order dated November 9, 2000, the State Supreme Court determined that the Diocese's proposed use of the Property to develop a cemetery "constituted conduct for a religious purpose." (*Id.* at 22.) Therefore, the court annulled the Board's denial of the Diocese's application for a special use permit and remitted the matter to the Board "for issuance of said permit" consistent with its opinion. (*Id.* at 26-27.) That ruling was made part of a Judgment entered on January 16, 2001. (*Id.* at 28-30.)

Less than three months later, on March 19, 2001, the Village enacted certain amendments to the Village Code, which the parties refer to as the "Places of Worship Law" or "POW Law".

(Am. Compl., Ex. 4.)[2]  Plaintiff characterizes the POW Law as "impos[ing] unconstitutional restrictions, including onerous set-back requirements, which specifically single out, target, and attempt to prevent or restrain the religious use of property in the Village."  (Am. Compl. ¶ 71.) The POW Law provides that: "Places of worship . . . are permitted in the B-4, B-B and B Residence Districts as a special exception, upon approval of the Village Board of Trustees and subject to [various] conditions," including setback requirements[3] and restrictions on building height, automatic sprinklers, and fencing.  (Am. Compl., Ex. 4.)

Meanwhile, the Village appealed the State Supreme Court's November 9, 2000 Order and entry of judgment.  On April 15, 2002, the Appellate Division upheld the trial court's determination that the Diocese's proposed use of the Property was a "religious use," but found that the "trial court erred in directing the defendant Board . . . to issue a special permit to the Diocese upon remittitur."  (Am. Compl., Ex. 3 at *McGann v. Inc. Vill. of Old Westbury*, 293 A.D.2d 581, 583 (2d Dep't 2002).)  The Appellate Division found that the Diocese's proposed development of Queen of Peace qualified as a type I action under the State Environmental Quality Review Act ("SEQRA") and, therefore, carried a presumption that such development would likely result in a significant adverse environmental impact.  (*Id.* at 583-84.)  The court found that an Environmental Impact Statement ("EIS") might be necessary.  (*Id.* at 584.) Therefore, the Appellate Division remanded the matter to the Board to determine the

---

[2]        The POW Law was enacted as a Local Law 4-2001 and is codified as Section 216-111.2 of the Village Code.

[3]        The POW Law provides that the "minimum required front yard shall be 200 feet. The minimum side and rear yard shall be 125 feet.  All minimum required yard setbacks shall be maintained as a landscaped area and/or landscaped buffer . . . ."  (Am. Compl., Ex. 4.)

environmental impact of the Diocese's proposed development of Queen of Peace "including examination under SEQRA of the effect of any possible mitigating measures." (*Id.*) The court further directed that "[a] determination on the plaintiffs' application shall be consistent with the preferential treatment afforded the religious use of this property." (*Id.*) On September 10, 2002, the New York Court of Appeals dismissed an appeal from the Appellate Division's April 15, 2002 Order. (Am. Compl., Ex. 3.)

### III. The SEQRA Process

In late November 2002, the Diocese requested that the Village begin the SEQRA process as required by the Appellate Division. The Diocese alleges that between 2002 and June 2010, defendants "abused virtually every device and mechanism available to prevent the development of Queen of Peace . . . ." (Am. Compl. ¶ 84.) In particular, the Diocese asserts that defendants "repeatedly and continually used, misused and applied [SEQRA] in a disparate and discriminatory manner . . . to delay without justification the consideration and approval of the Diocese's application to develop Queen of Peace, and . . . to add as much as possible to the Diocese's expenditures in connection with that process." (*Id.* ¶ 97.) For example, the Diocese contends that defendants: (1) made "misrepresent[ations] [to] and purposely deceived the Diocese so that it would make concessions that were not required for approval of the Diocese's application as to Queen of Peace" (*id.* ¶ 89)[4]; (2) required repeated soil and groundwater testing of the Property "with the hope of achieving results adverse to the Diocese" (*id.* ¶ 97C); (3)

---

[4]     The Diocese alleges that in mid-2004 it "agreed to a residential subdivision [of] almost thirty (30) acres of its Property" based upon defendants' assurances that, in exchange, the Diocese's special permit application would "receive proper consideration." (Am. Compl. ¶ 90.) The Diocese asserts that "nothing of the sort was intended by Defendants." (*Id.*)

attempted to require the Diocese to "fund psychiatric or psychological testing to ascertain the effects, if any, of someone's viewing a cemetery from the perspective of a passerby on an adjoining road," even though defendants knew that "SEQRA applies only to the environment, [and not to] human psychiatric or psychological matters" (*id.* ¶ 97D); (4) "withheld from the Diocese for months, and in one instance close to a year, documents and reports that address[ed] what the Defendants purport to be material aspects of the Diocese's application" (*id.* ¶ 97G); (5) demanded that the Diocese "continue to pay [Village-retained] attorneys['] . . . fees and expenses" even though that amount has exceeded the $100,000 cap imposed by Village Local Law § 103.4 (*id.* ¶ 99); and (6) "refused to act on the Final Environmental Impact Statement (or "FEIS") submitted by the Diocese on July 1, 2009 . . . within the time authorized by applicable law" (*id.* ¶ 97H).

