UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,

                         Plaintiff,

                                                    **MEMORANDUM & ORDER**

          v.                                        09–CV–5195 (PKC)

THE INCORPORATED VILLAGE OF OLD
WESTBURY, et al.,

                         Defendants.
-------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

     Plaintiff, The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese")

asserts claims against Defendants, The Incorporated Village of Old Westbury (the "Village"), its

Board of Trustees, and various individual Village trustees and officials, challenging the Village's

imposition of restrictions, pursuant to its "Places of Worship" zoning law (the "POW Law"), on

a proposed Diocese cemetery.  The Diocese alleges that the POW Law and Defendants' conduct

relating to its enforcement violate the Religious Land Use & Institutionalized Persons Act, 42

U.S.C. § 2000cc, *et seq.* ("RLUIPA"), 42 U.S.C. § 1983 ("Section 1983"), the Equal Protection

Clause of the Fourteenth Amendment, and the Free Exercise Clause of the First Amendment.

     Defendants move for summary judgment on all of the Diocese's claims on various

grounds.  Plaintiff moves for partial summary judgment solely on the basis that the POW Law is

facially unconstitutional.  Because the Court finds that the POW Law is facially constitutional,

the Diocese's motion is denied, and Defendants' motion with respect to that claim is granted.

The Court also grants Defendants' motion with respect to Plaintiff's RLUIPA equal terms claim and its Equal Protection claim[1], but denies summary judgment with respect to Plaintiff's (1) RLUIPA substantial burden claim, (2) as-applied constitutional challenge to the POW Law[2], (3) First Amendment free exercise of religion claim, (4) Section 1983 retaliation claim, and (5) unlawful search claim against Defendant Michael Malatino.[3] These five claims will proceed to trial.

*BACKGROUND*

## I. Parties

The Diocese is a non-profit religious corporation organized under the laws of the State of New York. (Def. 56.1[4] ¶1.) The Village, which was incorporated in 1924, is comprised of roughly 12 square miles of land in Nassau County, New York, and has a population of approximately 4,600 people. (*Id.* ¶ 2.)

---

[1] Plaintiff also moves to strike the affidavit of Michael H. Sahn, Esq., a Village attorney, submitted in support of Defendants' summary judgment motion. (Dkt. 137.) The Court denies that motion on the basis that Sahn's affidavit recites admissible facts of which he has personal knowledge and otherwise authenticates evidence being offered by Defendants in support of their motion. *See Peters v. Molloy Coll. of Rockville Ctr.*, No. 07 Civ. 2553, 2010 WL 3170528, at *1 (E.D.N.Y. Aug. 10, 2010) ("Whether to grant or deny a motion to strike is vested in the trial court's sound discretion.") (citation omitted); *Siani v. State Univ. of New York at Farmingdale*, 7 F. Supp. 3d 304, 334 (E.D.N.Y. Mar. 28, 2014) (same).

[2] The Amended Complaint also alleges an as-applied constitutional challenge to the POW Law (Dkt. 77 at ¶ 76), which is not the subject of Plaintiff's motion. Defendants move for summary judgment on the as-applied challenge. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. Opp."), filed 11/10/14, at 3–4. (Dkt. 144.)

[3] Although it is unclear from the pleadings, the Court assumes that this claim is alleged as a Section § 1983 violation of the Diocese's Fourth Amendment rights to be free from unreasonable searches and seizures.

[4] Citations to "Def. 56.1" refer to Defendants' Statement of Material Facts Not in Dispute. (Dkt. 140). Citations to "Pl. 56.1" refer to Plaintiff's Counter-Statement to Defendant's 56.1 Statement of Material Facts Not in Dispute. (Dkt. 139.)

The Village Board of Trustees ("Board") is the Village's legislative and governing body, and consists of five Trustees, one of whom, Defendant Trustee Fred Carillo, is designated as the Mayor of the Village. (*Id.* ¶ 4.) Defendant Trustees Carillo, Harvey Blau, Harvey Simpson, Steven Greenberg[5], and Michael Wolf have been sued in their individual and official capacities. (*Id.* ¶ 5.) Defendant Malatino, the Village's Superintendent of Buildings and Public Works, has also been sued in his individual and official capacities. (*Id.* ¶ 6.)

## II. Overview of Zoning and Environmental Regulations in New York

In 1975, New York State enacted the State Environmental Quality Review Act ("SEQRA"), which is codified in Article 8 of the New York Environmental Conservation Law ("ECL"). (*Id.* ¶ 20.) The SEQRA regulations contain an elaborate set of procedures that municipalities must comply with when evaluating the environmental impacts of a proposed development project. 6 NYCRR §§ 617.4, 617.5. One of the first steps in the SEQRA process is for the municipality to classify the project under SEQRA. (Def. 56.1 ¶ 20.) A project may fall into one of the following three categories: (1) Type I actions, which consist of actions that the Department of Environmental Conservation ("DEC") has determined are more likely to have significant adverse environmental impacts; (2) Type II actions, which consist of actions that the DEC has determined do not have a significant environmental impact; or (3) Unlisted actions, which are actions that are neither Type I or Type II actions. 6 NYCRR §§ 617.4, 617.5.

Since there can be more than one government agency with jurisdiction over a project, SEQRA contains a detailed set of procedures by which a municipality can establish itself as the "lead agency" for purposes of conducting the environmental impact review of the project. *Id.* §

---

[5] Trustee Greenberg is deceased. (*Id.* ¶ 5.)

617.6.  Once a lead agency has been established, it renders a "determination of significance" for the project, which is the basis for the action classification described above.  (Def. 56.1 ¶ 24.)

The initial SEQRA tool used to make a "determination of significance" is the Environmental Assessment Form ("EAF")[6].  (*Id.* ¶ 25.)  In making a legally sufficient "determination of significance," a lead agency must: (1) review the EAF and identify all relevant areas of environmental concern; (2) thoroughly analyze the relevant areas of environmental concern to determine if the project may have a significant adverse impact on the environment; and (3) set forth its determination of significance in writing, providing reference to any supporting documentation.  6 NYCRR § 617.7 (b).

If the lead agency determines that an action "may include the potential for at least one significant adverse environmental impact," an environmental impact statement must be drafted for the project.  *Id.* § 617.7(a)(1).  The Environmental Impact Statement ("EIS") must analyze the significant adverse impacts and all reasonable alternatives.  *Id.* § 617.9 (b)(1).  The project sponsor prepares and submits to the lead agency a draft EIS ("DEIS").  The lead agency will determine whether to accept the DEIS as adequate, with respect to its scope and content, for the purpose of commencing public review.[7]  *Id.*§ 617.9(a)(2).  If the DEIS is determined to be inadequate, the lead agency must identify, in writing, the deficiencies and provide this information to the project sponsor.  *Id.* § 617.9 (a)(2)(i). When the lead agency has determined that a DEIS is adequate for public review, it will then decide whether to conduct a public hearing

---

[6] The EAF is a form that the project sponsor submits to an agency for review to determine the environmental significance or nonsignificance of actions.  A properly completed EAF must contain enough information to describe the proposed action, its location, its purpose, and its potential impacts on the environment.  6 NYCRR §§ 617.2(m), 617.20.

[7] This determination must be made within 45 days of receipt of the DEIS.  *Id.* § 617.9(a)(2).

concerning the action. *Id.* § 617.9 (a)(4). The lead agency then must prepare and file a final EIS ("FEIS").[8] *Id.* § 617.9 (a)(5).

### III. The Diocese Seeks Authority to Develop the Queen of Peace Cemetery in the Village

On or about January 3, 1994, the Diocese submitted an EAF to the Village and an application to change applicable zoning to permit the Diocese to develop a cemetery, to be known as the Queen of Peace Cemetery ("QOP"), on approximately 97 acres in the Village (the "Property") that the Diocese had contracted to buy. (Def. 56.1 ¶ 55.) On March 21, 1995, the Diocese became the fee owner of the Property. (*Id.* ¶ 57.) On or about April 10, 1995, the Diocese formally retained Grever & Ward, Inc. ("Ward") to advise it on the development of its property for use as a cemetery. (Pl. 56.1 ¶ 58.) On July 10, 1995, Ward provided the Diocese with a Master General Plan that depicted the use of 86 of the 97.3 acres as a cemetery. (*Id.* ¶ 61.)

On October 17, 1995, the Village Planner, David J. Portman of Frederick P. Clark Associates, Inc. ("FPC") issued a report that the Diocese's proposed development of QOP constituted a commercial enterprise or business use of property that was inconsistent with the Village's comprehensive plan. (ASC[9] ¶ 62.) Following receipt of further public comment on the Diocese's application, on March 18, 1996, the Board passed a Resolution denying the Diocese's application, concluding that the proposed QOP was not a religious use of real property. (Pl. 56.1 ¶ 66.)

---

[8] The FEIS must be filed within 45 calendar days after the close of any hearing or within 60 calendar days after the filing of the DEIS, whichever occurs later. *Id.* § 617.9 (a)(5).

[9] "ASC" refers to Plaintiff's Amended Supplemental Complaint, dated 5/7/12. (Dkt. 77.)

## IV. State Court Action

On April 17, 1996, the Diocese commenced an action in Suffolk County Supreme Court ("State Court Action") against the Village and its Board based on eleven causes of action, including due process violations, exclusionary zoning claims, a free exercise violation, discrimination, denial of equal protection, and failure to accommodate a religious use. (Def. 56.1 ¶ 67.) On September 16, 1996, the court denied the Diocese's claim for injunctive relief. (*Id.* ¶ 68.) The court also denied both parties' motions for summary judgment, finding that the issue of whether the Diocese's proposed cemetery was a religious use presented a factual question to be resolved at trial. (*Id.* ¶ 69.)