## IV.     *Warrantless Searches of the Property*

In April 2009, Maltino, "who holds himself out as having police power within the Village," conducted "one or more warrantless searches" of the Property.  (*Id.* ¶ 100.)  The Diocese contends that these searches were conducted "to harass the Diocese in retaliation for continuing to insist that the long-abandoned structures on its Property had no historic value, and in an attempt to compel the Diocese to maintain them so that a pretextual historic significance concern would continue to require attention and the expenditure of resources to address same by the Diocese."  (*Id.*)

## V.      *Plaintiff's Allegations of Defendants' Animus and Hostility*

The Diocese alleges that defendants' "improper animus" towards it has been evident since 1995, when the Village attempted to stymy the Diocese's efforts to hold an All Souls Day

Mass on the Property. According to the Diocese, the Village took the "ridiculous position" that the Diocese needed to obtain a building permit from the Village's Board of Zoning Appeals to hold the Mass in a tent on the Property. (*Id.* ¶¶ 103, 104.) The Diocese asserts that since then, defendants "have repeatedly expressed discriminatory attitudes and views regarding the Diocese['s] proposed development of its Property for religious use." (*Id.* ¶ 105.) In May 1999, defendant Blau, then the Mayor of the Village, stated that "'a cemetery will never be built on [the] property,' . . . because he disbelieved . . . that a Roman Catholic cemetery such as Queen of Peace [ ] constitute[d] actual and sincere religious land use." (*Id.* ¶ 105 & Ex. 15 ¶ 4.) Between 2002 and 2004, "Village representatives repeatedly expressed hostility towards" the Queen of Peace proposal by "deliberately down-zon[ing]" the Property to induce the Diocese to abandon the project, and by referring to the cemetery as a "'parasite.'" (*Id.* ¶¶ 106-08 & Ex. 6 ¶¶ 10-11 & Ex. 16 ¶ 3.)

## VI.   *The Resolution*

The original Complaint was filed on November 30, 2009 and approximately one month later, on December 21, 2009, the Village "finally adopted its own version of the FEIS." (*Id.* ¶ 113.)[5] Based on information contained in the FEIS, the Board issued a "Statement of Findings" pursuant to SEQRA on April 19, 2010. In June 2010, the Board adopted a "Resolution Granting a Special Exception Permit and Related Variances to the Roman Catholic Diocese of Rockville Centre Authorizing the Use of Certain Property Within the Village of Old Westbury as a Place of

---

[5]     The Diocese alleges that the Village took the "extremely unusual" step of "taking control of the preparation of the FEIS" from the Diocese. (Am. Compl. ¶ 114 & n.6.) Defendants dispute this assertion, claiming that "the Diocese asked that the Defendants take control of the preparation and issuance of a Statement of Findings based on the FEIS." (*Id.* ¶ 114.)

Worship/Cemetery" (the "Resolution").  (Am. Compl., Ex. 21.)

The Diocese alleges that the Resolution "imposes onerous and restrictive conditions" upon its development of Queen of Peace, and that such conditions are "impractical" and make the project "unjustifiably more expensive."  (Am. Compl. ¶ 118.)  According to the Diocese, defendants imposed these restrictive conditions "with the hope . . . that the Diocese would be forced to abandon its development of the Property for religious use and failing that to limit it as much as possible."  (*Id.* ¶ 119.)

The Resolution includes, *inter alia*, the following provisions to which the Diocese objects: (1) setback requirements around both the perimeter of the Property (150 feet) and the pond on the Property (75 feet), which "reduce the property available to the Diocese [for burial purposes]" and are "significantly more restrictive than the requirements imposed by the Village for secular land uses," such as golf courses, polo grounds, and a public garden (*id.* ¶ 121A); (2) a requirement that the Diocese place a perimeter maintenance roadway outside the 150-foot perimeter setback, which further reduces the area available to the Diocese for burial purposes (*id.* ¶ 121B); (3) a requirement that the Diocese "retain and pay in perpetuity a third-party to maintain the landscaping at Queen of Peace" even though the defendants knew that "the Diocese maintains an experienced landscape maintenance staff at the Holy Rood Cemetery" located less than one mile away (*id.* ¶ 121C); (4) the Diocese's special exception permit authorized by the Resolution expires every five years unless the Diocese applies for and obtains a renewal from the Village and Board (*id.* ¶ 121E); (5) deed restrictions (*id.* ¶ 121H); and (6) required "pre-development" and "perpetual monitoring of groundwater" for nitrates with a standard that "is materially more restrictive than the groundwater nitrate concentration standard adopted by New York State" (*id.* ¶

121J).

## VII. The February 2011 Decision

The original Complaint, which, as noted above, was filed prior to the Board's adoption of the Resolution, asserted claims pursuant to RLUIPA and Sections 1983, 1985 and 1986.[6]  The crux of the allegations related to: (1) the defendants' conduct beginning at the time the Diocese initiated communications with the Village regarding development of Queen of Peace in 1993 through the conclusion of the State Court Action, (2) the enactment of the POW Law, and (3) defendants' alleged improper delay of the SEQRA process and refusal to issue a FEIS.  In the February 2011 Decision, the Court dismissed as time-barred the Diocese's RLUIPA and Section 1983 claims based upon defendants' pre-2002 conduct (including the Board's denial of the Diocese's 1996 application for a special use permit and defendants' alleged wrongdoing in connection with the State Court Action).  (Feb. 2011 Decision at 27-28.)  The Court also dismissed the Diocese's RLUIPA and Section 1983 claims based upon defendants' alleged misuse of the SEQRA process, finding such claims unripe for review because "at the time the Complaint was filed, the Board had not yet made a decision to approve or deny the Diocese's application for a special use permit to develop Queen of Peace." (*Id.* at 35.)  Although the Court reviewed the parties' letter submissions describing the Board's adoption of the Resolution, it concluded that: "To the extent that the Diocese now claims that the Resolution (and the

---

[6]     In addition to the defendants named in the proposed amended pleading, the original Complaint asserted claims against certain non-governmental entities and individuals who served as Village consultants in connection with the Diocese's special permit application and the SEQRA process.  Those claims, made pursuant to RLUIPA and Section 1983, were dismissed in their entirety.  (Feb. 2011 Decision at 14-23.)  The Diocese does not re-assert any claims against those consultant defendants in the proposed amended pleading.

10

conditions imposed on the Diocese therein) constitute a violation of the Diocese's constitutional

rights, such a claim does not fall within the ambit of the Complaint as currently framed." (*Id.* at

42.)[7] With the Court's permission, the Diocese filed the present motion seeking leave to amend

pursuant to Rule 15.