On December 28, 1998, the Second Department affirmed the trial court's decision that the determination of whether the Diocese's proposed cemetery is a religious use presented a factual question. (*Id.*) However, it reversed the trial court's denial of summary judgment for the Village on the second, third, fourth, seventh and eighth counts, holding that the Diocese's free exercise, discrimination, equal protection, and exclusionary zoning claims were without merit. (*Id.*) Following a trial in Supreme Court, on November 9, 2000, the court held that a Catholic cemetery is a "religious use" of property under New York law, and ordered that the matter be remitted to the Board with instructions to issue a special permit to allow the Diocese to develop a cemetery on the Property. (Pl. 56.1 ¶ 77.) That ruling was made part of a Judgment entered on January 16, 2001.[10]

---

[10] Plaintiff is correct that the State Court's determination that the use of the Property as a Catholic cemetery constitutes a "religious use" under New York law is *res judicata*. (Pl. Opp. at 33; Pl. 56.1 ¶ 77.) Defendants are collaterally estopped from re-litigating this issue. *See* Defendants'' Memorandum at Law in Support of Defendants' Motion to Summary Judgment ("Def. Mem."), filed 9/30/14, Dkt. 132, at 35 n. 56. Exhibits to Def. Mem. can be found at Dkt. 140.

Less than three months later, on March 19, 2001, the Board enacted a series of comprehensive zoning amendments ("2001 Amendments"), including the POW Law, codified as Code § 216–111.2. (Pl. 56.1 ¶ 81.) The POW Law and the history of its enactment are discussed *infra*.

On April 15, 2002, the Appellate Division upheld the trial court's conclusion regarding a cemetery being a "religious use" of property, but found that the "trial court erred in directing the defendant Board . . . to issue a special permit to the Diocese upon remittitur." (Pl. 56.1 ¶ 82.) The Appellate Division remitted the matter to the Board to determine the environmental impact of the Diocese's proposed development of QOP "including examination under SEQRA of the effect of any possible mitigating measures." (*Id.*) The court further directed that "[a] determination on the plaintiffs' application shall be consistent with the preferential treatment afforded the religious use of this property." (*Id.*)

## V.   Enactment of the POW Law

In the mid-1990s, the Village identified a rapid increase in special permit applications for institutional uses, specifically places of worship and private schools. (Def. 56.1 ¶¶ 43, 188.) Defendants claim that the Village was concerned about the adverse impacts that could result from the increasing number of these applications, including increasing levels of traffic, noise, air quality, water quantity and quality, and visual impact. (*Id.* ¶ 189.) In 1999, the Village issued a moratorium on applications for special permits so that it could examine whether amendments were needed to its zoning code, and hired professional planning consultants to advise it through the process.[11] (*Id.* ¶¶ 46, 190.) According to Defendants, the amendment process lasted more

_____

[11] The Board's consideration of amendments to the Village's Zoning Code addressed the following issues: (1) modification of current development controls for schools and places of worship; (2) restrictions for driveway curb-cuts for single-family lots; (3) modifications to the

than two years, and consisted of a detailed study of the causes for the increase in institutional use applications, a DEIS[12] regarding the Board's consideration of amendments to the Village's Zoning Code, hearing public comments on proposed amendments to the zoning code, and considering and responding to public comments by issuing a FEIS. (Ex. 12 to Sahn Aff.[13])

Defendants claim that during the past two decades, the Village developed certain standards for residential uses that it believed would be consistent with the Village's character, but had not done so for institutional uses. (Def. 56.1 ¶ 191.) Defendants assert that amendments to its zoning code were necessary to prevent "new non-residential uses [from developing] at a greater density than would be permitted for residential uses, thereby having a potentially significant adverse impact on the land, the environment and the village." (*Id.* ¶ 192.) Accordingly, the Village amended its zoning code in 2001 to impose development controls specifically for private schools and places of worship. (*Id.*) Defendants contend that relocating educational and places of worship to appropriate areas would help these institutions to "better function [and] minimize public health and safety risks, particularly to residential communities, and [would] help the Village to achieve its long range planning goal of preserving its low–density, rural, residential character." (*Id.* ¶ 193.)

---

Village's building volume regulations; (4) application of bulk and dimensional standards in the C Residence District to include a 10-acre minimum lot size for residences; (5) regulations controlling the conversion of large estates to residential subdivisions; and (6) amendment of the Village Zoning Map to change the zoning district classification for the southeastern portion of the Village from 8-4 Residence District (four-acre minimum lot size) to BB Residence District (two-acre minimum lot size). (Ex. 12 to Sahn Aff.)

[12] The DEIS and the FEIS evaluated the potential impact that amending the Village's Zoning Code would have on land use, regional plans, demographics, housing supply, transportation, groundwater quality, and community services. (*Id.*)

[13] Citations to "Sahn Aff." refer to the affirmation of Michael H. Sahn, Esq., in Support of Defendants' Motion for Summary Judgment. (Dkt. 143.)

The POW Law, enacted by the Village on March 19, 2001, permits places of worship in certain residential districts "as a special exception, upon approval of the Village Board of Trustees," and are "subject to [] conditions," including:

A. At least 200 feet of frontage on one of the Village's four main roads and vehicular access to the site being limited to these "multiple-lane streets";

B. A minimum lot area of 12 acres, with an increase of 2.5 square feet for each cubic foot of building volume on the site that exceeds 261,360 cubic feet;

C. Setbacks of 200 feet in the front, and 125 feet on the side and in the rear, of the site, all of which could be varied by the Board to provide additional buffering or landscaping along neighboring residential properties or public streets;

D. A building height restriction of 25 feet;[14]

E. A minimum of one off-street parking space for each two seats or pew spaces;

F. A requirement that the combined coverage of all buildings not exceed 4% of the first 12 acres of the site and 3% of any lot area in excess thereof;

G. A requirement that the combined coverage of all buildings, structures, and paved surfaces not exceed 20% of the first 12 acres of the site and 15% of any lot area in excess thereof;

H. A maximum amount of the site that may be sprinkled with an automatic sprinkler system of 20% of the first 12 acres and 10% of any lot area in excess thereof; and

I. A requirement that 35% of the first 12 acres of the site and 50% of any lot area in excess thereof remain in a natural, undeveloped state.

(Ex. 4 to ASC.)

---

[14] Although Defendants stated at oral argument that the building height restriction does not apply to church steeples, *see* Transcript of the parties' 1/29/15 oral argument on their cross-motions for summary judgment ("Oral Arg. Tr.") at 53:18–23, that exception does not appear in the text of the POW Law. (*See* Ex. 4 to ASC.)

## VI.	Subsequent Interaction Between the Diocese and the Village

On July 2, 2004, the Diocese filed a special permit and preliminary subdivision plan application for the QOP development. (Def. 56.1 ¶ 89.) On March 10, 2005, the Diocese submitted a subdivision application to the Village, and on the same day submitted a SEQRA, Part I EAF to the Board. (*Id.* ¶ 91.) Part I EAF described the QOP proposal as follows:

> The proposed action consists of an amended application for special use permit, site plan approval and subdivision approval for the redevelopment of a 97.3±-acre parcel into a cemetery and 10-lot residential subdivision in the Village of Old Westbury, Nassau County. The cemetery would be developed in three phases over a 45+-year period: 2006–2020; 2021–2030; and 2031–2050. The cemetery would contain an office, chapel, maintenance area, two mausoleum complexes and multiple, at-grade areas for future gravesites. The cemetery would use on-site-septic systems for sewage disposal and would be served by public water for potable use. Irrigation water would be obtained through an on-site well (or wells). . . .The cemetery would be surrounded by a six-foot-high fence. . . .[A] residential subdivision would be situated at the northern portion of the site . . . and would consist of 10 lots with a minimum lot size of 2.05 acres[.]

(Pl. 56.1 ¶ 92.)

On May 16, 2005, with respect to the Diocese's application, the Board declared itself lead agency under SEQRA. (Pl. 56.1 ¶ 96.) On July 8, 2005, the Diocese filed a special use exception permit application with the Board.[15] (*Id.* ¶ 97.) On approximately July 18, 2005, the Board adopted a positive declaration[16] under SEQRA for the Diocese's subdivision and special use permit applications. (*Id.* ¶ 99.)

---

[15] The Application stated the following: "Please be advised that it remains the Diocese's position that the special permit application is technically not required because, pursuant to the Orders of the Nassau County Supreme Court and the Appellate Division for the Second Department, the Diocese's original application has been remitted to the Board to determine the environmental impact of the plaintiff's proposed use, including examination under SEQRA of the effect of any possible mitigating measures." (Pl. 56.1 ¶ 97.)

[16] "Positive declaration means a written statement prepared by the lead agency indicating that implementation of the action as proposed may have a significant adverse impact on the

On February 7, 2006, the Diocese submitted a Draft Scope[17] pursuant to SEQRA. (Def. 56.1 ¶ 108.) On March 2, 2006, the Diocese filed an application for eleven variances from provisions of the POW Law. (*Id.* ¶ 109.) On April 5, 2007, the Diocese submitted its DEIS to the Board. (*Id.* ¶ 119.) On May 21, 2007, FPC requested an extension of the 45-day period to review the DEIS. (*Id.* ¶ 120.) The Diocese denied the request. (*Id.*)

On June 15, 2007, FPC provided comments to the Board regarding planning, zoning, and environmental issues raised by the DEIS, and recommended that the Village retain a hydrogeologist to review the Diocese's groundwater reports and analyses. (Def. 56.1 ¶ 122.) FPC also disagreed with the Diocese's conclusion that psychological impacts were not a type of human health impact that should be addressed during SEQRA review. (*Id.* ¶ 123.) However, after a meeting between the Diocese and Village representatives, FPC and the Village no longer requested that the Diocese address the psychological impacts of its proposal. (*Id.* ¶ 124.)

On July 5, 2007, Leggette, Brashears & Graham, Inc. ("LBG"), which was retained by the Village to advise it regarding the groundwater issues involved in the SEQRA process, provided comments regarding the potential impact of the proposal on wetland and groundwater resources. (*Id.* ¶ 126.) LBG disagreed with the Diocese's conclusions that groundwater data

---

environment and that an environmental impact statement will be required." 6 NYCRR § 617.2(a)(c).