## VIII. *The Proposed Amended and Supplemental Complaint*

The Diocese's proposed amended pleading asserts claims against defendants pursuant to

RLUIPA's "substantial burden" and "equal terms" clauses. The Diocese also alleges that

defendants violated its Fourteenth Amendment equal protection rights and retaliated against it in

violation of the First Amendment. Finally, the Diocese re-asserts its claims that the POW Law is

facially unconstitutional and that Maltino's warrantless searches of the Property violated the

Fourth Amendment. Defendants oppose the Diocese's motion to amend on the grounds that the

Diocese's proposed amendments would be futile.

## DISCUSSION

## I. *Legal Standard*

The Diocese frames its motion as seeking leave to "amend and supplement its complaint"

pursuant to Rules 15(a) and 15(d). (Not. of Mot.) "[T]he Rule 15(d) standard is functionally

identical to the standard set forth in Rule 15(a)." *Instinet Inc. v. Ariel (UK) Ltd.*, 2011 WL

4444086, at *2 n.1 (S.D.N.Y. Sept. 26, 2011) (citing *Gittens v. Sullivan*, 670 F. Supp. 119, 123-

24 (S.D.N.Y. 1987)). Under Rule 15(a), the Court "should freely give leave [to amend a

---

[7] The Court declined to dismiss the Diocese's claims regarding the unconstitutionality of the POW Law on timeliness grounds and, since defendants had not addressed the merits of those claims, the Court declined to address the merits *sua sponte*. (Feb. 2011 Decision at 30.) The Court also declined to dismiss the claims made against Maltino based upon the alleged warrantless searches he conducted on the Property in April 2009. (*Id.* at 42-44.)

pleading] when justice so requires." Fed. R. Civ. P. 15(a); *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010). A motion to amend may be denied, however, upon a showing of the futility of the proposed amendment. *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008). "[T]he standard for futility with respect to a motion to amend under Rule 15 is identical to the standard for a Rule 12 (b)(6) motion to dismiss – namely, the court must determine whether the allegations in the complaint state a claim upon which relief can be granted." *Crippen v. Town of Hempstead*, 2009 WL 803117, at *1 n.1 (E.D.N.Y. Mar. 25, 2009). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## II. *Plaintiff has Cured the Ripeness Deficiencies Identified in the February 2011 Decision*

Plaintiff contends that its RLUIPA and Section 1983 claims based upon defendants' misuse of the SEQRA process and decision on the Diocese's application for a special use permit are now ripe because the Resolution "is a final and definitive statement from the Village as to how the Diocese can (and cannot) use its property" and that it "inflicts immediate injury." (Pl.'s Mem. at 8.)

### A. *Legal Standard*

Article III of the Constitution requires that all cases or controversies be ripe for judicial review. *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005); *see also Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 770 (E.D.N.Y. 1999) ("In the area of land use, the doctrine of ripeness is intended to avoid premature adjudication of administrative action.") (internal quotation marks and citation omitted). "[T]he Supreme Court has developed

12

specific ripeness requirements applicable to land use disputes." *Murphy*, 402 F.3d at 347. In

*Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S.

172 (1985), the Supreme Court established a two-pronged ripeness test for the plaintiff's claims

that certain zoning laws amounted to a "taking" in violation of the Fifth Amendment. First, the

plaintiff had to show that prior to commencing its suit, it had "obtain[ed] a final, definitive

position as to how it could use the property from the entity charged with implementing the

zoning regulations." *Murphy*, 402 F.3d at 348 (citing *Williamson*, 473 U.S. at 186). Second, the

plaintiff had to demonstrate that it sought "compensation for an alleged taking before proceeding

to federal court." *Id.* at 349 (citing *Williamson*, 473 U.S. at 194).[8]

The Second Circuit has recognized that the two-pronged ripeness test set forth in

*Williamson*, although developed in the context of a Fifth Amendment takings claim, "has not

been so strictly confined." *Id.* The first prong of the *Williamson* ripeness test has been applied to

procedural and substantive due process claims as well as equal protection claims. *See id.* at 350

(collecting cases); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88

(2d Cir. 2002) (collecting cases); *Adrian v. Town of Yorktown*, 2007 WL 1467417, at *6

(S.D.N.Y. May 16, 2007) (finding the first prong of the *Williamson* test applied to equal

protection and due process claims).

The Second Circuit has also found that, under certain circumstances, the first prong of the

*Williamson* test can be applied to "a First Amendment claim emanating from a land use dispute."

---

[8]    The second prong of the *Williamson* test, which requires the plaintiff to seek
compensation for any alleged taking before proceeding to federal court, "is germane to takings
challenges" only and does not apply to due process, equal protection, or First Amendment
claims. *Murphy*, 402 F.3d at 349. Accordingly, it is irrelevant for present purposes.

*Murphy*, 402 F.3d at 350 & n.5 (applying *Williamson* test to claim of violation of First

Amendment rights to freely exercise religion); *Dougherty*, 282 F.3d at 90 (analyzing *Williamson*

test in context of First Amendment retaliation claim).  Thus, a plaintiff's claimed violation of his

First Amendment rights in the land use context will be ripe for review only if he can show that he

has suffered an "immediate injury" and that his "pursuit of a further administrative decision

would do nothing to further define his injury."  *Dougherty*, 282 F.3d at 90.  The ripeness of a

RLUIPA claim is determined using the same standard.  *See Murphy*, 402 F.3d at 350 (finding

that it is not "necessary to distinguish [a] RLUIPA claim from [a] First Amendment Free

Exercise claim when it comes to our ripeness inquiry") (collecting cases).