[17] The draft scope must contain the following information: (1) "a brief description of the proposed action"; (2) "the potentially significant adverse impacts identified both in the positive declaration and as a result of consultation with the other involved agencies and the public, including an identification of those particular aspect(s) of the environmental setting that may be impacted"; (3) "the extent and quality of information needed for the preparer to adequately address each impact, including an identification of relevant existing information, and required new information, including the required methodology(ies) for obtaining new information"; (4) "an initial identification of mitigation measures"; and (5) "the reasonable alternatives to be considered." *Id.* at § 617.8. The lead agency may either provide a period of time for the public to review and provide written comments on a draft scope or provide for public input through the use of meetings, exchanges of written material, or other means. *Id.*

from other Diocese's cemeteries indicated only minor impacts from fertilizer used in cemeteries and that such use had no impact on underlying groundwater quality. (*Id.*)

On January 2, 2008, the Diocese submitted a revised DEIS. (*Id.* ¶ 131.) According to Defendants, on January 23, 2008, FPC submitted its comments on the revised DEIS, noting that the Diocese had not accepted a number of suggested changes to various sections of the initial version of its DEIS, including the elimination of one of the subdivision lots due to steep slopes, inclusion of a 75-foot buffer around the Property's pond, and increasing the size of the buffer along the northern border of the cemetery portion of the Property from 100 feet to 150 feet. (*Id.* ¶ 139.) On February 11, 2008, LBG submitted its comments on the groundwater aspects of the January 2008 revised DEIS, stating, *inter alia*, that the Diocese's existing cemetery operations were contributing to nitrate levels. (*Id.* ¶ 139.) In addition, LBG commented that the Diocese should conduct base-line groundwater sampling and testing at its existing cemetery operations, and if ground water was determined to be negatively impacted by cemetery operations, the DEIS should identify and evaluate measures that could be implemented to mitigate these deleterious effects. (Ex. 94 to Def. Mem. at 13–14)

On May 7, 2008, the Diocese submitted further revisions to the DEIS. (Def. 56.1 ¶ 140.) On July 30, 2008, the New York Department of Transportation ("NYSDOT") rejected the Diocese's Jericho Turnpike access plan, which was part of the Diocese's DEIS. (*Id.* ¶ 142.) On August 1, 2008, FPC issued comments regarding its review of the traffic section of the DEIS, questioning whether the NYSDOT would accept either scenario set forth in the DEIS regarding traffic entering and exiting from the Property to and from Jericho Turnpike. (*Id.* ¶ 145.) On October 1, 2008, the NYSDOT reversed itself and approved the Diocese's automobile access plan. (*Id.* ¶ 152.)

According to Defendants, on August 12, 2008, LBG submitted its comments regarding the groundwater section of the DEIS including, among others, (1) that the Diocese must provide an Irrigation Management Plan ("IMP") in the FEIS because excessive irrigation would result in increased nitrate levels in the groundwater from fertilizer; (2) that the Diocese must install a monitoring well network to determine the direction of water flow on the Property and baseline nitrate levels, and must provide ongoing groundwater monitoring on the Property; and (3) a Risk Assessment analysis indicated that a moderate potential risk existed for groundwater contamination. (*Id.* ¶ 146.)

On August 13, 2008, FPC submitted comments regarding the non-traffic-related portions of the DEIS, including comments regarding the Diocese's continued non-compliance with standards for buffers along the northern border of the cemetery as designed, unauthorized roadways within buffer areas, the Diocese's continued refusal to erect 75-foot buffers around the existing pond, and FPC's continued insistence that steep slopes at the cemetery would create an environmental risk, unless two of the designated subdivision lots were combined into one. (*Id.* ¶ 147.)

On July 1, 2009, the Diocese submitted its draft FEIS ("DFEIS"). (*Id.* ¶ 159.) On July 13, 2009, the Diocese notified the Village that it had not been provided a copy of the FPC's August 13, 2008 comments prior to the Diocese's submission of the DFEIS. (Pl. 56.1 ¶ 161.) As a result, the Diocese indicated it had no obligation to respond to the comments contained in the August 13, 2008 FPC comments, noting that its DFEIS responded to the FPC comments to the extent required by law. (*Id.*) Defendants claim that the belated transmittal of the FPC's August 13, 2008 comments was unintentional. (Def. 56.1 ¶ 164.)

On August 17, 2009, during the regularly scheduled Board hearing, FPC requested that it be given until the Board's October 2009 meeting to review the DFEIS. (*Id* ¶ 167.) According to Defendants, the Board and FPC were also waiting for the results of groundwater testing for nitrates at the Property. (*Id.*) The Board extended the time for FPC to present its comments regarding the DFEIS until the October 2009 Board meeting. (*Id.*) On August 24, 2009, LGB submitted comments on the Diocese's July, 2009 Ground-Water Investigation Report for Holy Rood Cemetery.[18] (Ex. 119 to Def. Mem.) LGB found that increased nitrate concentrations in downgradient monitoring wells, some exceeding regulatory standards, were consistent with earlier investigation reports from Vanasse Hangen Brustlin, Inc. ("VHB"), an engineering, surveying and landscape architecture firm, indicating that cemetery operations, likely fertilization and leaching from grave sites, had impacted groundwater quality. (Def. 56.1 ¶ 168.) LGB repeated its request that the Diocese be asked to obtain an existing background level, or "maximum nitrogen loading factor," for the groundwater beneath the QOP site. (*Id.*)

On August 27, 2009, the Diocese's counsel, Eric Robinson, Esq., notified the Village that that it viewed the Village's decision to grant an extension of time to FPC and LGB to complete its review of the DFEIS as an unnecessary, and illegal, delay in acting on the Diocese's application.[19] (Exs. 120–123 to Def. Mem.) On September 11, 2009, the Diocese advised the Village that it deemed its application as having been denied since the Board did not place the application on the agenda for the September 2009 Board meeting. (Ex. 121 to Def. Mem.)

---

[18] Holy Rood Cemetery is a Diocese cemetery located in Westbury, New York. At all relevant times, the Diocese owned and operated Holy Rood. (Def. 56.1 ¶ 186.)

[19] Plaintiff's September 11, 2009 letter to the Village stated that the Diocese was required to decide QOP's application within 75 days of its submission of the FEIS to the Village on July 1, 2009. (Exs. 120–121 to Def. Mem.)

On October 9, 2009, FPC notified the Board that it needed until the November 2009 Board meeting to review the DFEIS, citing (1) the volume of material for review, (2) the unresponsiveness of the Diocese to FPC inquiries, and (3) the fact that numerous sections of the FEIS had to be revised because the DFEIS did not accurately reflect the views of the Board (the lead agency), as required by SEQRA. (Ex. 125 to Def. Mem.) FPC was also still waiting for the results of the groundwater testing that was purportedly being conducted on the Property by the Diocese. (Def. 56.1 ¶ 174.) On November 16, 2009, FPC advised the Board that it still needed to review (1) engineering plans for the cul-de-sac alternative raised by the Diocese; and (2) baseline groundwater nitrate data. (*Id.* ¶ 179.)

On November 30, 2009, the Diocese commenced this lawsuit. (*Id.* ¶ 181.) On June 21, 2010, the Board adopted the Final Resolution Approving Diocese Application with conditions and exceptions (the "Resolution"). (*Id.* ¶ 184.) As a modification of the POW's Law's requirements, the Resolution imposes, *inter alia*, the following conditions for the QOP site:

A. Maintaining a perimeter setback of 150 feet;

B. Constructing and maintaining a perimeter berm around the entire site from the start of its development;

C. Maintaining a complete barrier of densely planted trees and vegetation between property boundaries and areas authorized for religious use;

D. Constructing a perimeter roadway for maintenance of the cemetery that is outside any setback;

E. Paying a third party to maintain the landscaping at the site;

F. Removing and restoring a barn on the site, and continuing to maintain the barn in the future;

G. Accepting deed restrictions placed on the pond and associated wetland buffer area to purportedly protect it from future disturbance;

H. Including a plan for a nine-lot residential subdivision development on the site;

I. Providing pre-development and ongoing monitoring of groundwater at the site; and

J. Paying all of the Village's consulting and attorneys' fees in perpetuity in connection with the development of the site.

(ASC ¶ 121; Dkt. 77–21.) The Resolution also requires the Diocese to seek renewal of its authorization to develop and operate QOP every five years, at which time the Village could modify conditions for the renewal or deny authorization altogether. (*Id.*)

Due to its ongoing disagreement with the restrictions imposed by the Resolution, the Diocese has not broken ground on QOP to this day.

## VII. Procedural History of this Action

The Diocese filed this action on or about November 30, 2009. (Def. 56.1 ¶ 7.) On or about February 14, 2011, the Honorable Denis R. Hurley issued a Memorandum and Order (Dkt. 60) regarding Defendants' Motion to Dismiss. (*Id.* ¶ 8.) Judge Hurley ordered, *inter alia*, that "(a)ll of the Diocese claims against the Village Defendants based upon conduct occurring prior to and during the State Court Action are dismissed in their entirety." (*Id.* ¶ 9.) The Diocese filed a motion to amend its Complaint on July 27, 2011. (*Id.* ¶ 10.) Judge Hurley partially granted and denied the Diocese's motion. (*Id.* ¶ 11.) The Diocese filed its Amended and Supplemental Complaint on May 7, 2012. The Village Defendants filed their Answer and Special Defenses on June 1, 2012, and their Amended Answer on June 22, 2012. (*Id.* ¶ 12.)

*DISCUSSION*

## I. Summary Judgment Standard

The standard for summary judgment is well-established. Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *see Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011); *see also F.D.I.C. v. Great American Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 167 (2d Cir. 2009) (internal quotations and citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alterations in original); *see also Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56–57 (2d Cir. 2012); *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005). The nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation," *Jeffreys*, 426 F.3d at 554 (quotations and citations omitted); *see also DeFabio v. East Hampton Union Free Sch. Dist.*, 623 F.3d 71, 81 (2d Cir. 2010); and must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner*

*v. Clinton Cnty.*, 541 F.3d 464, 471 (2d Cir. 2008). In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where, as here, both parties have moved for summary judgment, "each party's motion must be examined on its own merits, and . . . all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc*., 249 F.3d 115, 121 (2d Cir. 2001).

## II.     Facial Constitutionality of the POW Law

The parties have cross-moved for summary judgment on the facial constitutionality of the POW Law. (Dkts. 136, 132.)

The Free Exercise Clause of the First Amendment, applied against the States by incorporation into the Fourteenth Amendment, *see Walz v. Tax Comm'n of City of N.Y.,* 397 U.S. 664, 702 (1970), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* ("*Lukumi*"), 508 U.S. 520, 532 (1993).