### B.      Application

The Diocese has established that the Resolution constituted a "final, definitive position as

to how it could use [its] property," *see Murphy*, 402 F.3d at 348 (citing *Williamson*, 473 U.S. at

186), sufficient to establish the ripeness of its equal protection claims.  The POW Law makes

clear that the Board's decisions on special permit applications filed by places of worship, such as

the Diocese's application, are not appealable to the Village Zoning Board of Appeals.  (*See* POW

Law at § 216-111.2(L), attached as Ex. 4 to Am. Compl.; *see also* Village Code § 216-

108(A)(15).)  The Court further finds that plaintiff has established the ripeness of its First

Amendment and RLUIPA claims because the Resolution caused the Diocese an "immediate

injury" such that "pursuit of a further administrative decision would do nothing to further define

[that] injury."  *Dougherty*, 282 F.3d at 90.

Defendants seemingly argue that the Diocese did not exercise its right, pursuant to New

York Village Law § 7-725B(9), to challenge the Resolution – and the underlying "Statement of

Findings" the Board made based upon the FEIS – by filing an Article 78 proceeding within 30 days after the Resolution was adopted.  (Defs.' Opp'n at 3.)  However, "[t]he first prong of the *Williamson* ripeness test [which requires a plaintiff to obtain a "final, definitive position" as to how it can use its property] is not an exhaustion requirement."  *Clark v. Town of E. Hampton*, 757 F. Supp. 2d 121, 122 (E.D.N.Y. 2010) (citing *Williamson*, 473 U.S. at 192).  The Supreme Court has explained that:

> [T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and *judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.*

*Williamson*, 473 U.S. at 193 (emphasis added).  Village Law § 7-725-b(9) provides that "[a]ny person aggrieved by a decision of . . . any . . . board . . . of the village" regarding an application for a special use permit "may apply to the supreme court for review" via an Article 78 proceeding.  In such a proceeding, a reviewing court "restrict[s] [itself] to [a determination of] whether there has been illegality, arbitrariness or an abuse of discretion."  *Matter of N.Y. Tennis Assocs. v. Town of Vestal*, 97 A.D.2d 899, 900 (3d Dep't 1983).  Thus, an Article 78 proceeding would have constituted nothing more than a judicial procedure pursuant to which the Diocese could have sought review of the Resolution and "obtain[ed] a remedy" if the decision to adopt the Resolution was found "to be unlawful or otherwise inappropriate."  *See Williamson*, 473 U.S. at 193.  The Diocese's failure to commence an Article 78 proceeding to request review of the Resolution does not render its claims unripe for judicial review given that the administrative process, per se, had run its course.

Defendants also assert that the Diocese has failed to allege that it has suffered any "'injury in fact'" as a result of the adoption of the Resolution or the application of the POW Law. (Defs.' Opp'n at 7.)  According to defendants, although New York Real Property Law § 451 requires the Diocese "to obtain approval from the Nassau County legislature before it can begin to build a cemetery," the Diocese "has yet to even submit a request to the Nassau County Legislature" for such approval.  (*Id.*)  This factual assertion, however, is not contained in the pleadings and is, therefore, not properly considered as part of the present motion.  *See Mahar v. U.S. Xpress Enters., Inc.*, 2009 WL 2227583, at *1 (N.D.N.Y. July 21, 2009) ("As a generally accepted legal proposition within the Second Circuit, when considering whether the proposed amended complaint is futile, the Court is expected to employ the Rule 12(b)(6) standard of review . . . In essence, the Court's review is relegated to the four corners of the proposed [pleading].").

### III.    *Plaintiff has Adequately Pled its RLUIPA "Substantial Burden" Claim*

RLUIPA prohibits the government from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person" or religious institution "unless the government demonstrates that imposition of the burden" is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc(a)(1).  Thus, to establish a prima facie violation of RLUIPA, a plaintiff must show "that the land use regulation at issue as implemented: (1) imposes a substantial burden, (2) on the 'religious exercise,' (3) of a person, institution, or assembly."  *Cathedral Church of the Intercessor v. Inc. Vill. of Malverne*, 2006 WL 572855, at *8 (E.D.N.Y. Mar. 6, 2006).  If a plaintiff makes out a prima facie showing, "the

burden shifts to the government to demonstrate that the regulation furthers a compelling governmental interest and is the least restrictive means of furthering that compelling interest." *Id.* At the pleadings stage, a plaintiff need only allege a prima facie violation; an analysis of whether the government has shown a compelling government interest or the use of least restrictive means is more appropriately addressed in connection with summary judgment. *See Bikur Cholim, Inc. v. Vill. of Suffern*, 664 F. Supp. 2d 267, 277 (S.D.N.Y. 2009); *Cathedral Church*, 2006 WL 572855 at **8-9.

Plaintiff asserts that the Resolution, which was adopted in accordance with the POW Law, constitutes a substantial burden for two reasons. First, the Resolution's setback requirements and provision that a portion of the Property must be used for residential purposes drastically reduce the amount of space available for use as burial plots. (Pl.'s Mem. at 12-13.) The Diocese alleges that when it accounts for the square footage of Property lost as a result of the required setbacks and residential subdivision, "the Resolution only permits [ ] the Diocese [to] use [ ] approximately 43% of its available land for religious use," which means that "the land at Queen of Peace Cemetery available for in-ground burial plots is reduced from about 92,779 plots to 42,775." (*Id.* at 13 (citing Am. Compl. ¶ 6).) The Diocese further asserts that the limitation of the Diocese's permit to five-year periods "renders illusory any ability [of] the Diocese to promise perpetual care for a decedent's remains." (Am. Compl. ¶ 6.) Finally, plaintiff argues that many of the conditions set forth in the Resolution, including excessive groundwater testing and landscaping requirements "require the Diocese to incur needless expense." (Pl.'s Mem. at 15.)