As the Supreme Court has instructed, however, the "right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion proscribes (or prescribes)." *Employment Div. v. Smith* ("*Smith*"), 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 (1982) (Stevens, J., concurring). Such laws are subject to

rational basis review.  *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene* ("*Cent. Rabbinical Cong.*"), 763 F.3d 183, 193 (2d Cir. 2014).  A law burdening religious conduct that is *not* both neutral and generally applicable, however, is subject to strict scrutiny.  *Lukumi*, 508 U.S. at 531–32, 546.  Neutrality and general applicability are interrelated, and, failure to satisfy one requirement means that it is likely that the other has not been satisfied.  *Id.*

### A.        The POW Law Is Neutral

A law is not neutral if it is "specifically directed at [a] religious practice."  *Smith,* 494 U.S. at 878.[20]  "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context."  *Lukumi*, 508 U.S. at 533.  Plaintiff argues that the POW Law is not neutral because it explicitly conditions zoning restrictions on whether the facility is a "place of worship", a term that by definition has no secular meaning and only

---

[20] On this issue, Defendants argue against adopting as law of the case the following language from Judge Hurley's April 23, 2012 decision:  "Here, it is clear that the POW Law 'refers to a religious practice without a secular discernable meaning from its language or context.'"  (Def. Opp. at 20–22 (quoting *Roman Catholic Diocese of Rockville Ctr. v. Inc. Vill. Of Old Westbury*, No. 09 Civ. 5195, 2012 WL 1392365, at *14 (E.D.N.Y. April 23, 2012) (quoting *Lukumi*, 508 U.S. at 533)).  The Court agrees with Defendants that this statement by Judge Hurley in his decision on Defendants' motion to dismiss was not intended to resolve the issue of the POW Law's facial constitutionality, but rather supported Judge Hurley's conclusion that Plaintiff had "alleged . . . enough at this stage to sustain its challenge to the POW Law."  *Id.*  Judge Hurley, in fact, noted that "a lack of facial neutrality does not give rise to a presumption of unconstitutionality".  *Id.* (citing *Locke v. Davey*, 540 U.S. 712, 720 (2004)).  Judge Hurley concluded by stating, "[w]hile the factual record created after discovery may ultimately support defendants' assertion that the POW Law was intended only to regulate 'secondary effects,' at this point the Court is unwilling to declare the Diocese's constitutional claim futile."  *Id.*  Thus, because Judge Hurley was addressing only the futility issue in the context of Plaintiff's motion to amend, and not resolving the ultimate question of whether the POW Law is facially constitutional, the Court does not deem this language from Judge Hurley's decision to be the law of the case with respect to the constitutionality question now before it.

burdens religious conduct. (Pl. Mem.[21] at 14). However, the correct analysis is not whether religion is mentioned in the ordinance, but whether the POW Law, as a whole, has a secular meaning that is discernable from the language or context of the statute.[22]

Here, the POW Law must be analyzed in the context of New York State public policy and the two-year moratorium that led to the comprehensive overhaul of the Village's zoning code and the implementation of the special exception zoning scheme for the Residential Districts. The history of the 2001 Amendments indicates that the POW Law was adopted in response to the influx of religious and educational institutions. (Def. 56. 1 ¶¶ 43–50, 188–194, Exs. 28–29 to Def. Mem.) The history behind the enactment of the POW Law makes clear that the law was adopted to ensure the development of these institutions in a manner consistent with the residential character of the Village and to mitigate the adverse impacts related to these institutional uses. (Exs. 28–29 to Def. Mem.)

Plaintiff argues that there is evidence of discriminatory intent because the POW Law was enacted only three months after Plaintiff prevailed in State Court against the Village in January 2001. (Pl. Mem. at 14–15). However, the evidence indicates that the 2001 Amendment process began well before the State Court decision. In the mid-1990s, the Village became concerned

---

[21] Citations to "Pl. Mem." refer to Plaintiff's Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, filed 9/30/14. (Dkt. 136.) Exhibits to Pl. Mem. can be found at Dkt. 134.

[22] The Court notes that while the Village could have enacted a law that regulates institutions of a certain size and scale, rather than specifically regulating places of worship, at the time the POW Law was passed, the Village already had strict zoning regulations for business, industrial, and residential uses, which were intended to mitigate the impact of these uses on the community. (Oral Arg. Tr. at 61:7–62:16.) In 1987, when the Village amended its zoning scheme to impose stricter standards on residential development, it did not make similar changes to its regulations for schools and places of worship. (Def. 56.1 ¶ 42.) Thus, the Village passed the POW Law in 2001 to address these regulatory gaps by modifying those sections of the zoning code that had become inconsistent with the Village's character and residential-use regulation. (*Id.*)

about the influx of places of worship and private schools, and about the gap in the Village's zoning scheme with respect to these institutions. (Def. 56.1 ¶ 43.) In June 1999, the Board of Trustees imposed a moratorium on development applications within the Village that related to subdivisions, partitions, changes of zone, and special use permits. (*Id*. ¶ 46.) Subsequently, the Village studied its zoning scheme, and the Village Planner proposed a series of comprehensive and coordinated zoning amendments. (*Id.* ¶ 46.) On February 20, 2001, the Board adopted a Findings Statement regarding the 2001 Amendments and enacted the Amendments in March 2001. (*Id.* ¶¶ 48, 50.) Therefore, Plaintiff's argument that the Village enacted the POW Law in response to, and as retaliation for, Plaintiff's State Court victory is contradicted by undisputed evidence that the Village was seeking to restructure its zoning scheme for religious and educational uses as early as 1999, two years prior to the final State Court decision, and that the purpose of the POW Law was to fill gaps in the Village's zoning scheme, which already restricted residential, commercial, and industrial uses.[23]

The case here is unlike *Lukumi*, where the Supreme Court reviewed a law that prohibited, for public health reasons, the animal sacrifice practice of the Santeria religion. *Lukumi*, 508 U.S. at 538–9. The Court found the neutrality of the law to be suspect because it was overbroad, resulted in a "flat prohibition" on the targeted religious practice, and did not exempt those aspects of the activity that did "not threaten the city's interest in public health." *Id.* In contrast to *Lukumi*, the POW Law does not apply exclusively to Plaintiff or the Roman Catholic religion, but applies equally to all religious institutions. Indeed, the POW Law does not proscribe more

---

[23] Plaintiff also offers as evidence of the Village's anti-religious motivation various conduct and statements by Village officials, discussed in more detail *infra* in the context of Plaintiff's Equal Protection claim. (*See* Section III.E.) However, as discussed later, the Court finds that these allegations are either disputed or insufficient to demonstrate that the POW Law was enacted for a discriminatory purpose.

religious conduct than necessary because it does not proscribe religious conduct at all. Instead, the POW Law permits places of worship to use property for religious purposes, subject to certain conditions that are designed to preserve the residential character of the Village. In fact, places of worship are treated the same as, or better than, not-for-profit schools, which are the only other institutions allowed in the Village's Residential Districts.[24] The law also treats places of worship better than many other secular institutional uses, such as theaters, recreational clubs, membership organizations, and entertainment venues, which are not permitted in the Village at all. (Def. Opp. at 11.) For these reasons, the Court finds that the POW Law is neutral.

### B. The POW Law Is Generally Applicable

The general applicability requirement prohibits the government from "selective[ly] impos[ing] burdens only on conduct motivated by religious belief . . ." *Lukumi*, 508 U.S. at 543. It "protect[s] religious observers against unequal treatment, and inequality [that] results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542–43, (internal quotation marks and citation omitted) (first alteration in original). A law is not generally applicable if it is "substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly

---

[24] For example, (1) Places of worship have a 12-acre lot size minimum, while not-for-profit schools are subject to a 15-acre minimum (§ 216–111.2B and § 216–111.3B); (2) places of worship have a 125-foot minimum side/rear yard setback (§ 216–111.2D), while not-for-profit schools are subject to a 150-foot minimum setback requirement (§ 216–111.3D); (3) places of worship must maintain 35% of their first 12 acres in a natural state (Village of Old Westbury Code § 216–111.2J), while not-for-profit schools must maintain that state in 35% of its first 15 acres (*Id.* § 216–111.3J); (4) both uses are required to have a front yard setback of at least 200 feet (*Id.* § 216–111.2D and § 216–111.3D); (5) the percentages to determine allowable sprinkler area are the same for both uses (*Id.* §§ 216–111.2I, 216–111.3I); (6) both uses are required to have a minimum of 200 feet of frontage on Store Hill Road, Jericho Turnpike, Hillside Avenue or Glen Cove Road (*Id.* §§ 216–111.2A, 216–111.3A); and (7) both have a 25-foot height limit (*Id.* §§ 216–111.2F, 216–111.3F).

justifying it." *Cent. Rabbinical Cong.*, 763 F.3d at 197. Relevant evidence includes, *inter alia*, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body. *Id.* at 540.

Plaintiff argues that the POW Law is not generally applicable because it applies to places of worship, and "includes no general regulation of secular institutional development." (Pl. Mem. at 14.) However, Plaintiff fails to acknowledge that the objectives of the POW Law are similarly pursued in the Village Zoning Code's provision regulating analogous non-religious conduct, specifically not-for-profit schools. As discussed *supra*, the legislative history of the 2001 Amendments indicates that the laws were enacted to control development and address the adverse impacts presented by *both* places of worship and not-for-profit schools in the Residential Districts. Therefore, the POW law, when viewed in the context of the 2001 Amendment process, is not under-inclusive but is generally applicable.[25]

### C. The POW Law Is Constitutional Under the Rational Basis Standard

Because the POW Law is a neutral law of general applicability, it need be justified only by a rational basis. Under the rational basis test, a statute will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The rational basis standard "'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (citation omitted). As long as the rational basis test is met, the statute

---

[25] Furthermore, the objectives pursued by the POW Law and not-for-profit schools law are also pursued in a host of other Village zoning laws that apply to non-secular entities such as theaters, recreational clubs, membership organizations, and entertainment venues.

will be upheld "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The POW Law is constitutional under a rational basis analysis. Defendants have a legitimate governmental purpose in maintaining the integrity of its zoning scheme and the residential character of the Village. It is well-established that States and cities may enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city. *See, e.g.*, *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 129 (1978); *New Orleans v. Dukes*, 427 U.S. 297 (1976); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9–10 (1974); *Bd. of Managers of Soho Int'l Arts Condo. v. City of N.Y.*, No. 01 Civ. 1226, 2004 WL 1982520, at *14 (S.D.N.Y. Sept. 8, 2004); *Trustees of Union Coll. in Town of Schenectady in State of N.Y. v. Members of Schenectady City Council*, 91 N.Y.2d 161, 165, 690 N.E.2d 862 (1997). The Village's objective of preserving the Village's residential character is a legitimate governmental goal.