The Diocese has sufficiently alleged that the conditions imposed as part of the Resolution

constitute a "substantial burden" within the meaning of RLUIPA.[9]  As noted above, the

conditions imposed by the Resolution would significantly restrict the Diocese's use of their

Property for religious burial purposes.  *See Chabad Lubavitch v. Borough of Litchfield*, 796

F. Supp. 2d 333, 343 (D. Conn. 2011) (finding sufficient allegations of substantial burden when

defendant limited plaintiff's expansion to an area that was 17,000 square feet smaller than what

plaintiff proposed and "if [plaintiff] conformed its plans to the [defendant's] specification, it

would need to sacrifice a good portion of the spaces that it believes is necessary to the exercise of

its religion"); *Cathedral Church*, 2006 WL 572855, at **2, 8 (finding plaintiff sufficiently

alleged a substantial burden by asserting that defendants' "actions and/or inactions with respect

to their building proposals" resulted in the plaintiffs having inadequate physical space, which

"constrained [ ] their ability to observe or participate" in fundamental religious practices).

Furthermore, the Diocese has alleged that the Resolution's requirements regarding rigorous

groundwater testing and landscaping/maintenance requirements were "imposed on [the Diocese]

arbitrarily, capriciously, or unlawfully," *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d

388, 350 (2d Cir. 2007).  (*See* Am. Compl. ¶ 97F (noting that the Board required groundwater

testing even though the Diocese submitted groundwater test results from nearby Holy Rood

Cemetery that "established conclusively that the more than one thousand bodies interred at Holy

Rood . . . have not affected adversely the groundwater under that cemetery"); *id.* ¶ 121C (alleging

---

[9]      Although defendants assert that plaintiff cannot allege a substantial burden
because the Board did not deny the Diocese's application outright, it is well-settled that "a
complete denial of [a] Plaintiff's proposal is not necessary for the Court to find that the
government regulation has imposed a substantial burden on religious exercise."  *Cathedral
Church*, 2006 WL 572855 at *8 (citing *Westchester Day Sch. v. Vill. of Mamaroneck*, 379
F. Supp. 2d 550, 556-57 (S.D.N.Y. 2005)).

that the Diocese was required to "retain and pay in perpetuity a third-party to maintain the landscaping at Queen of Peace" even though the defendants knew that "the Diocese maintains an experienced landscape maintenance staff at the Holy Rood Cemetery" located less than one mile away).)

Thus, plaintiff's motion to amend its pleading to assert a RLUIPA "substantial burden" claim is granted.

### IV.  *Plaintiff has Adequately Pled a First Amendment Free Exercise Claim*

"'The Free Exercise Clause of the First Amendment, which has been applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."'" *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).  "Government enforcement of laws or policies that substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny."  *Id.*  "Substantial burden" claims under RLUIPA, as discussed above, are analyzed under the same framework as First Amendment free exercise claims.  *Westchester Day Sch.*, 504 F.3d at 348 ("RLUIPA's legislative history indicates that Congress intended the term substantial burden to be interpreted 'by reference to Supreme Court [free exercise] jurisprudence.'") (quoting 146 Cong. Rec. S7774, S7776 (2000)) (alteration added); *see also Murphy*, 402 F.3d at 350 (noting that Congress intended RLUIPA to be a codification of "existing Free Exercise jurisprudence"); *Chabad Lubavitch*, 796 F. Supp. 2d at 342 (noting the identical analytical framework under RLUIPA and the Free Exercise clause).

Accordingly, for the reasons set forth above, the Diocese has sufficiently alleged that the

Resolution, adopted pursuant to the POW Law, constituted a substantial burden and, therefore, has adequately pled a claim pursuant to the Free Exercise clause of the First Amendment.

**V.      *Plaintiff has Adequately Pled a RLUIPA "Equal Terms" Claim***

RLUIPA's equal terms provision states: "No government shall impose a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). While RLUIPA's equal terms provision "'has the "feel" of an equal protection law, it lacks the "similarly situated" requirement usually found in equal protection analysis.'" *Third Church of Christ v. City of New York*, 617 F. Supp. 2d 201, 209 (S.D.N.Y. 2008) (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1229 (11th Cir. 2004)), *aff'd*, 626 F.3d 667 (2d Cir. 2010). "Therefore, Courts cannot fall back on the familiar equal protection standard in the application of RLUIPA." *Id.*

The Diocese bases its RLUIPA equal terms claims upon defendants' application of SEQRA in reviewing the Diocese's request for a special use permit (Am. Compl. ¶¶ 97B, 97E),[10] and the Board's adoption of the Resolution in accordance with the POW Law (*id.* ¶¶ 121(A)-(L)). With respect to its claims regarding defendants' misuse of SEQRA, the Diocese asserts that during the SEQRA process defendants, *inter alia*, required the Diocese to submit to extensive testing as to the effect of fertilizers, herbicides, and pesticides despite the fact that the Village does not restrict the use of such products by neighboring golf courses and polo grounds. (*Id.* ¶ 97B; *see also id* ¶ 97E (alleging that the Diocese was required to hire an arborist to survey the trees on the Property and assess the potential impact on those trees if the Property was used as a

---

[10]      *See Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 498 (S.D.N.Y. 2010) (finding that SEQRA constitutes a "land use regulation" within the meaning of RLUIPA).

cemetery, but no such requirement was imposed on nearby golf courses or polo grounds.)  With respect to the Resolution, the Diocese alleges, *inter alia*, that it has been subjected to more stringent requirements regarding setbacks, landscape and property maintenance, and groundwater testing than properties within the Village that are used for "secular" purposes, including golf courses, polo grounds, and public gardens.  (*Id.* ¶¶ 121A-L.)

When determining the sufficiency of plaintiff's RLUIPA equal terms claim, the Court's "threshold area of inquiry" is whether the proposed Amended and Supplemental Complaint identifies a sufficiently comparable non-religious institution or assembly.  *See Third Church of Christ*, 617 F. Supp. 2d at 209.  Defendants argue that "the Diocese has failed to offer any meaningful basis to compare the special permits for the Queen of Peace Cemetery against the land use permits of the alleged comparators."  (Defs.' Opp'n at 22.)