The POW Law is rationally related to achieving this objective. The DFEIS provided by the Village explains the reasoning behind the substantive components of the proposed 2001 Amendments, including the POW Law. (Ex. 28 to Def. Mem.) It is clear that the 2001 Amendments regulated building area, building height, building and parking area setbacks from property lines, screening, and traffic circulation to address the potential adverse impacts of large institutional facilities on the residential nature of the Village. (*Id.*) Therefore, the POW Law is rationally related to maintaining the integrity of the Village's zoning scheme, and is facially constitutional.

Accordingly, the Court denies the Diocese's summary judgment motion regarding the facial constitutionality of the POW Law, and grant's Defendants' cross-motion on this issue.

## III.    Defendants' Summary Judgment Motion

### A.    Plaintiff's Substantial Burden Claim Under RLUIPA

The Diocese claims that the Resolution, which was adopted pursuant to the Village's zoning authority under the POW Law, substantially burdens the Diocese's religious use of the Property as a cemetery, in violation of RLUIPA.  (ASC ¶ 121.)  Defendants move to dismiss this claim on the basis that the Village has not imposed any burden, no less a substantial one, on the Diocese's exercise of religion.  Rather, Defendants contend, the Diocese has had the authority to develop the Property as a cemetery for more than four years, but has chosen not to do so and, therefore, any burden on the Diocese's religious use of its Property is self-imposed.  (Def. Mem. at 32.)  The Court finds that there remain material facts in dispute regarding the issue of whether the Village, through its passage of the Resolution, has imposed a substantial burden on the Diocese with respect to the development and maintenance of QOP, and thus denies Defendants' motion as to the Diocese's RLUIPA claim.

### 1.    Plaintiff Has Made a *Prima Facie* Showing of Substantial Burden

Under RLUIPA, the Diocese must demonstrate a *prima facie* claim that the challenged rule constitutes a substantial burden on the exercise of its religious beliefs.  If the Diocese meets this burden, the Village must then prove that the substantial burden furthers a compelling governmental interest and is the least restrictive means of doing so.  *See* 42 U.S.C. § 2000(a)(1)(A–B); *Bikur Cholim, Inc. v. Village of Suffern*, 664 F. Supp. 2d 267, 275–76 (S.D.N.Y. June 25, 2009).  To establish a substantial burden on the exercise of religion, the Diocese must show that the government's action "directly coerces the religious institution to change its behavior."  *Fortress Bible Church v. Feiner*, 694 F.3d 208, 219 (2d Cir. 2012) (quoting *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007))

(emphasis omitted). "The burden must have more than a minimal impact on religious exercise, and there must be a close nexus between the two." *Id.* (citation omitted).

With respect to zoning regulations, a complete denial of a religious institution's enjoyment of its property is not required to show a substantial burden. *Cathedral Church of Intercessor v. Inc. Vill. of Malverne*, No. 02 Civ. 2989, 2006 WL 572855, at *8 (E.D.N.Y. Mar. 6, 2006). Where an organization has no realistic alternatives to its desired use of the property, a temporary or incomplete denial may constitute a substantial burden. *Westchester Day Sch.*, 504 F.3d at 349. However, the denial of a zoning variance that has a minimal impact on the institution's religious exercise does not qualify as a substantial burden. *Id.*

Here, Plaintiff argues that, although the Village did not deny the Diocese's permit application outright, the Resolution imposes arbitrary and unreasonable burdens that prevent the Diocese from using the Property for its intended religious purpose as a Roman Catholic cemetery. (Pl. Opp.[26] at 33–37.) For example, Plaintiff argues that the requirement to renew its special exception permit every five years is a substantial burden because it limits the Diocese's ability to convey a right of burial to deceased parishioners for more than five years, undermining the very purpose of the cemetery, *i.e.*, to provide a permanent burial site for parishioners. (ASC ¶ 121(E).) While Defendant is correct that the provision does not automatically revoke the Diocese's permit absent a renewal, it is clear that the Village *may* revoke or suspend the Diocese's permit if, after public hearing, it finds the Diocese has not complied with the Resolution.[27] (Ex. 138 to Def. Mem. at p. 14.) Thus, there is the potential risk that Defendants

---

[26] Citations to "Pl. Opp." refer to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed 11/10/14. (Dkt. 149.) Exhibits to Pl. Opp. can be found at Dkt. 148.

[27] "(I)n the event the Applicant does not comply with each and every term and condition of this

will deny or suspend the Diocese's permit in the future. This risk is magnified by the fact that Plaintiff would be left with no remedy because issues relating to special exception permits cannot be appealed to the Village's Board of Appeals.[28] (*Id.*)

Plaintiff also argues that the non-use setbacks required under the Resolution allow less than 44%, or about 42.5%, of the 97.3-acre QOP site for internments, thereby significantly restricting its use of the Property for religious burial purposes. (Def. Mem. at 4.) Plaintiff claims that other provisions in the Resolution that substantially burden the Diocese's use of the QOP site, including the requirements that the Diocese retain a third-party landscaper, construct a perimeter berm, conduct groundwater testing that is more restrictive than the accepted State standard, re-locate, refurbish, and maintain the Property's existing barn structure, and restore a pond on the Property. The Diocese argues that these requirements will cause it to incur substantial ongoing costs during the decades-long development of the QOP site. (ASC ¶ 121.) Plaintiff also argues that the fee provision in the Resolution is also unduly burdensome because it requires the Diocese to pay all of the Village's consulting and attorneys' fees without limit and in *perpetuity* in connection with the development of the Property.[29] (*Id.* at ¶ 121(G).)

resolution, except with the specific approval of the Board, said Board may, in addition to all other remedies available, after a public hearing, suspend or revoke the special exception permit and variance relief granted herein to the Applicant." (Ex. 138 to Def. Mem. at p. 14.)

[28] Defendants note that under § 216–111.2.Q of the Village Code, a special exception permit is subject to amendment by application to the Board of Trustees and that, therefore, the Diocese could have sought clarification of the five-year renewal provision. (Def. Mem. at 36–37.) However, this argument is beside the point, and fails to address the issue of Plaintiff's recourse if Defendants deny Plaintiff's renewal application.

[29] 6 NYCRR § 617.13(a) states that "the lead agency may charge a fee to the applicant in order to recover the actual costs of either preparing or reviewing the draft and/or final EIS." However, Plaintiff argues that the amounts already paid by the Diocese exceed the $100,000 cap on such fees under the Village's applicable local law. (ASC ¶ 99 (citing Village Local Law § 103.4).)

The Court finds that these allegations are sufficient to establish a *prima facie* claim for substantial burden within the meaning of RLUIPA.

## 2. Least Restrictive Means to Further a Compelling State Interest

Given that Plaintiff has made a *prima facie* claim of substantial burden, Defendants must prove that this burden both furthers a compelling governmental interest and is the least restrictive means of doing so. *See* 42 U.S.C. § 2000cc–2(a)(1)(A–B); *Bikur Cholim, Inc. v. Village of Suffern*, 664 F. Supp. 2d 267, 275–76 (S.D.N.Y. 2009). The Court does not address Defendants' argument that maintaining the aesthetic qualities of the Village is a compelling governmental interest because it is clear that there is a factual dispute as to whether the Village is using the least restrictive means to protect that interest. Defendants have conceded, both in their briefing and during oral argument, that the Diocese could apply for variances to any of the restrictions imposed by the Resolution, and the Village would likely approve them. (Def. 56.1 ¶ 106; Oral Arg. Tr. at 42:1–15.) For example, the Diocese applied for a variance to decrease the 200-foot front-yard setback to 150 feet, which was granted. (Oral Arg. Tr. at 42:6-24.) Defendants' willingness to grant such variances strongly suggests that the Resolution's provisions are not the least restrictive means to protect the Village's interests, and at a minimum, demonstrates that a factual dispute exists with respect to this issue. Furthermore, the issue of whether the many restrictions imposed on the Diocese's use of the Property constitute the least restrictive means is an inherently fact-intensive question that can only be resolved through the parties' presentation of competing fact and expert evidence. Therefore, summary judgment on the substantial burden claim is denied.

**B.     Plaintiff's Free Exercise Claim Under the First Amendment**

Plaintiff claims that the Resolution deprives the Diocese of its right to the free exercise of religion under the First Amendment.  Defendants move to dismiss this claim on the same grounds they asserted in connection with the substantial burden claim.

Substantial burden claims under RLUIPA are intended to mirror the framework of First Amendment free exercise claims.  *Westchester Day Sch.,* 504 F.3d at 348 ("RLUIPA's legislative history indicates that Congress intended the term substantial burden to be interpreted 'by reference to Supreme Court [free exercise] jurisprudence.'") (quoting 146 Cong. Rec. S7774, S7776 (2000)) (alteration added); *see also Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 350 (2d Cir. 2005) (noting that Congress intended RLUIPA to be a codification of "existing Free Exercise jurisprudence"); *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 198 (2d Cir. 2014) ("RLUIPA, after all, codified 'existing Free Exercise . . . rights against states and municipalities' that discriminated against religious land use.") (citation omitted).

Thus, there exist material facts in dispute with respect to the Diocese's RLUIPA substantial burden claim, such that Defendants' summary judgment on this claim must be denied.

**C.     Plaintiff's Equal Terms Claim Under RLUIPA**

Plaintiff alleges that the Village's application of the POW Law violated RLUIPA by treating the Diocese "on less than equal terms than a nonreligious assembly or institution."  (Pl. Opp. at 42–45.)[30]  Defendants move to dismiss this claim on the basis that Plaintiff has failed to

---

[30] Plaintiff also makes the same claim with respect to the Village's application of SEQRA. However, as Defendants correctly note, Judge Hurley has already rejected that argument.  *See* Dkt. 76 at 22–23 (holding, in connection with Plaintiff's motion to amend, that "[t]he Diocese cannot maintain a claim that defendants applied SEQRA to the Diocese's project in a "disparate and discriminatory manner" (ASC ¶ 97), when the Diocese never actually alleges that its comparators were also put through the SEQRA process and received more favorable treatment in

identify a sufficiently comparable secular institution that was treated more favorably than the Diocese.