The Second Circuit has "yet to decide the precise outlines of what it takes to be a valid comparator under RLUIPA's equal-terms provision."  *Third Church of Christ v. City of New York*, 626 F.3d 667, 669 (2d Cir. 2010).  In *Third Church of Christ*, the plaintiff-church was issued an accessory-use permit that allowed it to hold large-scale catering events on its property. After receiving complaints from the church's neighbors, however, the defendant-municipality determined that "the catering establishment is not an accessory use because . . . it appears to be a principal commercial establishment at the premises," and revoked the church's permit.  *Id.* at 668 (internal quotation marks omitted, alteration in the original).  The church asserted a claim under RLUIPA's equal terms provision, arguing that it received unequal treatment as compared to two hotels located within the same zoning district that had operated outside of their certificates of occupancy but were merely issued notices of violation (a lesser sanction than the revocation of an

accessory-use permit). *Id.* at 669. The Second Circuit concluded that the hotels were valid

comparators: both the church and the hotels were located in the same R-10 residential district,

both held large-scale catering events, and both were operating in violation of New York City land

use regulations. *Id.* at 671.

The Second Circuit emphasized that RLUIPA "is less concerned with whether formal

differences may be found between religious and nonreligious institutions – they almost always

can – than with whether, in practical terms, secular and religious institutions are treated equally."

*Id.* The Circuit distinguished the case before it – in which the church and the hotels received

different treatment even though they were "both subject to the same zoning rules and . . . are both

operating in violation of those rules" – from the case before the Eleventh Circuit in *Primera

Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295 (11th Cir. 2006).

In that case, a small church was denied a zoning variance and sought to compare itself to a larger

school that had been granted a permit to develop its property. The Eleventh Circuit found that

the church and school were not proper comparators under RLUIPA because they were subject to

different "zoning processes" as well as: "(1) different decision-making bodies (2) applying

different criteria (3) to achieve different ends." *Third Church of Christ*, 626 F.3d at 671 (citing

*Primera Iglesia*, 450 F.3d at 1311-13).

Here, the Diocese has failed to allege that defendants ever completed the SEQRA review

process with respect to the development of its comparators' properties. The Second Circuit has

noted that, pursuant to *Primera Iglesia*, "organizations subject to different land use *regimes*" – as

opposed to "organizations at different stages of the same procedural process" – "may well not be

sufficiently similar to support a discriminatory-enforcement challenge." *Third Church of Christ*,

626 F.3d at 671 (emphasis in the original). The Diocese cannot maintain a claim that defendants applied SEQRA to the Diocese's project in a "disparate and discriminatory manner," (Am. Compl. ¶ 97), when the Diocese never actually alleges that its comparators were also put through the SEQRA process and received more favorable treatment in connection with that process.

However, the Diocese has adequately pled a RLUIPA equal terms claim regarding defendants' application of the POW Law to the Diocese and the adoption of the Resolution. The Diocese has alleged that, pursuant to the POW Law, which applied solely to places of worship, defendants imposed overly stringent and burdensome conditions on the development of the Diocese's Property that were not imposed on land owners seeking to develop their properties for non-religious uses. The Diocese and its comparators both sought to maintain properties with expansive lawns that would require the use of fertilizers and pesticides, and both sets of properties would require ongoing landscaping and property maintenance. The Diocese, however, was subjected to more restrictive conditions regarding, *inter alia*, groundwater testing and property maintenance that its comparators. Accordingly, the Court finds the Diocese has sufficiently alleged the existence of appropriate comparators to sustain its RLUIPA equal terms claim.[11]

Thus, the Diocese's motion to amend its pleading to assert a RLUIPA equal terms claim based upon defendants' adoption of the Resolution is granted, but its motion to assert such a claim based upon defendants' application of the SEQRA process is denied.

---

[11] Defendants' argument that the use of the Property for a cemetery is materially different than the use of the comparators' properties for golf courses or public gardens, (Defs.' Opp'n at 20), is more appropriately addressed at the summary judgment stage. *See Chabad Lubavitch*, 796 F. Supp. 2d at 344.

## VI.     *Plaintiff's Fourteenth Amendment Equal Protection Claim*

### A.     *Plaintiff Cannot Maintain a Selective Enforcement or Class of One Claim*

Plaintiff asserts that defendants violated its Fourteenth Amendment equal protection rights by virtue of its discriminatory application of SEQRA and its adoption of the Resolution. Plaintiff couches its claims as "selective enforcement" claims, (Pl.'s Mem. at 16), which would require it to plead that: "(1) [it was] 'treated differently from other similarly situated' [entities] and (2) this 'differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Butler v. City of Batavia*, 323 Fed. Appx. 21, 22 (2d Cir. Apr. 6, 2009) (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007)). Defendants contend that plaintiff's claims are more appropriately analyzed as "class of one" claims. (Defs.' Opp'n at 17.) "The Supreme Court has 'recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 58 (2d Cir. 2010) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Under either a selective enforcement or class of one claim, the Diocese must allege the existence of similarly situated comparators. There appears to be some disagreement within the Circuit as to the definition of "similarly situated" in "selective enforcement," as opposed to "class of one," equal protection claims. *See Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 n.9 (E.D.N.Y. 2008). Some district courts have stated that "the standard for 'similarly situated' when bringing a selective enforcement claim is the same as in a 'class of one' claim." *Dones v.*

*City of New York*, 2008 WL 2742108, at *7 (S.D.N.Y. July 9, 2008); *see also Kamholtz v. Yates County*, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008) ("The similarly situated standard here [in the context of a selective enforcement claim] is the same as that for [ ] class-of-one claims."), *aff'd* 350 Fed. Appx 589 (2d Cir. 2009). Thus, these courts have required plaintiffs asserting either "class of one" or "selective enforcement" equal protection claims to "establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *See Ruston*, 610 F.3d at 59 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)) (internal quotation marks omitted).