The equal terms provision of RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Determining whether a municipality has treated a religious entity "on less than equal terms" requires a comparison between that religious entity and a secular one. *Third Church of Christ, Scientist, of New York City v. City of New York* ("*Third Church of Christ Scientist*"), 626 F.3d 667, 669 (2d Cir. 2010).

However, the mere fact that religious and secular organizations are subject to different land-use regimes does not necessarily prove unequal treatment. In *Third Church of Christ Scientist*, the Second Circuit noted that "organizations subject to different land-use regimes may well not be sufficiently similar to support a discriminatory-enforcement challenge." *Id.* at 671 (emphasis omitted). In reaching this conclusion, the court looked to *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County* (*"Primera"*), in which the Eleventh Circuit held that a church and school were insufficiently comparable to establish an equal terms claim, given that the institutions had sought different forms of zoning relief from different land-use authorities applying "sharply different" criteria. 450 F.3d 1295, 1311 (11th Cir. 2006). Because the evidence of the church's and school's treatment was thus "consistent with the . . . neutral application of different zoning regulations"—suggesting "*different* treatment, not *unequal* treatment"—the Eleventh Circuit held that the plaintiff-church in *Primera* had failed to establish a *prima facie* equal terms claim. *Id.* at 1313.

---

connection with that process."). Therefore, the Court will only examine Plaintiff's equal terms claim with respect to Defendants' application of the POW Law.

Here, Plaintiff fails to identify a comparable secular assembly or institution that was treated more favorably than the Diocese. The Meadow Brook Polo Club[31], Old Westbury Country Club, Glen Oaks Country Club[32], and Old Westbury Gardens[33] are not valid comparators because, by virtue of the 40+-year time gap, they were subject to a different land-use authority and were evaluated under different sets of criteria than were applied to the QOP site. In any event, Plaintiff fails to articulate how QOP could be viewed as roughly equivalent to golf courses, polo grounds, or public gardens.

Plaintiff also argues that the residence of Steven Schonfeld ("Schonfeld Residence") is a valid comparator. In 2002, the Village allowed Schonfeld to develop, on his 112.69 acre property, an approximately 25,000-square-foot house, a 4,000-square-foot guesthouse, two pools, various maintenance buildings and facilities, and a 54.33-acre, private nine-hole golf course and related lawns. (Pl. Opp. at 44; Ex. 26 to Sahn Aff.) Plaintiff argues that, in contrast to the Diocese, Schonfeld was not required to perform pre-development groundwater testing or ongoing groundwater monitoring, or hire third-party landscapers. (Pl. Opp. at 44.) According to Plaintiff, when Schonfeld added three holes to his private golf course in 2010, the Village did not

---

[31] In 1968, the Village Board of Appeals granted the Polo Training Foundation's application to use its 28-acre property as polo fields. No environmental impact review was undertaken by the Village or club because none was required by the Village or the State at that time. (Sahn Aff. ¶¶ 60–62.)

[32] Both the Old Westbury and Glen Oaks Country Clubs, in 1961 and 1966, respectively, applied to the Village's Board of Trustees for a change in zoning from Residence BB District to Residence C District, to permit the development of a golf course and club. No environmental impact review was undertaken by the Village or clubs because none was required by the Village or the State at that time. (Def. 56.1 ¶¶ 203–207.)

[33] In 1959, the Village Board of Appeals granted Old Westbury Gardens' application to establish a public garden, which at the time was an allowed use in the Village Code, as a charitable use. (Def. 56.1 ¶¶ 195–200.)

require any groundwater testing that was comparable to what was required at the QOP site.[34] (*Id.*)

The fundamental flaw in Plaintiff's argument is that RLUIPA prohibits treating religious uses inequitably when compared to those of a "nonreligious *assembly* or *institution*".[35] The Schonfeld Residence is neither.[36] Even if the Schonfeld property qualified as an assembly or institution, it would still not be an appropriate comparator for purposes of Plaintiff's equal terms claim. The impact that the Schonfeld Residence, a private home, would have on the environment and the Village's residential nature is substantially different from the intense and sustained impact that a large cemetery would have. Unlike a cemetery, the Schonfeld Residence would not attract a large number of people on a daily basis, significantly increase the amount of traffic, or substantially burden the land.[37] At best, Plaintiff has can only establish "*different* treatment, not

---

[34] The Planning Board's approval of Schonfeld's application on August 5, 2002 did not require groundwater testing. However, in December 2010, when the Planning Board approved the development of three additional golf holes, the Planning Board required Schonfeld to test the groundwater at the premises in accordance with the memorandum from FPC, dated November 12, 2010, and submit to the Village annual reports with respect to water quality usage data showing the results of each test. (Sahn Aff. ¶¶ 83–84.)

[35] RLUIPA does not define "assembly" or "institution". 42 U.S.C. § 2000cc(b)(1). When a word is not defined, it is interpreted by its "ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) (citation omitted). An "assembly" is "a group of persons who are united and who meet for some common purpose." BLACK'S LAW DICTIONARY (10th ed. 2014). An "institution" is "an established organization, esp. one of a public character." *Id. See Konikov v. Orange Cnty., Fla.*, 410 F.3d 1317, 1325 (11th Cir. 2005) (RLUIPA case applying a dictionary definition of "assembly" and "institution").

[36] Notably, the Village conditioned approval of the Schonfeld Residence on the owner providing a Declaration of Covenants and Restrictions stating that the nine-hole golf course would "be for private use only by the owner and non-paying guests and shall never be a public or institutional facility. . . ." (Def. 56.1 ¶ 228.) The Schonfeld Residence simply does not qualify as an "assembly" or "institution".

[37] According to the Diocese, the Resolution authorizes only 42,755 burial plots. The Diocese sought up to 54,125, inclusive of the acreage lost to residential development on its Property,

*unequal* treatment." *Primera*, 450 F.3d at 1313. This is insufficient for an equal treatment claim under RLUIPA.

Accordingly, because Plaintiff has failed to identify a nonreligious assembly or institution that was treated more favorably than the Diocese, Defendants are granted summary judgment on this claim.

### D.  Plaintiff's Retaliation Claim

The Diocese alleges that Defendants' conduct against Plaintiff since 2003 was undertaken in direct retaliation for Plaintiff's pursuit of the State Court Action and the current lawsuit, in violation of Section 1983. (Dkt. 77 ¶¶ 162–64). Defendants move to dismiss this claim, arguing that the process leading to the adoption of the 2001 Amendments, and the establishment of the language of the 2001 Amendments, had occurred months before the decision in the Trial Court in the State Court Action. (Def. Mem. at 14.)

"In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws." *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000); *Cheroff v. City of New York*, 2009 WL 816474, at *5 (E.D.N.Y. Mar. 26, 2009). To establish a *prima facie* case of retaliation under Section 1983, a plaintiff must demonstrate that: "(1) he has a right protected by the First Amendment; (2) the defendants' actions were motivated or substantially caused by his exercise of that right; and (3) the defendants' actions effectively chilled the exercise of his First Amendment right." *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). Defendants bear the burden of demonstrating that they "would have taken the same adverse [] action 'even in the absence of the protected

---

while still deferring to the POW Law. (Pl. Mem. at 4.) Plaintiff also noted during oral argument that each burial plot could be used for up to three bodies. (Oral Arg. Tr. at 35:12–23.)

conduct.'" *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251–52 (2d Cir. 2006).

There is no dispute regarding the Diocese's First Amendment right to sue the Village, as it did in 1996 and again here. *See, e.g.*, *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment."). The dispositive inquiries for purposes of this retaliation claim are whether Defendants had an improper motive with respect to its handling of Plaintiff's permit application and whether Defendants would have taken the same actions regardless of the Diocese's pursuit of the State Court Action and this federal action.

Plaintiff puts forth the following evidence in support of its Section 1983 claim:

At a Board meeting on March 19, 2001, Defendant Blau stated that the POW Law would "not [a]ffect any application that is already on file," which should have included the QOP application that was made in 1995. (Ex. 43 to Pl. Opp.; McDonough Tr.[38] at 22:8–23:6.) Plaintiff argues that it was only after the Diocese's victory in the State Court Action in 2002 that the Village subjected the Diocese to the requirements of the POW Law. (Pl. Opp. at 45.) Notably, Plaintiff cites to a September 27, 2005 letter from the Village Attorney to the Diocese in which the Village Attorney stated, "since you succeeded in persuading the Court that the proposed use is a religious use akin to a house of worship, you must apply to the Board of Trustees for a special permit to operate such a use." (Ex. 125 to Pl. Opp.) Plaintiff also points to Defendants Carillo's and Blau's deposition testimony in this case suggesting that if the Diocese had dropped the lawsuit, the "restrictions imposed through the Resolution could [have been]

---

[38] Citations to "McDonough Tr." refer to the transcript of Kevin McDonough's October 4, 2013 deposition. (Dkt. 148–8.)

reconsidered." (Pl. Opp. at 45–46.)[39] In their depositions, Carillo also stated that he was not a proponent of "litigious matters", and Blau stated that "there is nothing in this resolution that couldn't have been amended or changed if people wanted to get together around a table." (Carillo Tr. at 311:9–22; Blau Tr. at 220:4–10.) Plaintiff also alleges that, in response to the State Court Action, the Village tried to delay the QOP permit application and SEQRA process, and also sought to increase the Diocese's costs by making unreasonable requests for studies and testing, including, *inter alia*, "an analysis of the psychological impacts of cemeteries on persons who reside in the area of the cemetery and/or regularly must travel past cemetaries" and an expert study on the "impacts that existing cemeteries have had on property values." (Ex. 59 to Pl. Opp. at p. 20.) Finally, Plaintiff asserts that the alleged restrictive provisions of the Resolution, discussed *supra*, were a retaliatory response to Plaintiff's State Court Action.[40]

Although Defendants dispute Plaintiff's characterization and the weight of this evidence, the Court finds that Plaintiff has sufficiently demonstrated that there are materials facts in dispute upon which a jury might find a retaliatory motive by the Village based on the Diocese's pursuit of litigation in State and federal court over the Village's handling of the QOP permit application. In particular, the statement in the Village attorney's September 27, 2005 letter provides a link

---

[39] Carillo's and Blau's deposition testimony, however, was in response to questions about whether they felt, at the time of their depositions in 2013, that they would have done anything differently with regard to the Resolution. Notably, Carillo and Blau both stated that they stood by the Resolution. (Transcript testimony from Harvey Blau's' October 22, 2013 Deposition ("Blau Tr.") at 220:4–10; Transcript testimony from Fred Carillo's October 13, 2013 Deposition ("Carillo Tr.") at 311:9–22.) (Dkts. 140–186, 140–187.)