Other courts within this Circuit, however, have "employ[ed] the slightly different formulations set forth by the Second Circuit for each [type of] claim." *Vassallo*, 591 F. Supp. 2d at 184 n.9; *see also Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 694-95 (S.D.N.Y. 2011) (collecting and comparing cases). For example, the *Vassallo* court applied the *Ruston* definition of "similarly situated" to a class-of-one claim, and then applied a lesser standard of "similarly situated in all material respects" in its analysis of the selective enforcement claim. *Id.* at 184 (quoting *Sebold v. City of Middletown*, 2007 WL 2782527, at *26 (D. Conn. Sept. 21, 2007)) (internal quotation marks omitted).

Assuming *arguendo* that the Diocese has asserted a selective enforcement (rather than class of one) claim, and that a less demanding standard of similarly situated applies, the Diocese has utterly failed to articulate how the Queen of Peace cemetery project could be viewed by a

reasonably prudent person as being roughly equivalent to the golf courses, polo grounds, and public gardens located within the Village. *See Yajure v. DiMarzo*, 130 F. Supp. 2d 568, 572 (S.D.N.Y. 2001) (noting that "[t]he test for determining whether persons similarly situated were selectively treated is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent"). As such, and having failed to meet the lesser standard of "similarly situated," the Diocese cannot maintain an equal protection claim under selective enforcement or class of one theories.

> **B.** **Plaintiff's Equal Protection Claims are Adequately Pled as They Allege That the POW Law Contains an Express Classification Based Upon Religion, and That SEQRA was Applied in a Discriminatory Manner Motivated by Defendants' Discriminatory Animus**

The Second Circuit has made clear that, in addition to pleading selective enforcement or class of one claims, there are "several ways" to establish an equal protection violation, including by identifying (1) a law that contains "express[ ]" discriminatory classifications, (2) "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner," or (3) "a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) ("Pyke I").[12] A plaintiff alleging an equal protection claim under any of these three alternate theories "is not obligated to show a better treated, similarly situated group of individuals" in order to sustain its claim. *Id.*; *see also Alfaro v. Labador*, 300 Fed. Appx. 85, 87 (2d Cir. Nov. 14, 2008) (plaintiff asserted an equal protection violation based upon defendants' denial of his application for a zoning variance; the

---

[12] Although *Pyke I* involved allegations of racial discrimination, its rationale has been applied in the context of a plaintiff asserting an equal protection claim based upon religious discrimination. *See Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 2011 WL 5995075, at *8 (S.D.N.Y. Nov. 29, 2011).

Circuit rejected defendants' argument that plaintiff's failure to identify similarly situated comparators was fatal to his claim; "Even if no one else applied for a variance, Alfaro could prevail if the ZBA defendants' denial of his application was based on his race.").

Here, the Diocese has alleged that the POW Law contains an express classification based upon religion, i.e., that only places of worship were subject to its provisions setting forth the conditions that could be imposed on its special use permits. Even if the POW Law could be considered facially neutral, as the SEQRA undoubtedly is, the Diocese has sufficiently alleged that both statutes were applied against the Diocese in a discriminatory manner, as set forth above. Moreover, the Diocese has sustained its burden to allege that defendants were motivated by discriminatory animus. *See Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009) ("Pyke II") ("Plaintiffs challenging such facially neutral laws on equal protection grounds bear the burden of making out 'a prima facie case of discriminatory purpose.") (internal quotation marks omitted). The Diocese specifically alleges that the POW Law was adopted a mere three months after the conclusion of the State Court Action with the express purpose of preventing the Diocese from developing its Property for religious use. (Am. Compl. ¶¶ 71-75.) The Diocese has further alleged that during the SEQRA review process, defendants unjustifiably delayed the proceedings by, *inter alia*, imposing onerous and arbitrary requirements on the Diocese. For instance, defendants allegedly attempted to require the Diocese to "fund psychiatric or psychological testing to ascertain the effects, if any, of someone's viewing of a cemetery from the perspective of a passerby on an adjoining road," even though defendants were aware that SEQRA is concerned only with environmental – rather than psychological – impacts of a proposed project. (*See id.* ¶ 97D.) Finally, the Diocese has alleged specific instances in which Board members or

Village representatives expressed animus or hostility to the use of the Property for a Roman Catholic cemetery, a highly important aspect of that religion.  (*See id.* ¶ 27 ("The sanctity of a Catholic cemetery is vital to the faith . . . .")

Accordingly, the Diocese's motion to amend its pleading to assert an equal protection claim is granted.

## VII.    *Plaintiff has Adequately Pled That the POW Law is Facially Unconstitutional*

The Diocese asserts that the POW Law "targets religious use [of land, and] restricts land use *because* it is religious . . . ."  (Pl.'s Mem. at 15 (emphasis in the original); *see also id.* at 22.)  The Diocese argues that New York law provides that "religious use of property is entitled to preference"; according to the Diocese a property owner seeking to use its property for religious purposes is entitled to a presumption of "complete and full use" of his property and government actors then bear the burden to "determine the minimal conditions necessary to protect public health and safety."  (*Id.* at 15.)  The POW Law, argues the Diocese, "starts with onerous and arbitrary setbacks, height restrictions and other limitations on religious use, then requires applications for variances from them."  (*Id.*)  Defendants point out, however, that the POW Law actually *allows* places of worship to operate in a B-4 zoning district in which they would otherwise not be permitted to operate.  (Defs.' Opp'n at 14.)

Neither side has cited any case law that bears directly on the Diocese's claim that the POW Law is facially unconstitutional.  The Supreme Court has held:

> There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct. To determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face.  A law lacks facial neutrality if it refers to a religious practice

28

without a secular meaning discernable from the language or context.