[40] This claim is somewhat tenuous given the seven years between the Diocese's victory in the State Court Action in 2002 and the Village's passage of the Resolution in 2009. Plaintiff, however, has a more compelling argument that the Resolution, passed on June 21, 2010, was in retaliation for the instant lawsuit, which was initiated seven months earlier, on November 30, 2009.

between the Diocese's victory in the State Court Action and the Village's decision to apply the POW Law to the QOP site, which, Plaintiff argues, was a reversal in the Village's position. In addition, the temporal nexus of seven months, coupled with the surrounding circumstances, *e.g.*, the length and expense of the QOP permitting process and the extensive restrictions in the Resolution, which seemingly go beyond the POW Law's requirements and are arguably gratuitous (*see* discussion *infra* at pp. 26–28), could be viewed as supporting a finding of retaliatory motive on the Village's part. Accordingly, the Court denies summary judgment on Plaintiff's retaliation claim.[41]

### E. Plaintiff's Equal Protection Claim

Plaintiff alleges that it even if the POW Law is neutral, the Village nonetheless treated the Diocese in an intentionally discriminatory manner on the basis of religion. (Pl. Opp. at 40.) However, Plaintiff's Equal Protection claim merely recasts the same arguments it made when challenging the facial constitutionality of the POW Law, *i.e.*, alleging that the POW law was passed to intentionally discriminate against religious institutions versus secular ones. For largely the same reasons that the Court granted summary to Defendants on the facial constitutionality challenge, the Court grants summary judgment on Plaintiff's Equal Protection claim.

The Fourteenth Amendment states in pertinent part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1.

---

[41] Because of the Court's decision regarding the existence of disputed material facts regarding Defendants' animus towards Plaintiff's First Amendment protected actions, *see supra* (Section III.D.), the Court finds that Plaintiff's as-applied challenge to the POW Law also survives. *See Almengor v. Schmidt*, 692 F. Supp. 2d 396, 397 (S.D.N.Y. Mar. 11, 2010) *aff'd sub nom. Schain v. Schmidt*, 396 F. App'x 713 (2d Cir. 2010) ("The essence of an 'as applied' challenge . . . is a claim that the manner in which a statute or regulation was applied to a plaintiff in particular circumstances violated the Constitution, as for example where a facially valid statute was applied to a plaintiff in a discriminatory fashion based on animus toward the plaintiff's First Amendment protected views or activities.").

The Court has generally recognized three types of equal protection violations: (1) a facially discriminatory law; (2) a facially neutral law that is enforced in a discriminatory manner; and (3) a facially neutral statute that is motivated by discriminatory animus and applied with a discriminatory effect. *See, e.g.*, *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999); *see also Lukumi*, 508 U.S. at 535.

As previously discussed, the POW Law is facially neutral, which eliminates the first type of Equal Protection claim listed above. The second type of Equal Protection claim, for selective enforcement, was eliminated during the motion to dismiss stage of this case.[42] (Dkt. 76 at 25–26.) Therefore, the sole remaining Equal Protection claim requires the Diocese to present evidence that the POW Law, though facially neutral, was adopted with a discriminatory intent and was applied to the Diocese in an intentionally discriminatory manner.

To establish an Equal Protection claim, claimants must prove purposeful discrimination by a government actor, directed at a suspect class, such as a racial group, or a religion. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 615

---

[42] An Equal Protection selective enforcement claim requires a showing that "(1) [the plaintiff was] 'treated differently from other similarly situated' [entities] and (2) this 'differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Butler v. City of Batavia*, 323 Fed. App'x. 21, 22 (2d Cir. 2009) (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007)). In deciding the motion to dismiss, Judge Hurley ruled that the Diocese's selective enforcement claim failed because the Diocese did not sufficiently plead that it was treated different from other "similarly situated" entities. (Dkt. 76 at 25.) Judge Hurley held that, "[T]he Diocese has utterly failed to articulate how the Queen of Peace cemetery project could be viewed by a reasonably prudent person as being roughly equivalent to the golf courses, polo grounds, and public gardens located within the Village." (*Id.* at 25–26.) Judge Hurley's "similarly situated" analysis is consistent with this Court's RLIUPA equal terms discussion, *supra*. The Court notes that Plaintiff does not contend that there was selective enforcement with respect to the Roman Catholic religion vis-à-vis other religions, nor does it make a selective enforcement argument on the basis of the Diocese's pursuit of the State Court Action and this federal lawsuit against Defendants.

(S.D.N.Y. Jan. 4, 2013). Plaintiff must demonstrate, by a preponderance of the evidence, that the alleged "discrimination was a substantial or motivating factor" for the government's action or decision. *See Hunter v. Underwood*, 471 U.S. 222, 225 (1985); *see also U.S. v. City of Yonkers*, 96 F.3d 600, 611–12 (2d Cir. 1996) (a plaintiff making an Equal Protection claim must show that an impermissible factor, such as race, was *"a* motivating factor" for the State's action) (quotation marks and citation omitted) (emphasis in original). The plaintiff, though, "need not show . . . that a government decisionmaker was motivated solely, primarily, or even predominantly by" improper concerns based on religion. *City of Yonkers*, 96 F.3d at 611–12. The Second Circuit also instructs that "[b]ecause discriminatory intent is rarely susceptible to direct proof, litigants may make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) (citation omitted).

Here, Plaintiff fails to present sufficient evidence upon which a jury could find that the Village's application of the POW Law was motivated by anti-religious intent. While the evidence discussed below may be pertinent to Plaintiff's "substantial burden" RLUIPA claim, it fails to demonstrate that the Village targeted the Diocese because of its plan to develop the Property for religious use.

In support of its assertion that the Village acted out of a discriminatory purpose, Plaintiff claims that from 2004 to 2005, Defendants continued to suggest that they might assess QOP favorably if it included a residential subdivision. (Pl. Opp. at 15.) Plaintiff alleges that, at the insistence of Defendant Carillo, the Diocese expended significant time and money to present a plan that limited QOP to 69 acres and included multiple residential tax lots, each of which would pay property tax. (*Id.*) However, Plaintiff claims that despite this concession, the Diocese continued to delay its assessment of the QOP permit application. (*Id.*) Defendants argue that the

Diocese proposed the residential subdivision on its own accord, and without any input from the Village. (Def. Reply[43] at 2.)

In addition, Plaintiff alleges that in 2004, Defendants suggested to the Diocese that if it made significant Payments In Lieu of Taxes ("PILOT payments")[44] to the Village, Defendants would accelerate the approval process for the QOP application. (ASC ¶¶ 94–95; Ex. 6 to ASC; Pl. Opp. at 15.) Plaintiff argues that when it refused to make PILOT payments, Defendants manipulated the SEQRA process to thwart the QOP project. (*Id.*) Defendants allege that PILOT payment agreements are "common and not evidence of discrimination." (Def. Reply at 3.) Further, Defendants contend that the Diocese's application was approved without the PILOT payments requirement, indicating that the lack of PILOT payments did not affect the Village's decision regarding the application. (Def. Mem. at 23.)

Plaintiff also argues, in support of its allegation of discriminatory motive, that the Village intentionally delayed the processing of the QOP permit application. For example, the Diocese submitted a DFEIS on July 1, 2009 for determination within the 45-day statutory requirement, which Defendant failed to do. (Def. 56.1 ¶ 166.) Instead, Plaintiff claims that after responding to the DFEIS past the deadline, it sought "new or redundant reports, and studies on completed studies", even though the FEIS was intended to end SEQRA information gathering. (Pl. Opp. at 21; Ex. 93 to Pl. Opp.) While Defendants concede that they did not respond to the DFEIS within

---

[43] Citations to "Def. Reply" refer to Defendants' Reply Memorandum to Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed 11/21/14. (Dkt. 146.)

[44] PILOT payments are federal payments to local governments that help offset losses in property taxes due to non-taxable federal lands within their boundaries. *See* DEPT. OF THE INTERIOR, PAYMENTS IN LIEU OF TAXES, *http://www.doi.gov//pilt/index.cfm* (last visited 6/23/15). QOP, as a religious corporation, is exempt from property taxes. (Pl. Opp. at 32, n.33.)

the statutorily mandated period,[45] they argue that their responses to the DFEIS, albeit untimely, were "exactly in line with state-issued, SEQRA guidance."[46]  (Def. Mem. at 24.)

Plaintiff also claims that the Village demonstrated discriminatory animus when it did not send the Diocese the August 13, 2008 FPC comments until after the Diocese had prepared the DFEIS.  Defendants allege that the August 2008 comments were not intentionally withheld, and once the Village realized that the August 2008 comments had not been given to the Diocese, the Village sent the comments to the Diocese and also advised the Diocese, in writing, that it agreed with the Diocese's claim that a majority of the comments raised in the August 2008 comments were already addressed in the DFEIS submitted on July 1, 2009.  (Def. Opp. at 26; Def. 56.1 ¶ 163.)  Defendants also claim that their delay did not impede the progress of the Diocese's application.  (Def. Opp. at 26.)

Plaintiff argues that the Village similarly discriminated against other religious use applications.  Bethel United Pentecostal Church ("Bethel") sought approval to construct a house of worship on 29 acres in the Village.  (Ex. 46 to Pl. Opp.)  The POW Law was applied, even

---

[45] The Resolution was adopted on June 21, 2010, nearly a year after the DFEIS was submitted by Plaintiff.  (Def. 56.1 ¶ 184.)