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Here, it is clear that the POW Law "refers to a religious practice without a secular meaning discernable from [its] language or context." *Id.* While Court recognizes that a lack of facial neutrality does not give rise to a presumption of unconstitutionality, *see Locke v. Davey*, 540 U.S. 712, 720 (2004), the Diocese has alleged, by way of defense, enough at this stage to sustain its challenge to the POW Law. Defendants argue that "the Village Defendants enacted the POW Law to maintain property values, curb traffic concerns, and maintain the overall quality of life for the Village's residents." (Defs.' Opp'n at 15.) While the factual record created after discovery may ultimately support defendants' assertion that the POW Law was intended only to regulate "secondary effects," at this point the Court is unwilling to declare the Diocese's constitutional claim futile.

Accordingly, plaintiff's motion to amend its pleading to assert a claim challenging the constitutionality of the POW Law is granted.

### VIII. Plaintiff has Adequately Pled a First Amendment Retaliation Claim

The Diocese alleges that the defendants' "unlawful and outrageous conduct against [it] from in or about 2003 though the present was in direct retaliation for the Diocese's pursuit of a judicial remedy through the [State Court Action] . . . ." (Am. Compl. ¶ 164.) "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws." *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000). In particular, "[t]he Second Circuit has recognized that 'a claim for relief may be stated under section 1983 if otherwise routine administrative

decisions are made in retaliation for the exercise of constitutionally protected rights.'" *Chernoff v. City of New York*, 2009 WL 816474, at *5 (E.D.N.Y. Mar. 26, 2009) (quoting *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987)). To establish a *prima facie* case of retaliation under Section 1983, a plaintiff must demonstrate that: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Butler*, 323 Fed. Appx. at 23 (same); *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998) (same).[13]

Defendants argue that the Diocese's First Amendment retaliation claim is futile because "there is no allegation that the Diocese's alleged speech – litigating the question of its rights to pursue the development of a proposed cemetery – was in any way 'chilled' by the Village's alleged retaliatory conduct." (Defs.' Opp'n at 23-24.) Plaintiff responds that "where, as here, a plaintiff pleads non-speech injury such as damage to the ability to enjoy its property, courts do not require evidence of actual chilling." (Reply Mem. at 9.)

Recently, the Second Circuit stated that while "private citizens claiming retaliation for their criticism of public officials have [generally] been required to show that they suffered an 'actual chill' in their speech as a result[,] . . . in limited contexts, other forms of harm have been

---

[13]     The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways depending on the factual context." *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). The elements set forth in *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001), apply to suits, such as this one, brought by private citizens against public officials. *See Williams*, 535 F.3d at 76 (comparing the *Curley* standard with the *prima facie* requirements in cases brought by public employees and those brought in the "prison context").

accepted in place of this 'actual chilling requirement.'" *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011) (citing *Dougherty*, 282 F.3d at 91 (retaliatory revocation of plaintiff's building permit); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (retaliatory failure to enforce zoning laws)). Here, the Diocese has alleged that, in retaliation for its commencement of the State Court Action, defendants applied the SEQRA process against them unfairly and adopted a Resolution with arbitrary and substantially burdensome conditions. The Court finds these to be sufficient allegations of "other . . . harm" so as to sustain the Diocese's First Amendment retaliation claim even in the absence of allegations regarding actual chilling. *See Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 371 n.17 (S.D.N.Y. 2011) (sustaining First Amendment retaliation claim even without allegations of chilling effect because plaintiff alleged "other harm" in the form of a retaliatory denial of building permits and an unconditional variance).

Accordingly, the Diocese's motion to amend its pleading to assert a First Amendment retaliation claim is granted.

## IX.     *Absolute Immunity*

Defendants argue that "with the exception of Michael Maltino, claims against the individually named defendants are futile because the defendants are protected by absolute immunity." (Defs.' Opp'n at 24.) Defendants assert that the individual defendants are shielded from any liability for their passage of the POW Law and adoption of the Resolution because such conduct was within "'the sphere of legitimate legislative activity.'" (*Id.* (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 53-54 (1998)).)

Legislators, including local legislators, "are entitled to absolute immunity from civil

liability for their legislative activities." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003). "In order for legislative immunity to attach, the act in question must be taken 'in the sphere of legitimate legislative activity,'" and must be "the kind of broad, prospective policymaking that is characteristic of legislative action." *Id.* at 210-11 (quoting *Bogan*, 523 U.S. at 54). The Diocese does not contend that the individual defendants would not be entitled to legislative immunity for their roles in enacting the POW Law. Rather, the Diocese asserts that their "individual assessments with respect to the Diocese's application to develop Queen of Peace [as] set forth in the Resolution" are not protected. (Reply Mem. at 9.) The Court agrees. The individual defendants' alleged actions with respect to the adoption of the Resolution, which granted the Diocese a special use permit subject to specified conditions, "involved existing land-use policies as applied to a single [special permit applicant]" and, in adopting the Resolution, the individual defendants "did not engage in some broad policy debate about changing or enacting land use regulations or laws." *See Schubert v. City of Rye*, 775 F. Supp. 2d 689, 701 (S.D.N.Y. 2011).

Accordingly, the individual defendants other than Maltino are entitled to absolute immunity with respect to plaintiff's claims regarding the enactment of the POW Law, but are not entitled to absolute immunity with respect to the adoption of the Resolution.

## *CONCLUSION*

For the reasons set forth above, the Diocese's motion to amend its pleading is denied as to its RLUIPA equal terms claim based upon defendants' application of SEQRA and the Diocese's claims against the individual defendants with respect to the enactment of the POW Law.  The Diocese's motion is granted in all other respects.


**SO ORDERED.**

Dated:  Central Islip, New York
        April 23, 2012                        ___/s/_____
                                              Denis R. Hurley
                                              Unites States District Judge