[46] Defendants cite to Chapter 5 of the SEQRA Handbook to support their argument that as the lead agency, they had the authority to revise or request substantive comments to the FEIS.  (Def. Mem. at 24.)  The relevant portion of Chapter 5 states:

> The lead agency is responsible for the adequacy and accuracy of the final EIS.  A project sponsor may be requested to respond to substantive comments to a DEIS. However, final acceptability is the responsibility of the lead agency.  Other involved and interested agencies may be consulted by the lead agency, and outside consultants may be utilized both by the project sponsor and lead agency, but this in no way reduces the responsibility of the lead agency for the final product.  The lead agency may revise any responses offered by the project sponsor.

(Ex. 52 to Def. Mem.)

though the project began in 1999, prior to the enactment of the POW Law.  (*Id.*)  Plaintiff also claims that Defendants encouraged Bethel to sell acreage for residential development.  (*Id.*)  In a letter sent from Bethel to the Mayor and the Village Board, dated August 30, 2006, Bethel claims that it entered into an agreement to make PILOT payments "after it was clear that it had no choice if it was going to obtain a use permit for a house of worship."  (Ex. 46 to Pl. Opp. at p. 2–3.)  Bethel also stated that it was subjected to a seven-year SEQRA process, due to many delays on behalf of the Village.[47]  (*Id.* at pp. 1–2.)

In 2000, Central Presbyterian Church ("CP") sought religious land use approval for a 21-acre property.  Defendants also applied the POW Law, including setbacks, building volume, and parking limitations, even though the project began prior to the enactment of the POW Law.  (Ex. 50 to Pl. Opp.)  Plaintiff claims that CP was subjected to an unfairly protracted SEQRA process, including requiring CP to conduct excessive and repetitive testing, and was charged excessive fees as part of the permitting process.  (Pl. Opp. at 42, n.48; Ex. 51 to Pl. Opp. at 54:23–55:3 (in a meeting with CP and the Board of Trustees, CP describes the application process as an "endless process"); Ex. 52 to Pl. Opp. at p. 2 ("[E]xtended review process…[and] constant repetition of Village's demand that [CP] accede to a reduction in the size of is facility . . . nothing more than a means for the Village to attempt to defeat this application by delay and imposition of expense.").

---

[47] According to a letter from Bethel to the Mayor and the Village Board, dated August 30, 2006, the hearing on the Bethel's application was postponed fourteen times either because the Village consultants had not completed review of Bethel's submissions, or the Village's consultants issued lengthy comments, after or just prior to the board meeting, which did not afford Bethel sufficient time to respond or revise the DEIS.  Bethel appeared before the Board fourteen times to present various aspects of its application.  (Ex. 46 to Pl. Opp. at pp. 1–2.)

While Plaintiff presents evidence that may bolster its "substantial burden" RLUIPA or retaliation claims, it fails to set forth sufficient evidence that upon which a jury could find *anti-religious* animus by the Village with respect to its adoption and application of the POW Law, its handling of the SEQRA process, or its enactment of the Resolution. Even though the Village may have specifically imposed restrictions on religious institutions, such as the Diocese, Bethel and CP, the evidence is still insufficient to support a finding that religion was *a substantial or motivating factor* for the Village's actions, especially given that the Village imposed the same, if not more burdensome, restrictions on non-religious uses, such as private schools, and residential, business, and industrial uses. Plaintiff also fails to cite to any direct evidence of anti-religious sentiment or motivation by Defendants. Plaintiff thus cannot demonstrate that the Village's actions arose from "impermissible bias, as opposed to, for example, strong opposition on principled grounds." *Fisher v. Vassar Coll.*, 70 F.3d 1420, 1442 (2d Cir. 1995). Accordingly, summary judgment is granted on Plaintiff's Equal Protection claim.[48]

### F.     Plaintiff's Claims Against Malatino

Plaintiff argues that beginning in April 2009, Michael Malatino, "who holds himself out as having police power within the Village," conducted one or more searches of the QOP site without a warrant or sufficient cause.[49] (ASC ¶ 100.) Plaintiff alleges that the Village Attorney

---

[48] It is unclear whether Plaintiff alleges a violation of RLUIPA's non-discrimination provision, which prohibits the government from treating a religion less favorably than other religions. Regardless, the Second Circuit has made clear that direct evidence of discriminatory intent is required to establish a RLUIPA non-discrimination claim, if a plaintiff cannot identify a religious comparator that was treated more favorably. *Chabad Lubavitc*, 768 F.3d at 199–200. The Diocese has not identified a religious comparator that the Village treated more favorably than the Diocese, nor has it offered direct evidence of discriminatory intent, as discussed earlier.

[49] As discussed *supra*, although not explicitly stated by the Plaintiff in the complaint, the Court assumes, based on the facts and circumstances, that Plaintiff is alleging a Section 1983 violation of the Diocese's Fourth Amendment rights.

admitted to a Diocese attorney that these searches were conducted, but then thought better of it and tried to deny and minimize this admission. (Pl. Opp. at 30–31.) According to Plaintiff, the factual dispute over whether the Village Attorney made this admission to the Diocese attorney is sufficient to preclude summary judgment with respect to Plaintiff's illegal search claim. (*Id.*)

Defendants deny that Malatino even entered the Property. According to Defendants, in April 2009, Richard Richot, the Village Historian, complained about the condition of a house on the Property known as the Hitchcock House, and requested that the Village conduct an inspection of the house. (Def. Mem. at 48–49.) Defendants claim that Malatino inspected the Hitchcock house from the street, while remaining in his car. (*Id.*; Malatino Tr.[50] at 36:2–7.) Defendants allege that Malatino again inspected the Hitchcock House in May 2009 because the Diocese was performing remedial work on it that had been requested by the Village. (Def. Mem. at 49.) However, Defendants assert that even though Malatino had the authority under the Village code to enter the Property to conduct the inspection, he never entered the Property because he was able to accomplish the inspection without doing so. (*Id.*)

The Court finds that there is a dispute of material fact about whether Malatino ever entered the Property and whether he had a warrant or sufficient cause to do so. Therefore, summary judgment is denied as to claims against Malatino regarding any allegedly warrantless search of the Property.

### G. Absolute and Qualified Immunity for the Trustees

Defendants argue that the claims against the Trustees should be dismissed under the

---

[50] Citations to "Malatino Tr." refer to the transcript from Michael Malatino's August 13, 2013 deposition. (Dkt. 148–118.)

doctrines of absolute[51] and qualified immunity.  (Def. Mem. at 45.)

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "Because the defense of qualified immunity is designed to relieve government officials of the burdens of litigation as well as of the threat of damages, summary judgment is encouraged as a device for disposing of claims barred by qualified immunity."  *Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). Concluding that a defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts.  *Id.*; *Taravella v. Town of Wolcott*, 599 F.3d 129, 134–35 (2d Cir. 2010).

The initial inquiry as to whether qualified immunity applies is to determine if plaintiff can show that the accused official violated a constitutional right.  *Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006) (citation omitted).  If no such right was violated, the inquiry proceeds no further, and the plaintiff's claim fails.  *Id.*  Since the jury will decide any remaining claims regarding Defendants' alleged violation of Plaintiff's constitutional rights, the qualified immunity issue cannot be decided until after the jury decides this threshold issue.  *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (when material facts pertaining to immunity are in dispute, the appropriate procedure is to allow the jury to resolve any disputed facts that are material to the qualified immunity issue, so that the court may make the "ultimate determination

---

[51] Legislators, including local legislators, "are entitled to absolute immunity from civil liability for their legislative activities."  *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 210 (2d Cir. 2003).  Judge Hurley previously ruled that "the individual defendants other than [Malatino] are entitled to absolute immunity with respect to plaintiff's claims regarding the enactment of the POW Law, but are not entitled to absolute immunity with respect to the adoption of the Resolution."  *Roman Catholic Diocese of Rockville Ctr.*, 2012 WL 1392365, at *16.

of whether the officer's conduct was objectively reasonable. . . .").

### H.    Plaintiff's RLUIPA Claims for Money Damages Against the Trustees

Plaintiff seeks monetary damages against the Trustees pursuant to RLUIPA.  (Def. Opp. at 47–48.)

Courts are divided on the issue of whether the "appropriate relief" available under RLUIPA extends to monetary damages.  *Compare Madison v. Commonwealth of Virginia,* 474 F.3d 118, 131–32 (4th Cir. 2006) (monetary damages are not available under RLUIPA); *Bock v. Gold*, No. 5 Civ. 151, 2008 WL 345890, at *6 (D. Vt. Feb. 7, 2008) ("RLUIPA does not create a claim for monetary damages against the defendants in their official capacities.") *with Hankins v. NYS Dep't of Corr. Servs.*, No. 07 Civ. 0408 , 2008 WL 2019655, at *7 (N.D.N.Y.  Mar. 10, 2008) ("It appears that, after the enactment of RLUIPA in 2000, states could accept federal funds . . . only on the condition that they comply with RLUIPA, which effectively constituted a waiver of their sovereign immunity under the Eleventh Amendment."). Courts within this Circuit have found that "the term 'appropriate relief against a government' makes no mention of compensatory or other damages, and thus is insufficient to provide the unambiguous waiver necessary for a finding that New York, by accepting federal funds, waives its right to sovereign immunity on claims for money damages under RLUIPA."  *Pugh v. Goord*, 571 F. Supp. 2d 477, 509 (S.D.N.Y. Jul. 31, 2008).   The Court adopts this reasoning, and accordingly dismisses Plaintiff's claims for monetary damages against the Trustees that are based on RLUIPA.

*CONCLUSION*

For the reasons set forth above, the Court finds that the POW Law is facially constitutional and therefore denies Plaintiff's motion for summary judgment, and grants Defendants' motion for summary judgment on this claim.  The Court otherwise grants, in part, and denies, in part, Defendant's motion for summary judgment.  The five claims that will

proceed to trial are Plaintiff's: (1) RLUIPA substantial burden claim, (2) as-applied constitutional challenge to the POW Law, (3) First Amendment free exercise of religion claim, (4) Section 1983 retaliation claim, and (5) Section 1983 unlawful search claim against Defendant Malatino.  The parties shall file their Joint Pretrial Order on October 5, 2015.

SO ORDERED:

_____/s/ Pamela K. Chen_____
PAMELA K. CHEN
United States District Judge

Dated: September 3, 2015
        Brooklyn, New York